UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                    :

UNITED STATES OF AMERICA,         :

                Plaintiff,     :      No. 10 Crim. 1205 (PAC)

                                  :

        v.                      :

LOUIS TOMASETTA and EUGENE HOVANEC,    :

                Defendants.    :

------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON ALL COUNTS

**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS & LINCENBERG, P.C.**
Gary S. Lincenberg (admitted *pro hac vice*)
Peter J. Shakow (admitted *pro hac vice*)
1875 Century Park East, 23rd Floor
Los Angeles, California  90067
310.201.2100

**CLAYMAN & ROSENBERG**
Charles Clayman
Isabelle Kirshner
305 Madison Avenue
New York, New York  10165
212.922.1080

*Attorneys for Defendant Eugene Hovanec*

**MORRISON & FOERSTER** LLP
Dan Marmalefsky (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California  90013-1024
213.892.5200

Lawrence Gerschwer
Katie L. Viggiani
1290 Avenue of the Americas
New York, New York 10104-0050
212.468.8000

*Attorneys for Defendant Louis Tomasetta*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     DEFENDANTS ARE ENTITLED TO JUDGMENT OF ACQUITTAL ON ALL
        COUNTS FOR LACK OF VENUE IN THE SOUTHERN DISTRICT ......................... 3

        A.      Legal Standard ................................................................................ 3

        B.      Conspiracy (Count One) ................................................................. 4

        C.      The Substantive Counts (Counts Two Through Seven) ........................ 8

                1.      Venue cannot be based on dinners that occurred outside the statute
                        of limitations ....................................................................... 8

                2.      Securities Fraud (Count Two)................................................... 9

                        a.      The acts constituting the alleged securities fraud violations
                                all took place in Southern California ........................... 10

                        b.      The Nu Horizons dinners were, at most, preparatory acts........... 11

                3.      False Entries in Books and Records of an Issuer of Securities
                        (Count Three)...................................................................... 15

                4.      False Filings with the SEC (Counts Four and Five) ................. 16

                5.      False Certification of Financial Reports (Count Six) ............... 17

                6.      False Statements to Auditors (Count Seven) .......................... 17

III.    COUNT ONE MUST BE DISMISSED BECAUSE NO EVIDENCE OF A
        SINGLE OVERARCHING SCHEME WAS ADDUCED AT TRIAL ........................ 18

IV.     COUNTS TWO, FOUR, AND FIVE SHOULD BE DISMISSED BECAUSE
        THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE
        DOUBT THAT ANY ALLEGEDLY FALSE STATEMENT WAS MATERIAL ....... 20

V.      COUNTS TWO AND FOUR THROUGH SEVEN MUST BE DISMISSED AS
        AGAINST DR. TOMASETTA FOR LACK OF EVIDENCE OF INTENT ................. 24

VI.     COUNTS ONE THROUGH FIVE MUST BE DISMISSED AS AGAINST MR.
        HOVANEC FOR INSUFFICIENCY OF THE EVIDENCE ......................................... 27

VII.    CONCLUSION................................................................................................ 30

la-1169266

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................20

*United States v. Aracri*,
    968 F.2d 1512 (2d Cir. 1992)...........................................18, 19

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989)....................................3, 4, 8, 13

*United States v. Bozza*,
    265 F.2d 206 (2d Cir. 1966)...............................................13

*United States v. Brennan*,
    183 F.3d 139 (2d Cir. 1999)........................................3, 4, 11

*United States v. Cabrales*,
    524 U.S. 1 (1998)..................................................................3

*United States v. Crop Growers Corp.*,
    954 F. Supp. 335 (D.D.C. 1997).....................................15, 17

*United States v. Dixon*,
    536 F.2d 1388 (2d Cir. 1976)............................................24

*United States v. Geibel*,
    369 F.3d 682 (2d Cir. 2004)......................................9, 11, 12

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)...............................................26

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010) ...................................22, 23 & n.9

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006).................................................3

*United States v. Peltz*,
    433 F.2d 48 (2d Cir. 1970).................................................24

*United States v. Ramirez*,
    420 F.3d 134 (2d Cir. 2005)....................................3, 4, 8, 11, 12

la-1169266

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008)..............................................................................14, 15

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003).....................................................................................15

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011)............................................................................ *passim*

*United States v. Wilson*,
    No. 01 Cr. 53 (DLC), 2001 WL 798018 (S.D.N.Y. July 13, 2001)................................ *passim*

### STATUTES, REGULATIONS, AND RULES

15 U.S.C.
    § 78aa ..........................................................................................................9
    § 78ff ......................................................................................9, 15, 16, 17
    § 78ff(a) .....................................................................................................24
    § 78j(b)........................................................................................................9
    § 78m(a).....................................................................................................16
    § 78m(b)(2)................................................................................................15
    § 78m(b)(5)................................................................................................15

17 C.F.R.
    § 240.13a-1 ...............................................................................................16
    § 240.13b2-1 .............................................................................................15
    § 240.13b2-2 .............................................................................................17

18 U.S.C.
    § 2.................................................................................................15, 16, 17
    § 1350.........................................................................................................17

Fed. R. Crim. P. 18 .................................................................................................3

### OTHER AUTHORITIES

U.S. Const. amend. VI .............................................................................................3

la-1169266

## I.      INTRODUCTION

Following a five-week trial, the Government failed to establish necessary elements of all of the counts in the Indictment.  For this reason, the jury deadlocked on all counts, and deadlocked in favor of acquittal on six of the seven counts.[1]  Because of the absolute failure of proof, the Court should grant a judgment of acquittal on all counts for both Defendants.

*First*, the Government did not establish proper venue for any of the counts.  The Government elicited no evidence that either Defendant committed any of the crimes charged in the Southern District of New York.  In fact, the testimony and documentary evidence offered by the Government at trial established that *none* of the alleged acts of wrongdoing took place in this district.  With respect to Counts Two through Seven, the Government introduced absolutely no evidence of any act constituting the crime that took place in the Southern District of New York within the statutory time period.  With respect to Count One, the Government failed to establish that any act in furtherance of the alleged conspiracy took place here.  Absence of venue is a matter of constitutional import, and compels dismissal.

*Second*, the conspiracy count (Count One) fails as a matter of law because the Government offered no evidence of any link between the alleged revenue recognition fraud and the alleged option backdating fraud.  In failing to establish this critical link, the Government failed to prove the single overarching conspiracy charged in the Indictment.  For this independent reason, Count One also must be dismissed.

*Third*, the Government failed to present sufficient evidence from which any rational juror could have concluded that any alleged misstatement or omission from Vitesse's SEC filings was

---

[1]      The jury deadlocked despite some general anti-corporate and anti-Wall Street sentiment that was unrelated to the evidence and that should have had no place in the deliberations, but was expressed by some of the jurors in this case.

la-1169266

material.  While the Government argued that various of Vitesse's disclosures were inaccurate, it did not introduce any testimony from which a jury could have concluded that Vitesse's reported financial figures would have been materially different but for the alleged misstatements or omissions.  This fatal flaw provides a further, independent basis for granting judgment of acquittal on those Counts for which materiality is an element of the offense — Counts Two, Four and Five.

*Fourth*, Counts Two and Four through Seven must be dismissed because the Government elicited no evidence that Dr. Tomasetta read, much less discussed or understood, any of the accounting disclosures alleged to have been false in Vitesse's 2005 and 2006 SEC filings when he signed and certified those filings, or when signing the technical management representation letter to KPMG.  Indeed, the evidence at trial squarely established that individuals in Vitesse's finance department wrote these particular documents and gave them to Dr. Tomasetta to sign, but never discussed their contents with Dr. Tomasetta.  Thus, the Government has not, as a matter of law, established beyond a reasonable doubt that Dr. Tomasetta acted knowingly — much less willfully — when he made the allegedly false statements described in Counts Two and Four through Seven.  For this additional and independently sufficient reason, Counts Two and Four through Seven must be dismissed.

*Finally*, the Court should dismiss all counts against Mr. Hovanec for insufficiency of evidence.  The evidence left no reasonable dispute that Mr. Hovanec did not prepare the books and records or financial statements.  Indeed, Counts Four and Five involved financial statements during a time period when Mr. Hovanec was no longer the CFO.  There was no evidence that Mr. Hovanec signed, reviewed, consulted on, or had any role whatsoever in the preparation of

the financial disclosures in these financial statements.  Nor was there evidence that Mr. Hovanec

even had any knowledge of what was disclosed in these financial statements.

## II.    DEFENDANTS ARE ENTITLED TO JUDGMENT OF ACQUITTAL ON ALL COUNTS FOR LACK OF VENUE IN THE SOUTHERN DISTRICT

### A.    Legal Standard

The Sixth Amendment guarantees criminal defendants the right to be tried in "the state

and district wherein the crime shall have been committed."  U.S. Const. amend. VI; *see also* 15

U.S.C. § 78aa.  This mandate — that crimes be prosecuted where committed — is a bedrock

constitutional principle.  *United States v. Cabrales*, 524 U.S. 1, 6 & n.1 (1998); *see also United*

*States v. Novak*, 443 F.3d 150, 161 (2d Cir. 2006) (noting "constitutional underpinning and

importance of proper venue" and reversing conviction due to improper venue) (internal quotation

marks and citation omitted).  This mandate is also embodied in Federal Rule of Criminal

Procedure 18, which provides, "[u]nless a statute or these rules permit otherwise, the government

*must* prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18

(emphasis added); *accord United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005).

Where multiple offenses are alleged, "venue must be proper with respect to each count."

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).  "The burden is

on the government to prove that the crime was committed in the district in which the prosecution

is brought."  *Id.*; *accord United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).

In order to determine whether the government has met its burden, courts must "'initially

identify the conduct constituting [each] offense' and then 'discern the location of the commission

of the criminal acts.'"  *Ramirez*, 420 F.3d at 138 (quoting *United States v. Rodriguez-Moreno*,

526 U.S. 275, 279 (1999)); *United States v. Brennan*, 183 F.3d 139, 144 (2d Cir. 1999) ("to

determine whether prosecution was proper in the Eastern District, we therefore must ascertain where the crimes with which [the defendants] were charged were committed").

"Venue is proper only where the acts constituting the offense — the crime's 'essential conduct elements' — took place." *Tzolov*, 642 F.3d at 318.  Therefore, "[a] prosecution may only occur . . . in a district 'in which *an act occurs that the statute at issue proscribes.*'"  *United States v. Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018, at *4 (S.D.N.Y. July 13, 2001) (emphasis added) (quoting *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999)).

In contrast, venue will not be proper "in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Beech-Nut*, 871 F.2d at 1190; *Tzolov*, 642 F.3d at 319 ("preparatory acts . . . were not acts 'constituting' the violation" for purposes of venue).  This is the case even where the government alleges the substantive offense was continuing in nature, such as in a conspiracy charge.  *Ramirez*, 420 F.3d at 141 ("'[w]hether the crime be continuing or noncontinuing' . . . 'venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense'") (quoting *Beech-Nut*, 871 F.2d at 1190).

## B.    Conspiracy (Count One)

Defendants are charged in Count One of the Indictment with conspiring to make false disclosures in Vitesse's public financial reports about the Company's revenue recognition and stock option granting practices.  In addition to the other elements of conspiracy, the Court instructed the jury that the Government must prove by a preponderance of the evidence that an act in furtherance of the conspiracy occurred in the Southern District of New York ("SDNY"). (Jury Charge at 48.)  This act need not have occurred within the limitations period, but must have occurred during the life of the alleged conspiracy.  *Id.*

-4-

The Government did not contend, or introduce any evidence at trial, that any acts relating to stock options occurred in New York.  Instead, it asserted that venue is proper in the SDNY with respect to the conspiracy count because Mr. Hovanec and Dr. Tomasetta attended relationship-building dinners with certain executives of Nu Horizons at San Pietro's restaurant in Manhattan, and that these dinners somehow furthered the revenue recognition aspects of the scheme.  As the Government acknowledged in closing argument, these dinners are the *only* purported bases for venue.  (*See* RT 3012 (Closing statement by Ms. Goldstein:  "You're also going to be asked to find acts that took place in the Southern District of New York, and in this case New York City.  And for that, you can look at all the dinner meetings held in New York City by the top executives of Nu Horizons and Vitesse…"); *see also* RT 3253 (Mr. O'Donnell, in rebuttal, declared that with respect to evidence of venue, "yes, it's those dinner meetings at the San Pietro in Manhattan, Mr. Hovanec's favorite restaurant").)

As evidence of these dinners, the Government offered the testimony of David Bowers, a former Nu Horizons executive, and two summary exhibits, drawn from Dr. Tomasetta and Mr. Hovanec's expense reports, that identify the dates of various Vitesse-Nu Horizons dinners (GX 1325-A and 1325-B, attached hereto as Exhibit A.)  None of Bowers' testimony established that the dinners furthered any goal of the alleged conspiracy.  The Government alleged that the Defendants conspired to make false disclosures in Vitesse's public financial statements regarding its revenue recognition practices.  Even when viewed in the light most favorable to the Government, the evidence produced at trial is insufficient to establish that any of the San Pietro dinners constitutes an act in furtherance of this alleged conspiracy.

Bowers' testimony about the San Pietro dinners was far too general and imprecise to permit any conclusion that the dinners furthered any conspiracy, much less a conspiracy to

submit false financial statements.  First, to the extent he recalled anything about them, Bowers'

testimony was that the dinners were primarily social in nature.  (*See, e.g.*, RT 1473-74, 1500,

1609.)  Second, he acknowledged having only a "vague" recollection of dinners that took place

as many as ten years ago (RT 1604), and was repeatedly mistaken about basic facts like who

attended and where the dinners were held.  (*Compare, e.g.*, RT 1411 (Bowers testifies that

quarterly dinners were typically held at San Pietro's every quarter) with GX 1325-A and -B

(reflecting that only 8 entries out of 30 Vitesse-Nu Horizons dinners took place at San Pietro's);

*see also* RT 1490-91 (Bowers testified incorrectly that a March 2005 dinner with spouses

included lower-level staff such as Adam Wisniewski); RT 1452 and 1459-61 (Bowers testified

about dinners in March and June 2004, but GX 1325-A and -B show no dinners in either of those

months).)  For two dinners, Bowers provided no testimony whatsoever about what was

discussed.  (*See* RT 1490 (March 2005 dinner) and RT 1497-98 (June 2005 dinner).)  With

respect to a third, which purportedly took place in March 2002, ten years before his testimony in

this trial, Bowers' testimony focused on a "$3 for $2" deal that was never actually implemented.[2]

The final dinner about which Bowers testified was another mostly social dinner in September

2005.  The entirety of his testimony regarding that dinner was that it involved the following:

> Typical social discussion, a lot of it, and then business overview of
> the two companies, how we were each doing, and then discussion
> about cash for the quarter and what they were looking for.  The
> stocking package had pretty well been resolved by that point.

(RT 1500.)

---

[2]      *See* RT 1606:  "Q:  Do you recall whether that [$3 for $2] arrangement ever did
come to fruition?  A:  I don't recall that it did, in fact."  Also, though Bowers testified that the
dinner took place at San Pietro's, there is no substantiation in the record of that (GX 1325-A and
B only go back to 2003).

This testimony tells us only that — in the midst of a largely social occasion — executives from Vitesse and Nu Horizons had a brief general discussion about business. This is hardly unusual, given that Nu Horizons bought more than $550 million worth of product from Vitesse between September 2001 and April 2006. The Government has never alleged that the entire Vitesse-Nu Horizons relationship was fraudulent. In fact, as the Court will recall, Government counsel went to great lengths to seek to exclude evidence relating to nearly two-thirds of Vitesse's sales to Nu Horizons as "irrelevant" to the prosecution. (RT 1720 (At sidebar during testimony by Mr. Milazzo, Ms. Goldstein argued that "it's actually irrelevant what percentage of total sales Vitesse had with Nu Horizons because our case is focused on what Vitesse did with these quarterly stocking packages. It has nothing to do with the total size of the relationship").) If, as the Government has acknowledged, the business relationship itself was appropriate (even if it alleges there were some problematic aspects), the Government cannot simply point to any business-related discussion and assert that that discussion was in furtherance of the conspiracy.

Even more obviously, the brief and generalized testimony about what was discussed fails to establish that any of it was related to the alleged scheme. Even reading Bowers' testimony in the light most favorable to the Government, one cannot simply assume, for instance, that a "business overview" discussion furthered Defendants' alleged scheme to falsify disclosures about internal accounting decisions. Even if the executives did discuss cash payments, multiple government witnesses including Richard Riker testified that such a practice was normal and proper. (*See, e.g.*, RT 248 (Riker on direct: "Q: And what significance, if any, was there to Vitesse of receiving a cash payment on or before that date? A: Getting cash in any time is a good time").) Moreover, there is no evidence that any payments were actually made at these

dinners, or even that any payments were agreed to.[3]  Instead, the evidence suggests — at best — an informal and generalized discussion about a perfectly legal business transaction.  Without more, Bowers' testimony cannot be assumed to be linked to the alleged conspiracy.  The same is true for returns.  Even Mr. Mody, the Government's main cooperating witness, testified that there was nothing improper about taking returns.  He emphasized the point that we are emphasizing here: that any wrongdoing occurs only if a credit is not taken on the books back in California.  (RT 2222 ("Q:  And you didn't see anything wrong with taking the returns whether or not there was a side agreement with Cisco requiring the returns to be taken, did you? A:  Well, there's nothing wrong in taking the return provided you offer a credit").)  Neither Bowers nor any other witness testified to any discussions at San Pietro's about how returns were being booked in California at Vitesse.  At most, the dinner discussions in Manhattan were *preparatory* acts to the wrongdoing allegedly being committed in California; such acts are legally insufficient to establish venue.  *Ramirez*, 420 F.3d at 141; *Beech-Nut*, 871 F.2d at 1190.

Because the Government has not proven that any of these dinners — or any other event occurring in the SDNY — constituted an act in furtherance of the alleged conspiracy, Count One should be dismissed for lack of venue.

### C.    The Substantive Counts (Counts Two Through Seven)

#### 1.    Venue cannot be based on dinners that occurred outside the statute of limitations

The Court gave the following instructions on venue:

> Also, with venue, in addition to the elements I've just described for
> you, you must decide separately with respect to each count the
> issue of venue.  For the conspiracy charged only in Count One, you

---

[3]    In fact, most of the discussion regarding cash payments appears to have taken place via email. (*See, e.g.,* RT 1510-11 and GX 887.)

> must decide whether any act in furtherance of the conspiracy charged occurred within the Southern District of New York.  And the Southern District of New York includes Manhattan and the Bronx.  Queens, Brooklyn, Nassau, and Suffolk are in the Eastern District of New York, not the Southern District.  For the conspiracy charge only, the overt acts in support of venue need not have occurred during the statute of limitations.

(RT 3348-49.)

> With respect to venue, I can clarify it to this extent:  For Counts Two through Seven, the government must prove that the act or transaction constituting the offense occurred in the Southern District of New York on or after December 7, 2005.

(RT 3410.)  The Government has conceded that its only bases for venue in the SDNY — to the extent it argued any basis at all — were the San Pietro dinners.  It is uncontested, however, that none of these dinners took place after December 7, 2005.  (*See* Exhibit A (GX 1325-A and 1325-B).)  Therefore, as a matter of law, Counts Two through Seven must be dismissed because of the statute of limitations.

For the independent reasons set forth below, each of these Counts must be dismissed because no act or transaction constituting the offense occurred — at any time — in Manhattan.

## 2.     Securities Fraud (Count Two)

Count Two charges Defendants with securities fraud under 15 U.S.C. §§ 78j(b) and 78ff. Securities fraud has its own specific venue provision, and limits venue in criminal cases to "the district wherein any ***act or transaction constituting the violation* occurred**."  15 U.S.C. §78aa (emphasis added); *Tzolov*, 642 F.3d at 318; *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004).  Thus, in order for Count Two to be properly brought in the SDNY, the acts constituting "the substantive securities fraud offense" must have taken place in this district.  *Tzolov*, 642 F.3d at 319.  They did not.

a.     The acts constituting the alleged securities fraud
violations all took place in Southern California

The Government's theory of the case was that Defendants committed securities fraud by

making false disclosures to Vitesse's investors.  Specifically, the Government steadfastly insisted

that disclosures in Vitesse's SEC filings misstated Vitesse's actual accounting policies and true

financial condition.

For example, in the Government's motion to preclude Defendants' experts from

testifying at trial, the Government told the Court, "the Government charged the defendants with

lying to investors about how Vitesse recognized revenue, not with violating GAAP regarding

revenue recognition," and later emphasized, "the defendants are charged with misleading the

investing public with material misstatements, and not with violating any provision of GAAP."

(Docket No. 55, Mot. to Preclude at 18-19.)  The Government again emphasized in its reply

brief, "the Indictment alleges that the defendants made and caused to be made material

misrepresentations concerning the way the company counted certain of its sales revenue to a

major distributor."  (Docket No. 62, Reply at 6.)  Following the Government's presentation of its

case-in-chief, the Government conceded that "[t]he gist of all the counts are that the defendants

made false and misleading representations about the company's financial performance," and

further conceded that any deals that the Defendants allegedly reached with Nu Horizons were

mere "background" to the allegedly false disclosures.  (RT 2833.)

None of the alleged conduct constituting the substantive count of securities fraud took

place in this district.  Indeed, the Government adduced no evidence at trial that any of the

allegedly false statements to investors that provide the basis for the securities fraud count were

made within the SDNY.  Rather, the Government's evidence demonstrated that all of the

statements made by Defendants that the Government alleges were false — whether in the form

-10-

of securities filings, investor calls, or earnings releases — were made at Vitesse's headquarters in

Southern California.  Thus, venue is not proper in this district.  *Tzolov*, 642 F.3d at 318;

*Brennan*, 183 F.3d at 144.

> **b.      The Nu Horizons dinners were, at most,
> preparatory acts**

During closing argument, the Government conceded that it had a single basis for venue

for the securities fraud count: the periodic dinners described above that Mr. Hovanec (and, on

occasion, Dr. Tomasetta) attended with representatives of Nu Horizons, at which the parties are

purported to have discussed Nu Horizons' future orders of Vitesse's products.  (RT 3012.)

These are the dinners that the Government characterized as "background" to the allegedly false

disclosures.  (RT 2833.)

The Government's theory is that the dinners led to product sales from Vitesse to Nu

Horizons, and that Vitesse subsequently misstated its method of recognizing the revenues and

accounting for returns in connection with these (and other) product sales in its public disclosures.

However, the alleged misstatements in the public disclosures are what constitute the alleged

securities fraud violations; the dinner discussions were, at most, mere "preparatory acts" to the

allegedly false disclosures that followed.  It is well-established in the Second Circuit that

"preparatory acts" such as these dinners are insufficient to establish venue.  *See, e.g.*, *Tzolov*, 642

F.3d at 319 ("[w]e have cautioned that 'venue is not proper in a district in which the only acts

performed by the defendant were preparatory to the offense and not part of the offense'")

(quoting *Beech-Nut*, 871 F.2d at 1190); *Ramirez*, 420 F.2d at 141.

For example, the Second Circuit found venue in the SDNY to be improper in *United

States v. Geibel*, an insider trading case involving defendants who resided outside of the district.

369 F.3d 682 (2d Cir. 2004).  In that case, the defendants were tippees who obtained information

-11-

that had been misappropriated from the SDNY. *Id.* at 697. The majority of the securities fraud counts charged in the indictment there related to unlawful trades that took place outside of New York. Given that these counts' "essential conduct elements" took place outside of the district, the Second Circuit held that venue for these counts was improper. *Id.* Although the misappropriation of information from the SDNY facilitated the unlawful trading, the misappropriation did not confer venue because it was a preparatory act and thus, "anterior and remote" to the charged offenses. *Id.* The Second Circuit noted that to hold otherwise "would be to in effect grant the Southern District of New York carte blanche on venue in virtually all insider trading cases." *Id.*

Another illustrative example is provided by the Second Circuit's decision in *United States v. Ramirez*, a case involving visa fraud. 420 F.3d 134. In *Ramirez,* the visa fraud count was premised upon the defendant's submission of fraudulent Form I-129 petitions to the INS office located in Vermont. *Id.* at 140-141. Prior to these submissions, however, the defendant had taken steps to assemble the petitions in Manhattan, including by obtaining approvals from the Manhattan office of the Department of Labor. *Id.* The Second Circuit determined that venue on the visa fraud counts was not proper in the SDNY, notwithstanding the acts that had occurred there, because all such acts were "preparatory" and did not constitute the charged offense itself. *Id.* at 141. The Court of Appeals reasoned, "[the defendant] was not charged in connection with *assembling* the forms prior to the[] submission" of the fraudulent petition, but instead was charged with "knowingly *presenting* a fraudulent Form I-129 Petition . . . and attachments to the Vermont INS." *Id.* (emphasis added). Filing the false forms with the Manhattan office of the Department of Labor was merely "'a condition precedent'" and in "preparation for" the charged offense, and "consequently, was not part of the offense." *Ramirez*, 420 F.3d at 142.

The Court in *Ramirez* cited to the Second Circuit's earlier opinion in *Beech-Nut*, in which Beech-Nut executives were charged with the crime of "'put[ting] into the stream of interstate commerce adulterated or misbranded' food." *Beech-Nut*, 871 F.2d at 1189 (alteration in original).  In *Beech-Nut*, the Government sought to establish venue in the Eastern District of New York through Beech-Nut executives' telephone calls and order confirmations to a supplier located there.  *Id.* at 1189-90.  The Second Circuit found this an insufficient basis for venue because the telephone calls and order confirmations were merely "preparatory to the offense and not part of the offense."  *Id.* at 1190.  The Second Circuit explained that "[t]he mailings and telephone calls into the Eastern District, relied on by the government, were orders for concentrate that would later be used in Beech-Nut's fabrication of apple juice and thus were merely preparatory to the eventual introduction of the juice into commerce," which constituted the essential conduct element of the crime.  *Id.* at 1190-91; *see also United States v. Bozza*, 365 F.2d 206, 220-221 (2d Cir. 1966) (where crime charged was receipt of stolen goods, venue in Eastern District of New York not established where defendant made and received calls there to negotiate the price of the stolen goods, but actually received the stolen goods outside of the district).

Most recently, in *United States v. Tzolov*, 642 F.3d 314, the defendant was tried and convicted in the Eastern District of New York of securities fraud for making false statements to investors regarding the nature of the auction rate securities that the defendant had purchased on their behalf.  The defendant's office was located in the SDNY, but he traveled through the Eastern District of New York (via JFK Airport) to attend meetings with his overseas investors.  The defendant appealed his securities fraud conviction and argued that venue in the Eastern District was improper because his travel through JFK did not constitute a part of the substantive securities fraud offense with which he was charged.  The government opposed, and — much as

-13-

the Government has argued in the present case with respect to the Nu Horizons dinners —

argued that venue was proper because the flights were "an important part of furthering the

[fraudulent] scheme." *Id.* at 318 (internal quotation marks and citation omitted).

The Second Circuit soundly rejected the Government's argument, and held that the

defendant's travel through the Eastern District of New York to go to investor meetings was not

sufficient to establish venue for the securities fraud count, because the travel was a mere

"preparatory act." *Id.* The Court of Appeals noted, "[w]e have little difficulty concluding that

the government failed to offer competent proof that any 'act or transaction *constituting* the

[securities fraud] violation occurred' in the Eastern District." *Id.* (emphasis in original) (quoting

15 U.S.C. § 78aa). The Second Circuit noted that "[a]ll the fraudulent statements that were part

of the government's proof . . . were made in telephone calls or emails from Credit Suisse's

Madison Avenue offices located in the Southern District or in meetings with investors. None of

this activity occurred in the Eastern District." *Id.* at 318-319. The Court of Appeals continued:

> Nor did Butler commit securities fraud by boarding a plane in the
> Eastern District. At most, catching flights from the Eastern
> District to meetings where Butler made fraudulent statements were
> preparatory acts. They were not acts 'constituting' the violation.
> We have cautioned that venue is not proper in a district in which
> the only acts performed by the defendant were preparatory to the
> offense and not part of the offense. . . . That is all we have here.
> In other words, going to Kennedy airport and boarding flights to
> meetings with investors were not a constitutive part of the
> substantive securities fraud offense with which Butler was
> charged.

*Id.* at 319 (internal quotations omitted). Having determined venue was improper, the Second

Circuit vacated the conviction.

By contrast, the Second Circuit has upheld venue for securities fraud *only* where the acts

constituting the substantive count actually occurred within the district. Thus, in *United States v.*

*Royer*, a case involving insider trading and market manipulation, venue in the Eastern District of

New York was appropriate because defendants provided misappropriated information to seven individuals who resided and traded on this information in the Eastern District.  549 F.3d 886, 894-95 (2d Cir. 2008).  Similarly, in *United States v. Svoboda*, the fraudulent trades that constituted the securities fraud occurred within the district in which the prosecution was brought. 347 F.3d 471, 482-84 (2d Cir. 2003).  In both cases, the conduct was "part of" the offense, not merely "preparatory" or "anterior" to it.

As none of the alleged conduct constituting the substantive count of securities fraud took place in this district, Count Two must be dismissed.

### 3.   False Entries in Books and Records of an Issuer of Securities (Count Three)

Count Three of the Indictment charges both Defendants with willfully and knowingly falsifying and causing to be falsified the books, records, and accounts of Vitesse in violation of 15 U.S.C. §§ 78m(b)(2), 78m (b)(5), 78ff, 17 C.F.R. § 240.13b2-1, and 18 U.S.C. § 2.  These statutes "require publicly held corporations to keep accurate records and accounts."  *Wilson*, 2001 WL 798018, at *6.  Thus, any violations of these statutes "occur at the time the records are made or kept."  *Id.*; *see also United States v. Crop Growers Corp.*, 954 F. Supp. 335, 352 (D.D.C. 1997) ("The key language of the statute defines the violation as the falsification of books and records" and "violations of these statutory provisions are committed at the time the records are made or kept.").

All of the evidence offered by the Government shows that Vitesse maintained its books, records, and accounts in Southern California.  No testimony or documentary evidence was offered to establish that Vitesse maintained its books, records or accounts in the SDNY, or that any allegedly false entries in Vitesse's books, records and accounts were made in the SDNY. Indeed, during closing argument, the Government did not argue that *any* evidence established

venue with respect to Count Three.  (*See* RT 3012.)  As the essential conduct elements of Count

Three did not occur in this district, Count Three must be dismissed.[4]

### 4.      False Filings with the SEC (Counts Four and Five)

Counts Four and Five of the Indictment charge both Defendants with willfully and

knowingly making false statements in Vitesse's Form 10-K for the fiscal year ending

September 30, 2005 (Count 4) and in Vitesse's Form 10-Q for the fiscal quarter ending

December 31, 2005 (Count 5) in violation of 15 U.S.C. §§ 78m(a), 78ff, 17 C.F.R. § 240.13a-1,

and 18 U.S.C. § 2.  The offense charged in these counts "is committed when the defendant

willfully and knowingly makes, or causes to be made, *any statement in any application, report,*

*or document required to be filed under this chapter* or any rule of regulation thereunder. . . which

statement was false or misleading with respect to any material fact."  *Wilson*, 2001 WL 798018

at *4-5.

Here, the Government did not offer any evidence showing that Defendants made or

caused to be made false statements in these filings while in the SDNY.  What the evidence at

trial *did* show is that every person involved in drafting, reviewing, signing or filing these forms

was based in California and conducted these activities in California.  Vitesse's outside auditors

and lawyers, who reviewed and commented on the financial filings, also conducted these

activities in California.  Finally, it was a California-based customer service representative from

Donnelly Financial who sent Ms. Kaplan an email confirmation that the SEC had accepted

---

[4] Nor is registration of Vitesse stock on a national exchange sufficient to establish venue here.  Where, as here, "the act of registration is not the conduct being regulated by this particular section of the securities laws," the fact of such registration "is not an 'essential *conduct* element' proscribed by" the statute being enforced.  *Wilson*, 2001 WL 798018, at * 7 (emphasis in original) (quoting *Rodriguez-Moreno*, 526 U.S. at 280).  Moreover, NASDAQ — the exchange on which Vitesse was traded — is a "virtual" exchange, with trades taking place exclusively via computer and not on any physical trading floor.  (RT 122-23 (testimony of Thomas Carocci).)

Vitesse's 2005 10-K filing.  (Def. Ex. 5363.)  The Government did not offer any evidence to

establish that Defendants committed the conduct elements of the crimes described by Counts

Four and Five while in the SDNY, and thus Counts Four and Five must be dismissed.[5]

Moreover, during closing argument, the Government did not argue that it had *any* basis for

asserting venue was proper with respect to Counts Four or Five.  (*See* RT 3012-13.)

### 5.    False Certification of Financial Reports (Count Six)

Count Six of the Indictment charges Dr. Tomasetta with false certification of Vitesse's

Form 10-K for the fiscal year ending September 30, 2005 in violation of 18 U.S.C. §§ 1350

and 2.  As with the Counts described above, the Government offered no evidence that

Dr. Tomasetta certified Vitesse's 2005 Form 10-K in the SDNY.  Indeed, the evidence adduced

at trial demonstrates that Dr. Tomasetta signed the certification in Southern California at

Vitesse's headquarters.  (Ex. 5373.)  As with Counts Three through Five, during closing

argument, the Government did not argue that it had *any* basis for establishing venue with respect

to Count Six.  (*See* RT 3013-14.)  Count Six should be dismissed.

### 6.    False Statements to Auditors (Count Seven)

Count Seven of the Indictment charges Dr. Tomasetta with making false statements to

auditors in violation of 15 U.S.C. §78ff, 17 C.F.R. § 240.13b2-2, and 18 U.S.C. § 2.  On this

charge, venue is proper *only* "in the district where the allegedly false or misleading statements

were made to the auditors."  *Wilson*, 2001 WL 798018, at *7; *see also Crop Growers*, 954 F.

Supp. at 352-53.  Count Seven is based on the management representation letter that

Dr. Tomasetta signed on December 12, 2005.  (Indict. ¶ 85; Ex. 404.)  It is undisputed that

---

[5] It is well-established that the mere fact that the 10-K and 10-Q reports may have been "obtained by investors and others throughout the United States, including in New York, New York," is "not sufficient to create venue."  *Wilson*, 2001 WL 798018, at *5.

Dr. Tomasetta signed this letter at Vitesse's headquarters. (Ex. 5373.) Moreover, Vitesse's

outside auditors were located in Woodland Hills, California, and thus any alleged false or

misleading statements were made to the auditors either at their Woodland Hills office or at

Vitesse's headquarters in Southern California. (*E.g.*, Ex. 404.) The Government elicited no

evidence suggesting that Dr. Tomasetta ever made false statements, or caused false statements to

be made, while he was in the SDNY, and during closing argument, the Government did not

argue that it had *any* basis for establishing venue with respect to Count Seven. (*See* RT 3014.)

As none of the conduct elements of Count Seven took place in the SDNY, Count Seven must be

dismissed.

### III.    COUNT ONE MUST BE DISMISSED BECAUSE NO EVIDENCE OF A SINGLE OVERARCHING SCHEME WAS ADDUCED AT TRIAL

In response to a pretrial motion, the Government stated that the Indictment facially

alleges that the "revenue recognition fraud" and the "options backdating fraud" were integrated

parts of "a single overarching scheme to defraud Vitesse investors." (Opp. to Duplicity Motion

at 2-7, 9-15.) The Court took the Government at its word and allowed trial to proceed under the

theory that the Indictment charges a single overarching scheme comprised of both revenue

inflation fraud and options backdating fraud. (9/21/2011 Hearing Tr. at 2-19.)

The Government failed to present any evidence establishing a single overarching

conspiracy encompassing both revenue inflation and options backdating, much less evidence

from which a rational juror could find such a singular scheme *beyond a reasonable doubt*. To

the contrary (and as Defendants forewarned in their pretrial motion), the evidence served only to

highlight that the two alleged schemes were entirely unrelated. Whether there existed a single

scheme or multiple schemes is determined by the scope of the illicit agreement. *See, e.g.*, *United

States v. Aracri*, 968 F.2d 1512, 1521 (2d Cir. 1992) ("'In order to prove a single conspiracy, the

government must show that each alleged member agreed to participate in what he knew to be a

collective venture directed toward a common goal'") (quoting *United States v. Maldonado-

Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)).  The trial record here is devoid of any evidence that

there existed an illicit agreement contemplating both revenue inflation and options backdating.

As the Court instructed,

> The first thing you must determine is whether the government has
> proven beyond a reasonable doubt that a single, overarching
> conspiracy existed, that is, an agreement among two or more
> people to join together to further one common unlawful design or
> purpose.  The single unlawful design or purpose alleged here
> included both:  (1) recognizing revenue on product shipments in a
> manner that was inconsistent with Vitesse's disclosures; and (2)
> falsely representing that Vitesse had no options granted to
> employees in which the market price of the underlying stock
> exceeded the exercise price on the date of grant.  If you find two
> separate and independent conspiracies, or indeed no conspiracy at
> all, then you must find the defendants not guilty of the conspiracy
> charge in Count One.

(RT 3380.)  Because no rational jury could find a single overarching conspiracy, the Court

should enter judgment of acquittal on Count One for this independent reason.[6]

---

[6] Not only did the Government fail to present evidence of any single overarching
conspiracy, it failed to present any evidence from which the jury could infer that Defendants
engaged in any activity relating to Vitesse's stock option grants in the SDNY.  Rather, the
evidence conclusively establishes that all of the activities relating to Vitesse's stock option grants
and disclosures occurred in California.  The evidence also conclusively demonstrates that none
of the challenged stock option grants occurred in FY 2005 or 2006.

Thus, to the extent Count One relies upon the stock option grant disclosure "scheme" to
impose liability on Defendants, Count One should be dismissed on the separate and independent
grounds that venue for the stock option allegations is not proper in this District and any claims
regarding accounting for stock options are time-barred.

IV.    **COUNTS TWO, FOUR, AND FIVE SHOULD BE DISMISSED BECAUSE THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT ANY ALLEGEDLY FALSE STATEMENT WAS MATERIAL**

The Government's only putative evidence of materiality is the testimony of a single San Francisco-based stock analyst, Mr. Pajjuri, and some summary exhibits and testimony about the size of various quarterly stocking packages.  Neither alone nor together was such evidence sufficient to establish the required element of materiality.

Mr. Pajjuri testified that Vitesse's "revenue recognition" and "sales returns reserve" disclosures were important to him because the company's stated accounting policies affected his revenue forecasts.  (RT 2495, 2548.)  He then testified that the "accounting for stock based compensation" disclosure was an item that he "looked at" because an in-the-money option grant would result in a compensation expense, which would in turn affect earnings per share ("EPS").  (RT 2499-2501.)  This testimony, at best, established only that analysts — presumably acting as proxies for reasonable investors — would factor the stated accounting policies into their analysis of revenues, expenses, and EPS, which Mr. Pajjuri described as three financial metrics that "matter."  (RT 2486-90.)

This testimony was insufficient.  Materiality is gauged not by whether a misstatement affects a financial metric that "matters," but by whether the misstatement itself "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks and citation omitted).  The Government presented no evidence that reasonable investors would care — much less consider it critical to their investing decisions — to learn that Vitesse was deferring revenue on some, but not all, of its sales to Nu Horizons or that a percentage of its sales

returns was not recorded in the proper period.[7]  Similarly, there is no evidence that investors in December 2005 (when Vitesse filed its annual report) would have considered it important that some of Vitesse's historical stock option grants in 2001 and 2003 may have been in-the-money on the date of grant.

The Government eschewed any claim regarding the actual financial impact of Vitesse's alleged failure to follow the stated accounting policies that the Government placed at issue. Specifically, the Government presented no evidence about what Vitesse's reported revenue figures would have been had Vitesse accounted for all shipments to Nu Horizons on a sell-through (point-of-sale) basis (and which would have eliminated any concomitant issues with pending credits and aging accounts receivables).  Indeed, as Ms. Kaplan testified, revenues were understated cumulatively from August 2001 through December 2005.  (RT 1264.)[8]  Similarly, the record is utterly silent as to what Vitesse's reported expenses and EPS would have been had Vitesse recorded non-cash compensation expenses for stock option grants in 2001 and 2003. More importantly, it is undisputed that there would not have been any impact on earnings or EPS for FY 2005 and the first quarter of FY 2006 because there were no in-the-money options granted in those periods.

Finally, the summary testimony about the size of the quarterly stocking packages — without an analysis of what the revenue figures would have been had the packages been accounted for on a sell-through (point-of-sale) basis — reveals nothing about whether revenues

---

[7]     Indeed, Mr. Pajjuri's testimony was that no matter what Vitesse disclosed in any of its financials between 2004 and early 2006, he maintained a "Sell" rating for the stock.  The Government has contended that Vitesse reported overly favorable results; it cannot now suggest that Mr. Pajjuri's "Sell" rating would have improved had Vitesse reports been *less* favorable.

[8] Indeed, summary witness Peter Salomon confirmed that Vitesse often understated revenue.  (RT 1788-89.)

were overstated and, if so, the magnitude of the overstatement.  Any doubt about the inadequacy of such evidence to establish materiality is highlighted by *United States v. Goyal*, 629 F.3d 912 (9th Cir. 2010), whose underlying facts bear an uncanny similarity to the facts here.

Goyal was the Chief Financial Officer of Network Associates, Inc. ("NAI") (formerly known as McAfee) from approximately 1997 to 2001.  *Goyal*, 629 F.3d at 913.  Before 1998, NAI sold its well-known antivirus and network-security software directly to end users; in 1998, the company started selling products through distributors.  *Id.*  The prosecution charged Goyal with securities fraud and making false filings with the SEC on the ground that NAI improperly recognized revenue on large quarter-end sales to its largest distributor.  *Id.*  To close these sales, NAI granted the distributor substantial discounts, rebates, and other favorable terms, including the right to return unsold product in several quarters.  *Id.* at 914.  The prosecution argued that Goyal improperly accounted for these significant quarter-end deals on a sell-in (point-of-purchase) basis.  *Id.*  The jury convicted Goyal of securities fraud, making false filings with the SEC, and lying to NAI's auditors.  *Id.*  The district court denied Goyal's motion for judgment of acquittal, and Goyal appealed.  *Id.*

The Ninth Circuit reversed and remanded for entry of judgment of acquittal on all counts. *Id.* at 913.  The court held — viewing the evidence in the light most favorable to the Government — that no rational trier of fact could have found the essential element of materiality beyond a reasonable doubt.  *Id.* at 914-16.  The prosecution argued that NAI materially overstated its revenue because (1) the company recognized revenue at a different time than it should have; and (2) its accounting produced artificially high revenue figures in certain periods. *Id.* at 915.  The court concluded that, "[w]ithout evidence of how much less revenue NAI would have recognized on the [quarter-end] deals if it had used sell-through [point-of-sale] accounting,

the jury had no basis to conclude that the misstatement of reported revenue resulting from the [quarter-end] transactions was material." *Id.* Confronted with this problem, the prosecution argued that the jury could have inferred materiality from the mere fact that the dollar amounts of the quarter-end deals were substantial and represented up to 40% of NAI's total revenue on a quarterly basis. *Id.* at 916. The court roundly rejected this argument because it did not pertain to the alleged overstatement itself:

> The jury could not have inferred materiality from this evidence . . . because it was not the absolute magnitude of the [quarter-end] deals that mattered. The jury needed to assess whether NAI's use of sell-in [point-of-purchase] accounting for the [quarter-end] transactions materially increased NAI's overall revenue when compared to using sell-through [point-of-sale] accounting. But the jury had no evidentiary basis for making the required comparisons. There was simply no evidence that the effect of using sell-in rather than sell-through accounting for the [quarter-end] transactions was so substantial that it made a material difference.

*Id.* The court concluded that, "[b]ecause Goyal's jury had no competent evidence of materiality before it, it could not have properly convicted him on any of the securities counts." *Id.*[9]

As discussed above, the Government's summary testimony suffers from the very fatal defect identified by the Ninth Circuit in *Goyal*: it completely failed to address, much less quantify, the effect on reported revenue of using sell-in (point-of-purchase) rather than sell-through (point-of-sale) accounting. For the foregoing reasons, the Government failed to prove beyond a reasonable doubt that any allegedly false statement was material, and the Court should enter a judgment of acquittal on Counts Two, Four, and Five.

---

[9] Chief Judge Kozinski's concurrence about the overreaching of the criminal prosecution in *Goyal* (629 F.3d at 922) is equally true here: This case plainly did not warrant criminal prosecution, but rather should have remained in the civil arena.

la-1169266

## V.     COUNTS TWO AND FOUR THROUGH SEVEN MUST BE DISMISSED AS AGAINST DR. TOMASETTA FOR LACK OF EVIDENCE OF INTENT

Under federal securities laws, a person may be held criminally liable for making a false statement only if the person made the statement both "knowingly" and "willfully."  15 U.S.C. § 78ff(a).  Counts Two and Four through Seven should be dismissed because the Government failed to present any evidence from which a reasonable jury could determine beyond a reasonable doubt that Dr. Tomasetta made false statements *knowingly* and *willfully*.

As the Court explained to the jury, to sustain a conviction on any of these offenses, the Government must prove that Dr. Tomasetta acted "with intent to do something the law forbids, that is to say, with bad purpose either to disobey or disregard the law." (RT 3332 (internal quotation marks omitted)); *see also United States v. Peltz*, 433 F.2d 48, 54-55 (2d Cir. 1970) (to satisfy the "willfully" requirement, the prosecution must show that "[the defendant] was aware he was doing a wrongful act"); *United States v. Dixon*, 536 F.2d 1388, 1397 (2d Cir. 1976) (the defendant "must be shown to have had *some* evil purpose") (emphasis added).  Thus, the Government must prove beyond a reasonable doubt that Dr. Tomasetta knew he was making a false statement (i.e., "knowingly") and that he was doing so for a wrongful purpose (i.e., "willfully").

Throughout trial (and during pretrial hearings), the Government identified three allegedly false disclosures in Vitesse's SEC filings that provide the basis for Counts Two and Counts Four through Seven, each appearing in the "Critical Accounting Policies" section of the filings:

1.  Revenue Recognition:  "Certain of our production revenues are made to a major distributor under an agreement allowing for pricing credits and right of return on products unsold.  Accordingly, we defer recognition of revenue on such products until the products are sold to the end user."

-24-

2. <u>Sales Returns Reserve</u>:  "We record reductions to revenue for estimated product returns and pricing adjustments, in the same period that the related revenue is recorded.  The amount of these reductions is based on historical sales returns, analysis of credit memo data and other known factors at the time."

3. <u>Accounting for Stock Based Compensation</u>:  "For options granted to employees, compensation expense was recorded on the date of grant only if the current market price of the underlying stock exceeded the exercise price.  We had no options granted to employees in which the market price of the underlying stock exceeded the exercise price on the date of grant."

(Ex. 68 at 33-35; Ex. 69 at 17-18.)  Despite four weeks of testimony, the Government failed to present any evidence establishing that Dr. Tomasetta (1) knew that these disclosures were included in the lengthy SEC filings, (2) knew that these disclosures were false, <u>and</u> (3) included the disclosures in the SEC filings for a wrongful purpose.  Indeed, there is no evidence that Dr. Tomasetta ever read or discussed these specific accounting-related disclosures with the people in Vitesse's finance department who prepared them.  (RT 1197.)  Ms. Kaplan confirmed that she did not know whether Dr. Tomasetta reviewed the filings before signing them, and also confirmed that she never discussed the contents of the filings with Dr. Tomasetta.  (RT 1208.)  Nor did Lori Williams or Yatin Mody testify that either ever discussed or called Dr. Tomasetta's attention to the disclosures regarding Vitesse's revenue recognition practices or stock option accounting.

Moreover, the evidence at trial established that Dr. Tomasetta signed the filings only after Vitesse's finance department, outside auditors, and outside lawyers had reviewed and approved

la-1169266

the disclosures — skilled professionals hired by Vitesse for their expertise in accounting and legal disclosures.  (RT 1190-1209.)

With respect to the December 12, 2005 management representation letter, signed by Mr. Mody, Ms. Kaplan, and Dr. Tomasetta, the Government alleged that the letter contained false statements relating to Vitesse's technical accounting policies.  Once again, the Government failed to present any evidence establishing that Dr. Tomasetta (1) knew and understood the contents of the letter, (2) knew that the letter's statements were false, and (3) signed the letter for a wrongful purpose.  Indeed, the Government offered no evidence that Dr. Tomasetta ever read the letter or discussed any portion of the letter with anyone.  To the contrary, Ms. Kaplan testified that KPMG sent her the 2005 audit representation letter late on a Friday night, and that she had Dr. Tomasetta sign it the following Monday without discussing its contents or accuracy with him.  (RT 1206-09.)  Moreover, Ms. Kaplan testified that an individual without formal accounting training would not have understood the technical accounting terminology used in the letter, including with respect to the allegedly false statements of Vitesse's accounting policies. (RT 1204.)

In light of this record, no reasonable jury could find beyond a reasonable doubt that Dr. Tomasetta *knowingly* and *willfully* caused Vitesse to misrepresent its accounting policies and financial condition in its disclosures, made a false statement in an SEC filing, falsely certified an SEC filing, or made a false statement about Vitesse's technical accounting policies to its outside auditors.  Indeed, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks and citation omitted).  Accordingly, the Court

-26-

should grant a judgment of acquittal on Counts Two and Four through Seven for this independent reason.

## VI.   COUNTS ONE THROUGH FIVE MUST BE DISMISSED AS AGAINST MR. HOVANEC FOR INSUFFICIENCY OF THE EVIDENCE

Count One of the Indictment alleges conspiracy, Count Two alleges substantive securities fraud, Count Three charges Mr. Hovanec with making false entries in Vitesse's books and records, and Counts Four and Five allege false filings with the SEC.  Mr. Hovanec, however, never prepared or oversaw preparation of the books, records or financial statements for Vitesse during 2001-2006.  Moreover, he was not even in the Finance Department after April 2005, a date which precedes by many months the statute of limitations cutoff.  Because the Government failed to prove that Mr. Hovanec engaged in any conduct constituting any of these alleged crimes within the limitations period, the evidence adduced at trial is insufficient to support his conviction on any of those counts.  (*See* RT 3348 (Jury Charge for Counts Two through Five: "[B]ecause of what is called the statute of limitations, each defendant may be found guilty on a given charge only if you find beyond a reasonable doubt that any conduct on his part…that otherwise satisfies the elements of the charge occurred after December 7, 2005").)  As to Count One, the evidence showed Mr. Hovanec's involvement in dealings with Nu Horizons, but not in preparing the financials.  Counts One through Five, therefore, should be dismissed as against Mr. Hovanec.

The Government introduced not one shred of evidence that Mr. Hovanec participated in any way in the preparation or filing of the 2005 Form 10-K and the Q1 2006 Form 10-Q, which are the post-December 7, 2005 financial statements at issue in this case.  Indeed, the testimony at trial confirms that it was Ms. Kaplan and Mr. Mody who prepared those financials in conjunction with KPMG, outside counsel at Davis Polk & Wardwell, and the Board of Directors.  According

-27-

to Ms. Kaplan, "Mr. Hovanec play[ed] no role in connection with external financial reporting." (RT 1002-03; *see also* Ex. 2787 (Jefferson Wells Analysis of External Financial Reporting process).)  Lori Williams, who arrived at Vitesse shortly before the 2005 Form 10-K was filed, also confirms this.  (*See* RT 209-10 (Testimony of Lori Williams:  "Q:  …with respect to this [2005] 10-K, it was Ms. Kaplan and Mr. Mody who were the principal drafters of the document, isn't that right?  A:  That is my understanding, yes").)

The evidence at trial also confirmed that Mr. Hovanec had no role with respect to keeping the Company's books and records.  This, too, was the bailiwick of Mr. Mody and Ms. Kaplan, as it had been for years.  Mr. Mody testified:

> Q:     For this entire period of '01, September of '01 through around April of '06, isn't it true that you oversaw the recording of items in Vitesse's books and records?
>
> A:     Yes … The people that recorded them reported indirectly to me.

(RT 2179-80 (testimony of Yatin Mody).)

After April 2005 (and even for some time before that), Mr. Hovanec's role was to maintain business relationships — much as a high-level salesman would do — and to monitor legal proceedings involving the Company.  It was Mr. Mody and Ms. Kaplan, not Mr. Hovanec, who handled the accounting and financial issues.  The testimony demonstrated, for example, that:

- It was Ms. Kaplan and Mr. Mody — not Mr. Hovanec — who communicated with the auditors on financial issues.  (*See, e.g.*, RT 211 (Williams); RT 1004 (Kaplan); RT 2198 (Mody).)

- It was Mr. Mody who picked the credits to issue, or who later would provide guidance to Ms. Kaplan about which credits to issue.  It was also Mr. Mody who signed off on the credits to issue.  (RT 1277-78 (Kaplan).)

- Ms. Kaplan had only one conversation with Mr. Hovanec on the propriety of Vitesse's credit practices.  In that conversation, which Ms. Kaplan testified

-28-

occurred in 2005, Mr. Hovanec remarked that he did not know what was going on with the credits and that it was not his job to deal with credits.  (RT 1278-79 (Kaplan).)

- Mr. Mody ran the quarterly revenue meetings as of late 2005.  (RT 159 (Williams).)

- Lori Williams, who replaced Ms. Kaplan in the Finance Department, never had any conversations with Mr. Hovanec about unrecorded credits.  (RT 178-79 (Williams).)

- The issue of revenue recognition was Mr. Mody's responsibility.  (RT 2203 (Mody).)

- It was Mr. Mody and Ms. Kaplan — not Mr. Hovanec — who were responsible for making sure Vitesse adhered to its revenue recognition policy.  (RT 2203-04 (Mody).)

- Ms. Kaplan was responsible for maintaining and revising Vitesse's revenue recognition policy.  (RT 2205 (Mody).)

- It was Mr. Mody, Ms. Kaplan and later Ms. Williams — not Mr. Hovanec — who calculated the sales return reserve and other reserves (e.g., bad debt, inventory).  (RT 211 (Williams); RT 2188-89 (Mody).)

- It was Mr. Mody who directed Vitesse to seek cash payments from Nu Horizons.  (RT 2203 (Mody:  "The cash was at my direction").)

- Mr. Hovanec had no role in the RMA approval process.  (RT 1096 (Kaplan).)

- After he became CFO, Mr. Mody even sought to exclude Mr. Hovanec from high-level discussions, further distancing Mr. Hovanec from the financial decision-making process.  (RT 2438 (Keever).)

Nor did the Government establish that Mr. Hovanec possessed the requisite criminal intent with respect to stock options.  Despite extensive testimony about the events of 2006, which the Government asserts was evidence of consciousness of guilt, it failed to establish that Mr. Hovanec knew or understood *in 2001 or 2003* the accounting ramifications relevant to the granting of stock options.  Indeed, there was affirmative testimony by Lori Williams that as late as March or April 2006, Mr. Hovanec was *unaware* of those accounting rules.  (RT 192-93 (recounting how Mr. Hovanec came into her office following publication of the Wall Street

-29-

Journal article and asked to borrow reference books on GAAP accounting so that he could

research the issue of stock options).)  Nor was there evidence that in 2001-2005, Mr. Hovanec

ever deceived board members or auditors in the dating of stock options.

Given the extensive testimony about Mr. Hovanec's lack of involvement in relevant

financial aspects of the Company within the statutory period, even when judged in the light most

favorable to the Government, and even when setting aside the dispositive issue of venue, the

evidence is not sufficient to convict Mr. Hovanec on any of the substantive counts alleged in the

Indictment.

## VII.    CONCLUSION

For the reasons stated above, the Court should direct entry of judgment of acquittal on all

counts.

Dated: Los Angeles, California           MORRISON & FOERSTER LLP
       May 8, 2012

                                         Dan Marmalefsky
                                         555 West Fifth Street
                                         Los Angeles, California  90013-1024
                                         213.892.5200

                                         Lawrence Gerschwer
                                         Katie L. Viggiani
                                         1290 Avenue of the Americas
                                         New York, New York 10104-0050
                                         212.468.8000

                                         By:    */s/ Dan Marmalefsky*
                                                Dan Marmalefsky
                                                *Attorneys for Defendant*
                                                *Louis Tomasetta*

-30-

Dated: Los Angeles, California    BIRD, MARELLA, BOXER, WOLPERT,
       May 8, 2012                NESSIM, DROOKS & LINCENBERG, P.C.

                           Gary S. Lincenberg
                           Peter J. Shakow
                           1875 Century Park East, 23rd Floor
                           Los Angeles, California  90067
                           310-201-2100

                           CLAYMAN & ROSENBERG
                           Charles Clayman
                           Isabelle Kirshner
                           305 Madison Avenue
                           New York, New York  10165
                           212-922-1080

                       By:    */s/ Peter Shakow*
                               Peter Shakow
                               *Attorneys for Defendant*
                               *Eugene Hovanec*

la-1169266