UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA              :

   -v.-                                           :          10 Cr. 1205 (PAC)

LOUIS TOMASETTA and                   :
EUGENE HOVANEC,
                                      :

               Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - : - X


### MEMORANDUM OF LAW IN OPPOSITION TO THE
### DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL


                                      PREET BHARARA
                                      United States Attorney
                                      for the Southern District of New York
                                      Attorney for the United States of America


JOHN J. O'DONNELL
KATHERINE R. GOLDSTEIN
Assistant U.S. Attorneys
   - Of Counsel -

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENTS ................................................................. 1

STATEMENT OF FACTS ........................................................................ 2

    A.    Vitesse's Disclosures Concerning Its Financial Position
           And Results of Operations ...................................................... 3

    B.    The Fraudulent Scheme .......................................................... 5

          1.    False Representation Concerning Vitesse's Revenue ................. 5

                  a.    Misrepresentations Concerning Recognition
                        of Revenue On Transactions With Nu Horizons .............. 5

                        (i.)    The Initial Stocking Package ........................... 5

                        (ii.)    Quarterly Stocking Packages ........................... 9

                  b.    Fraudulent Manipulation Of Credits
                        For Returned Product ................................................. 12

                  c.    Misrepresentations Concerning
                        Accounts Receivables .............................................. 15

          2.    Misrepresentations Concerning Vitesse's Options ..................... 15

ARGUMENT ........................................................................................ 20

    I.    The Standard For A Rule 29 Motion ........................................... 20

    II.    The Evidence Was Sufficient For A Jury To Find Venue
           Was Proper In The Southern District Of New York ........................... 21

        A.    Applicable Law .................................................................. 21

        B.    Discussion ........................................................................ 22

           1.    Conspiracy To Commit Securities Fraud ....................... 22

           2.    Substantive Securities Fraud ...................................... 25

    III.    The Evidence Was Sufficient For A Jury
           To Find A Single Conspiracy ..................................................... 30

IV.    The Evidence Was Sufficient For A Jury
       To Find Material Misrepresentation............................................. 32

V.     The Evidence Was Sufficient For A Jury To Find Tomasetta and
       Hovanec Willfully Participated In The Fraudulent Scheme................... 35

CONCLUSION........................................................................................37

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988)........................................................ 32

*Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000)..................................... 32, 33

*Gebhardt* v. *ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003)..............................33

*United States* v. *Aracri*, 968 F.2d 1512 (2d Cir. 1992)..........................................30

*United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)................. 27

*United States* v. *Berger*, 224 F.3d 107 (2d Cir. 2000)..........................................30, 32

*United States* v. *Chalarca*, 95 F.3d 239 (2d Cir. 1996)..........................................22

*United States* v. *Ferguson*, 653 F.3d 51 (2d Cir. 2011).........................................32, 33

*United States* v. *Gagliardi*, 506 F.3d 140 (2d Cir. 2007)....................................... 20

*United States* v. *Geibel*, 369 F.3d 682 (2d Cir. 2004)..........................................27, 30

*United States* v. *Gonzalez*, 922 F.2d 1044 (2d Cir. 1991)....................................... 22

*United States* v. *Goyal*, 629 F.3d 912 (9th Cir. 2010)......................................... 34, 35

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999)....................................... 21

*United States* v. *Hardwick*, 523 F.3d 94 (2d Cir. 2008)......................................... 21

*United States* v. *Johnson*, 510 F.3d 521 (4th Cir. 2007)......................................25, 26

*United States* v. *Kim*, 246 F.3d 186 (2d Cir. 2001).............................................. 28

*United States* v. *Magassouba*, 619 F.3d 202 (2d Cir. 2010)..................................... 28

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)..............................30

*United States* v. *Matthews*, 20 F.3d 538 (2d Cir. 1994)......................................... 21

*United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001).......................................21

*United States* v. *Morrison*, 153, F.3d 34 (2d Cir. 1998)......................................... 21

*United States* v. *Motz*, 652 F. Supp. 2d 284 (S.D.N.Y. 2009)...................................28

*United States* v. *Naranjo*, 14 F.3d 145 (2d Cir. 1994)............................................ 22

*United States* v. *Potamitis*, 739 F.2d 784 (2d Cir. 1984).........................................22

*United States* v. *Ramirez*, 420 F.3d 134 (2d Cir. 2005).......................................25, 27

*United States* v. *Reed*, 773 F.2d 477 (2d Cir. 1985)...........................................22, 26

*United States* v. *Rivlin*, 2007 WL 4276712 (S.D.N.Y. Dec 5, 2007)........................... 28

*United States* v. *Rodriguez-Moreno*, 526 U.S. 275 (2000).....................................22

*United States* v. *Rommy*, 506 F.3d 108 (2d Cir. 2007)...........................................23

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993)................................................. 30

*United States* v. *Royer*, 549 F.3d 886 (2d Cir. 2008)............................................. *passim*

*United States* v. *Smith*, 198 F.3d 377 (2d Cir. 1999)...........................................22, 24

*United States* v. *Svoboda*, 347 F.3d 471 (2d Cir. 2003)......................................... 26

*United States* v. *Tannenbaum*, 934 F.2d 8 (2d Cir. 1991).......................................*passim*

*United States* v. *Tzolov*, 642 F.3d 314 (2d Cir. 2011)......................................... 23, 24, 27

*United States* v. *Williams*, 205 F.3d 23 (2d Cir. 2000)...........................................30

**Statutes and Rules**

U.S. Constitution, Amendment VI...................................................................21

15 U.S.C. § 78j(b)........................................................................................ 25

17 C.F.R. § 240.10b-5...............................................................................24-25

Fed. R. Crim. P. 18..................................................................................... 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA          :

   -v.-          :          10 Cr. 1205 (PAC)

LOUIS TOMASETTA and          :
EUGENE HOVANEC,

      :

         Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendants Louis Tomasetta's ("Tomasetta") and Eugene Hovanec's ("Hovanec") motion for a judgment of acquittal on all counts of the Indictment. Following a four-week trial before this Court and a jury, the jury deadlocked. For the reasons set forth below, the motion should be denied.

Indictment 10 Cr. 1205 (PAC), filed on December 8, 2010, charged Tomasetta and Hovanec in the following counts: (1) conspiracy to commit securities fraud, make false statements to auditors, make false statements in annual and quarterly reports filed with the SEC, and to falsify the books and records of a public company (Count One); (2) securities fraud (Count Two); (3) making false entries in the books and records of an issuer of securities (Count Three); (4) two counts of making false filings with the SEC (Counts Four and Five); (5) false certification of financial statements (Tomasetta only) (Count Six); and, (6) making false statements to auditors (Tomasetta only) (Count Seven).

-1-

Tomasetta and Hovanec proceeded to trial on March 21, 2012.  The trial ended on April 24, 2012, when the Court declared a mistrial due to the jury's inability to reach a unanimous verdict on any of the counts in the Indictment.

Tomasetta and Hovanec move for a judgment of acquittal arguing that the Government failed to present evidence that would enable a reasonable jury to:  (1) find by a preponderance of the evidence that venue was proper in the Southern District of New York ("SDNY"); (2) find beyond a reasonable doubt that the conspiracy charged in Count One constituted a single conspiracy; and (3) find beyond a reasonable doubt that the misrepresentations were material.  In addition, Tomasetta separately argues that the Government failed to present evidence that would enable a reasonable jury to find beyond a reasonable doubt that he had the required fraudulent intent and Hovanec separately argues that Counts One through Five should be dismissed as against him for insufficiency of the evidence.  All of these arguments lack merit.

## STATEMENT OF FACTS

The evidence at trial overwhelmingly demonstrated that Tomasetta, the former Chief Executive Officer of Vitesse Semiconductor Corporation ("Vitesse"), and Hovanec, the former Chief Financial Officer and Executive Vice President of Vitesse, orchestrated a scheme from 2001 to 2006 to deceive Vitesse's investors about Vitesse's financial condition and results of operations.  The fraudulent scheme primarily involved false statements to investors about Vitesse's revenues, sales returns, accounts receivable, and stock options.  Vitesse publicly disclosed certain methods of accounting for its revenue, sales returns, and stock options, but its actual practices were materially different from its disclosures.  Tomasetta and Hovanec lied directly to investors and auditors about transactions that they negotiated and directed.  In addition, the defendants intentionally caused their subordinates, including co-conspirators Yatin

Mody ("Mody") and Nicole Kaplan ("Kaplan"), to effect transactions and entries into Vitesse's

accounting records that they knew would result in false and misleading disclosures to investors.

Mody and Kaplan testified pursuant to cooperation agreements about their participation

in the fraudulent scheme and their direct dealings with both defendants concerning the fraud.

Their testimony was corroborated by documentary evidence and the testimony of other

witnesses.

## A.     Vitesse's Disclosures Concerning Its Financial Position And Results of Operations

During the relevant time, Vitesse was a publicly traded corporation, and was required to

publicly report information concerning its business and results of operations.  Vitesse

communicated this information by (1) filing with the Securities and Exchange Commission

("SEC") annual and quarterly reports of SEC Forms 10-K and 10-Q which were signed and

certified by Tomasetta and Hovanec (until he became Executive Vice President in April 2005)

(Tr. 1860-61; GX 50-69);[1] (2) issuing press releases that were reviewed and approved by

Tomasetta and Hovanec (Tr. 1856-58; GX 101-120; 124-27, 129, 130); (3) holding regular

conference calls with securities analysts on which Tomasetta and Hovanec (until he became

Executive Vice President in April 2005) participated (Tr. 1858; GX 150-159); and (4) attending

meetings with securities analysts and institutional investors in, among other locations, New

York, Boston, and San Francisco.  (Tr. 1825-27).

The evidence showed that securities analysts and investors focused on Vitesse's reported

revenue and associated revenue trends, and earnings or loss per share.  (Tr. 1861-62, 2487).

Because Vitesse was losing money during 2001 to 2006, the analysts specifically concentrated

---

[1] "Tr." refers to the transcript of the testimony at trial; "GX" refers to Government exhibits and "DX" refers to defense exhibits.  "Def. Mem." refers to the defendants' May 8, 2012 memorandum in support of the motion.

on when Vitesse would return to profitability. (Tr. 1861-62, 2506). Vitesse's revenue trends were an important metric that aided analysts in predicting when Vitesse would become profitable. (Tr. 2487). In late 2005, Vitesse came close to achieving profitability and at least one analyst upgraded his recommendation regarding Vitesse's stock. (Tr. 1949-50, 2519; GX 422).

In addition to providing information concerning past results of operations, Tomasetta and Hovanec also provided "guidance" to the investing public, which was a prediction of the company's future performance. (Tr. 1858-59). Vitesse's guidance for revenue figures was based upon revenue targets that were set by Tomasetta.[2] (Tr. 1858) This guidance was important to investors and securities analysts who made recommendations concerning whether investors should buy or sell the stock. (Tr. 159-60, 162-63, 531-32). It was well known that failure to meet these expectations would "[have had] a profoundly negative effect on the stock price." (Tr. 1852-53, 1894-95). In fact, over 17 quarters from 2002 to 2006, Vitesse failed to meet its revenue guidance only two times. (GX 415 (Q404), 420 (Q405)).

---

[2] The revenue targets were initially developed by Vitesse's sales department, and were revised by Tomasetta to make them higher. (Tr. 229-32, 1896-97). Tomasetta regularly communicated the revenue targets to Vitesse employees. Tomasetta and Hovanec also attended regular "revenue meetings" with Vitesse sales and finance executives, at which they discussed ways in which they could assure that Vitesse's revenue would meet the target. The witnesses uniformly described an atmosphere at Vitesse of intense pressure to meet the revenue targets, which pressure was attributed to Tomasetta. (Tr. 159-60, 812-14, 825, 1306-08, 1897-98).

-4-

B.     **The Fraudulent Scheme**

1.     **False Representations Concerning Vitesse's Revenue**

The evidence overwhelmingly proved that Vitesse's public disclosures contained improperly inflated revenue figures because, among other things, (1) Vitesse had recorded as revenue shipments to Nu Horizons Electronics Corp. ("Nu Horizons"), a distributor which had an undisclosed right to return the product; and (2) Vitesse had failed to record credits, or reductions, to revenue for product returned from customers, all contrary to its public disclosures.

a.     **Misrepresentations Concerning Recognition of Revenue On Transactions With Nu Horizons**

(i.)     **The Initial Stocking Package**

The Nu Horizons relationship commenced in 2001 in the midst of a severe downturn in the technology industry.  Beginning in late 2000 and continuing through the summer of 2001, Vitesse experienced a sharp decline in its revenues, and saw an unprecedented level of product returns from customers.  (Tr. 829-30).  Vitesse's revenues dropped from $165 million for the quarter ended December 31, 2000 to $60 million for the quarter ended June 30, 2001.  (Tr. 1835).  Vitesse's stock price experienced a similar precipitous decline during the same period. (*Id.*)  As of April 2001, Vitesse had received at least $52 million in product returns.  (Tr. 1842-43; GX 375; *see* Tr. 829-30).  These pending product returns, once they were recorded on Vitesse's books, would have resulted in significant reductions in Vitesse's revenues, on top of the significant decline in revenues the company had already experienced.

Throughout 2001, Mody routinely apprised the defendants of the company's increasing number of product returns and, in April 2001, specifically discussed with Tomasetta and Hovanec the $52 million in pending returns, a number which the defendants found shocking. (Tr. 1845-47).  In a meeting with Mody, Tomasetta and Hovanec made the decision to embark

on a fraudulent course, deciding that, rather than record all of the credits at once and miss their revenue targets by a wide margin, they would "bleed" the credits out over time by recording portions of the credits over subsequent periods. (*Id.*) Tomasetta and Hovanec made this decision hoping that the markets would improve, and they would be able to clean up the credits as it did. (*Id.*) The decision to defer the recording of credits was based in part upon the fact that in March 2001 Vitesse had taken the unprecedented step of revising its guidance down twice in the same month. (Tr. 1849-51). Booking the credits would have meant that guidance would have to be revised a third time during the same quarter, dealing a blow to management's reputation. (Tr. 1851-53).

Accordingly, Vitesse did not record the $52 million in pending credits during the quarter ended June 30, 2001, and fraudulently reported revenue of $60 million that quarter. (GX 51). If Vitesse had recorded the $52 million in credits, the revenue for that quarter would have been close to zero. (Tr. 1855). The decision not to record credits was not disclosed to Vitesse's Board or its auditors. (Tr. 1855-56).

In the summer of 2001, Vitesse began discussing a distribution agreement with Nu Horizons. (Tr. 1395). Although there were business reasons for Vitesse to engage a distributor at that time, the evidence plainly showed that the defendants planned, from the outset, to use a multi- million dollar initial stocking package ("ISP") transaction with Nu Horizons as a means to disguise the large number of pending credits. (Tr. 1887-88). The evidence showed that Hovanec was a key participant in negotiating the ISP. The testimony established that the initial package was for approximately $10 million, but that Hovanec suggested that the order include the purchase of an additional $30 million in product, a request that Richard Riker ("Riker") (then Vitesse's Vice President of Sales and Marketing) thought was "aggressive." (Tr. 340-42). Nu

-6-

Horizons agreed to the entire $40 million ISP, but only on the condition that it would be allowed to return any product it could not sell. (Tr. 248-51, 1404-06). Charles David Bowers ("Bowers"), a senior executive at Nu Horizons involved with the Vitesse relationship, explained that, because Nu Horizons had no prior experience in selling Vitesse products, it was necessary for Nu Horizons to have the ability to return any product it purchased in the ISP that it was unable to sell. (Tr. 1404). Vitesse agreed to Nu Horizons's request, and Riker provided a written side letter making clear that Nu Horizons had the right to return any product that it purchased in the ISP. (Tr. 247-51, 1404-06; GX 700). Drafts of the side letter were reviewed and approved by Hovanec. (Tr. 253-56, 258-59, 361; GX 691, 692, 692A). Indeed, the evidence showed that it was Hovanec's idea to put the return provisions for the ISP in a document separate from the distributorship agreement – where it could be kept secret from auditors.[3] (Tr. 253-56, 258-5; GX 691, 692, 692A).

In late September 2001, Vitesse shipped approximately $42 million worth of product to Nu Horizons. (GX 1200A). Mody and Kaplan both knew that the package included large quantities of products that had previously been returned or were otherwise not likely to sell through to an end customer. (Tr. 838, 840-41, 1871-74, 1890-91). Mody believed that it was widely known in the company that there was no demand for the products. (Tr. 1874, 2325-26). Kaplan shared her concerns about the ISP with Mody and Hovanec, and Hovanec told her that the "paper was clean on it" and that the transaction was necessary to meet Vitesse's revenue goals. (Tr. 838-39).

---

[3] Vitesse and Nu Horizons entered into a written distribution agreement in September 2001 which provided, among other things, that Nu Horizons had the right to rotate its stock by returning up to 10 percent of its prior six months purchases twice a year. (Tr. 243-44, 834-36, 1400, 1405; GX 701). Kaplan and Mody both testified that Hovanec took measures to make sure that the distributorship agreement contained provisions that would facially support recognizing revenue on sales to Nu Horizons. (Tr. 835-36, 1870). The fact that Hovanec instructed that the return rights be set forth in a separate letter strongly suggested that he intended to conceal them.

Vitesse recorded approximately $37 million in revenue for the quarter ended September 30, 2001 in connection with the ISP. (Tr. 841-42, 1889; GX 10A; *see* Tr. 269-72). At the same time, Vitesse booked credits in roughly the same amount, using the revenue from the ISP to offset the reduction in revenue that would result from booking the credits. (Tr. 841-42, 1886-87). Had Vitesse not recorded revenue on the ISP, its reported revenue for that quarter would have been negative. (Tr. 1889; GX 1249). Tomasetta and Hovanec directed that revenue from the ISP be used to allow Vitesse to secretly record the outstanding credits. (Tr. 1887-88 (Tomasetta explained the plan to Mody in a meeting where Hovanec was present); *see* Tr. 829-31 (Nu Horizons was solution to the problem of credits in 2001)).

Nu Horizons eventually returned approximately $24.4 million worth of product from the ISP, an astonishing 58 percent of product that had already been counted as revenue. (Tr. 1680-81; GX 1200-A). Tomasetta and Hovanec were well aware of these returns because they discussed them with Bowers (Tr. 1408-10; GX 708), were advised of the returns by Vitesse employees (Tr. 273-76, 699-700, 707, 843-44, 848-53, 855-56, 1304-05; GX 695, 696), and approved large returns. (Tr. 848-53, 856-57; GX 711-A, 714).

Vitesse's Form 10-K for the fiscal year ended September 30, 2001 ("FY 2001"), signed by Tomasetta and Hovanec, omitted any disclosure about the $40 million ISP or about the fact that Vitesse had recorded large numbers of credits for product returns. (Tr. 1890). Hovanec directed Kaplan not to tell Vitesse's auditors about the ISP and falsely told the auditors that the Nu Horizons relationship began in October 2001. (Tr. 841-42, 949; *see* Tr. 2134-35 (the Nu Horizons transaction was not disclosed to KPMG in connection with the 2001 audit)). The concealment of details of the ISP – such as the fact that product shipped had previously been returned and that Nu Horizons had return rights – was fraudulent. Since Vitesse recorded $40

million in revenue on the transaction – revenue that converted its reported revenue from negative to positive – information about the ISP transaction was plainly material.

**(ii.)**     **Quarterly Stocking Packages**

From late 2002 to March 2006, Vitesse used quarter-end transactions (called "quarterly stocking packages") with Nu Horizons to fill the persistent gaps between Vitesse's revenue targets and its actual revenue. (Tr. 283, 285-86, 288, 816, 859-60, 1414, 1453-54). These quarterly stocking packages had a material effect on Vitesse's reported quarterly revenue. (Tr. 2816-20; GX 10B to 10-E (copies of which are attached as Exhibit A)). Indeed, in some quarters, the quarterly stocking packages accounted for nearly 40 percent of Vitesse's reported revenue. Bowers testified that the Vitesse quarterly stocking packages grew to be almost half of the business between the two companies (Tr. 1413, 1452), and were different in size and scope from those that Nu Horizons had with other suppliers. (Tr. 1422).

The evidence overwhelmingly showed that Nu Horizons had an unlimited right to return all of the product purchased in these stocking packages that it could not re-sell to end customers. (Tr. 296, 299, 725, 865, 1309-10, 1399, 1402, 1417, 1447, 1532-33, 1645). Tomasetta and Hovanec were aware of and authorized these return rights. (Tr. 1417, 1532-33). In addition, Vitesse granted Nu Horizons significant financial concessions as a further inducement for Nu Horizons to enter into the transactions. (Tr. 1416-17). Nu Horizons also frequently made large cash payments – referred to as "prepayments" – to Vitesse which were negotiated in conjunction with the quarterly stocking packages. (Tr. 865-66, 1426, 1920; GX 1200-C). These cash payments were not related to the size of the stocking package or Nu Horizons's outstanding payables to Vitesse, but rather were based upon Vitesse's desire to show the investing public a stronger cash position on its balance sheet. (Tr. 1426, 1637, 1920-23).

-9-

Tomasetta and Hovanec were well aware that Vitesse's reported revenue included the quarterly stocking packages. The quarterly stocking packages were regularly discussed at Vitesse's revenue meetings and at smaller "close the gap" meetings, held with only key executives, including those directly involved in the fraud, that sometimes followed the revenue meetings. (Tr. 232-34, 283-88, 825-26, 859-60, 877, 1904-1906). It was openly discussed at these meetings that the quarterly stocking package would be a mechanism to close the gap between the revenue target and the projected quarterly revenue. (Tr. 1906-07, 1909-10, 1912; *see also* GX 1220-B).

Both Tomasetta and Hovanec were directly involved in the Nu Horizons relationship. Hovanec was the "executive sponsor" at Vitesse for Nu Horizons, and he regularly traveled to New York to meet with representatives of Nu Horizons concerning the stocking packages. (Tr. 181-82, 276-79, 858, 867, 1409-11, 1474-75, 1919-20). Hovanec and Tomasetta had quarterly meetings with Nu Horizons senior executives Bowers and Arthur Nadata ("Nadata"), Nu Horizons' CEO, usually at a restaurant in Manhattan. (Tr. 891-92, 1390-91, 1409-11, 1452, 1484-85, 1489-91, 1499-1500, 1508-10, 1515-17, 1608-09). The regular meetings that Tomasetta and Hovanec had with Bowers and Nadata – especially the dinner meetings in Manhattan – involved high-level business discussions between the senior executives, but also usually involved discussions concerning the scope of the stocking package and cash payment that Vitesse was requesting for the quarter. (Tr. 1390-91, 1409, 1435-36, 1484-85, 1500, 1515-17, 1538, 1610).

Some specific examples of Tomasetta's and Hovanec's direct involvement in the quarterly stocking packages include the following:

- From late 2002 to late 2003, the return rights were set forth in side letters signed by Riker. (Tr. 298-304; GX 717, 726, 742, 744, 751, 758). In late 2003, Vitesse sales

employees told Bowers that Vitesse would not continue to provide written side letters. (Tr. 1418). In response, Bowers told Vitesse that he would not agree to any more of the quarterly stocking packages without written assurances that Nu Horizons would be allowed to return any unsold product. (Tr. 1418-20, 1448, 1462). At a meeting in December 2003, Hovanec told Bowers that he could not put anything in writing, but that Nu Horizons could treat the quarterly stocking packages as standard purchases with a full right of return, thereby convincing Nu Horizons to continue placing quarterly stocking package orders. (Tr. 1418-20, 1448, 1462).

- In September 2004, Vitesse was having difficulty meeting its revenue target for the September 2004 quarter and proposed a $20 million stocking package to Nu Horizons – the largest to date. At this time, Nu Horizons had a large volume of materials from prior stocking packages that it wanted to return and was resistant to the large stocking package. (Tr. 1465-69). The issue was discussed at a meeting Kaplan attended with Mody, Tomasetta and Hovanec, where Tomasetta told Hovanec to make a deal with Nu Horizons. (Tr. 877-78). In a conference call with Nu Horizons representatives, Hovanec agreed that Nu Horizons could return $10 million worth of inventory by November 2004. (Tr. 1470-73, 1635-36, 1929-32, 2244-46). Hovanec subsequently directed Kaplan and Barbara Gzyl ("Gzyl") to create blank return forms (called "return material authorizations" or "RMAs") that would enable Nu Horizons to return $10 million worth of unspecified product to Vitesse during the time period requested by Nu Horizons. (Tr. 867-73, 1320-27). Kaplan and Gzyl created documents denominated as RMA 10001 and 10002 and sent them to Nu Horizons, which used the RMAs to return $12 million worth of product. (Tr. 882-85, 885-88; GX 805, 809). The creation of these return authorization documents was highly unusual. Kaplan complained to Hovanec about the request. (Tr. 871-72, 876-77). Gzyl put Hovanec's initials on the document to make clear that he had authorized the documents. (Tr. 1321).

- In December 2004, Hovanec authorized Vitesse to provide Nu Horizons with another blank RMA form that allowed Nu Horizons to return an unlimited amount of product. (Tr. 893-95; GX 348, 822). Nu Horizons used this document – denominated RMA 10003 – to return approximately $12 million worth of product. (Tr. 894-99, 1349). Hovanec was aware of the return (GX 826, 827, 828), and told Kaplan not to record approximately $4.7 million worth of product into Vitesse's inventory. Hovanec told Kaplan to ship that product back to Nu Horizons that same quarter using manual invoices. (Tr. 899-904). Kaplan complained to Hovanec about the issuance of the blank RMA to secure the order and the instruction to ship product back to Nu Horizons without recording it into inventory. (Tr. 892, 895-96, 901-02). Hovanec told her that they had to do the transaction to meet the revenue target. (Tr. 892).

- In September 2005, senior sales executives at Vitesse proposed a new distributorship contract to Nu Horizons that contained less favorable terms. (Tr. 1502-03; GX 879). Bowers, recognizing that he had leverage from the quarter-end activities between Vitesse and Nu Horizons (GX 879), complained to Hovanec about the proposed new contract. Hovanec rescinded it on the spot. (Tr. 1506-07; GX 883).

-11-

Although the quarterly stocking packages were a significant percentage of Vitesse's recorded revenue quarter after quarter, Vitesse represented in its financial statements that it *deferred* counting the revenue from the sale of such products until the products were sold by Nu Horizons to the end-user. (Tr. 144-46, 919-22; GX 64, 68). Hovanec and Tomasetta knew that these disclosures were false. (Tr. 923).

### b. Fraudulent Manipulation Of Credits For Returned Product

The evidence also overwhelmingly demonstrated that the defendants directed Mody and Kaplan to manipulate the timing of the recognition of credits for product returns to conceal the fact that revenue had been improperly recognized and to avoid reducing revenue to reflect product returns.

As Mody explained, in early 2001, upon learning that there were approximately $52 million worth of credits for product returns pending, Tomasetta and Hovanec decided not to record the credits, but to bleed them out over time. (Tr. 1845-47, 1854-55). Then, they decided to use the revenue from the ISP as a disguise so they could record the credits without any obvious impact to Vitesse's 2001 revenue. (Tr. 1866-68, 1889).

Over the following years, Vitesse developed a practice, at the direction of the defendants, in which it did not immediately record credits for product returns on its books and records. Rather, members of the finance department kept track of the pending credits on an off-line spreadsheet. (Tr. 155-56, 164-66, 826-27, 923-25, 1915-17, 1960-62; GX 324, 331, 336, 338, 342, 344, 1160). Each quarter, Tomasetta and Hovanec would review the pending credits with Mody (and sometimes Kaplan) and they would determine the amount of credits that would be recorded for that quarter. (Tr. 817-18, 826-28, 927-28, 1892-93, 1907, 1912, 1917). This determination was based upon their assessment of how the amount of credits recorded would

negatively impact Vitesse's revenue number for the quarter. (Tr. 163, 179, 317-18, 392, 927-28, 1892-93, 1907, 1912, 1917). Mody did not recall any quarters where Vitesse recorded all of the credits that were outstanding. (Tr. 1913).

The amount of credits on the spreadsheet fluctuated during the relevant time. As the quarterly stocking packages with Nu Horizons grew in size in 2004 and 2005, the product returns by Nu Horizons and corresponding credits also grew larger. (*See* Tr. 933-34). These returns were not fully recorded until months after the product was actually returned. (Tr. 888, 1933). For example, as noted above, in early 2005, Nu Horizons returned $12 million worth of product purchased in prior stocking packages. Of that return, approximately $5.6 million was not recorded until June 2006, more than a year later. (Tr. 1781; GX 1100).

From late 2004 through early 2006, the amount of credits on the pending list ranged from $5 million to $17 million. (*Compare* GX 324 ($5.5 million as of August 26, 2004) *with* GX 333 ($17.5 million as of April 12, 2005)). When compared to the reported revenue figures during that same time period, which ranged from $44.4 million to $60 million (GX 10-B to 10-E), the significance of the pending credits to Vitesse's quarterly revenues is obvious.[4]

Because Vitesse did not record credits during the quarters that the product was returned, its revenues were overstated during the relevant time. In addition, its representations concerning product returns and the calculation of its sales return reserve were false and misleading. (Tr. 180-81, 922-23, 930-31, 939-40, 1946-47).

---

[4] The defendants argue that Vitesse's revenues were actually understated cumulatively from August 2001 through December 2005. (Def. Mem. 21). This argument is misleading. First, because the evidence showed that they were used to close the gap on a quarterly basis, the real issue is how the stocking packages and the pending credits for the various quarters compared to that quarter's revenue. Second, as Mody explained, the two mechanisms were used in conjunction with one another, and thus looking at them individually does not present the whole picture. (Tr. 2327-28).

Tomasetta and Hovanec were well aware that the manipulation of the credits made Vitesse's publicly reported results false and misleading because they had discussed the credits with Mody and Kaplan for years. (Tr. 923, 1955-56, 1959). For example, in January 2006 Vitesse reported $53 million in revenue for the quarter ended December 31, 2005, and told analysts that Vitesse was making progress towards a return to profitability. (Tr. 1951-53; GX 159). At the time of this report, however, Vitesse had $15 million worth of pending credits, which would have had a significant negative impact upon revenue for that quarter. (Tr. 1953; *see* GX 342 (showing $14.5 million in pending credits as of February 28, 2006)). Prior to the analyst call, Mody told Tomasetta that an employee of the finance department had overbooked approximately $850,000 worth of credits more than was budgeted, and that Mody had reversed these credits in order to avoid missing the revenue target for that quarter. (Tr. 1954-56, 2106-07).

In April 2006, at around the time Vitesse's Board directed that an internal investigation be conducted into its stock options, Tomasetta and Hovanec each separately instructed Mody to record all of the then-outstanding credits notwithstanding the effect that would have on Vitesse's ability to meet its revenue targets. (Tr. 1956-60). This direction demonstrated that Tomasetta and Hovanec were each aware that the outstanding credits had previously been concealed. In addition, after Tomasetta, Hovanec and Mody were suspended, they discussed the fact that the internal investigators had questioned Kaplan about Vitesse's practices with respect to credits. (Tr. 2050-51). At that meeting, Tomasetta observed that the inquiry into credits would "open up a new can of worms." (Tr. 2051).

-14-

### c.     Misrepresentations Concerning Accounts Receivables

Vitesse also misrepresented its accounts receivable by failing to reflect the fact that Nu Horizons had returned product and therefore was not obligated to pay the invoices for that product. (Tr. 809, 941, 1971). When Vitesse did record credits for Nu Horizons product returns, the finance department generally applied the credits to the oldest invoices, rather than the invoice that related to the product that was returned. In addition, Vitesse improperly manipulated its accounts receivable balances by applying cash payments from Nu Horizons to older, unrelated invoices. (Tr. 866-67, 1969). These practices made Vitesse's receivables look less aged than they actually were.

Mody discussed the fact that Vitesse's receivables balance included aged and uncollectible receivables with Tomasetta and Hovanec. In those discussions, Mody explained that Kaplan's group would apply cash to the oldest receivables in order to conceal the true age of from Vitesse's auditors. (Tr. 1969-71, 2103). Kaplan testified to having discussions with Hovanec and Mody to "get their stories straight" on what information to share with the auditors concerning receivables. (Tr. 941-42). In fact, Kaplan, at the direction of Hovanec and Mody, told Nu Horizons representatives not to return an audit confirmation letter to KPMG because she and the others knew that Nu Horizons could not truthfully confirm the statements in the letter. (Tr. 190-92, 942-46).

### 2.     Misrepresentations Concerning Vitesse's Options

During the relevant period, Vitesse regularly granted stock options to its employees and senior executives, which enabled the employees to purchase Vitesse stock in the future at a specified price called the "exercise price." Tomasetta and Hovanec generally initiated and oversaw the options grant process. (Tr. 2395-97; *see* Tr. 521-23, 526 (Board relied on Tomasetta

and Hovanec with respect to options)).  Options were granted by Vitesse's Compensation

Committee, a committee comprised of members of the Board of Directors, and their action was

memorialized by minutes of Compensation Committee meetings.[5]  (Tr. 1973, 2060, 2088-89)

The grant date for options was usually the date of the board meeting at which the options

were approved.  (Tr. 2395).  However, during periods where the stock became more volatile,

Hovanec would fix the grant price by looking for the lowest price within a month or so of the

Board meeting, rather than using the price on the date of the meeting.  (Tr. 2395).  Keever

assisted Hovanec (and sometimes Tomasetta) in making these determinations by printing lists of

stock prices within a date range and circling the low prices.  (Tr. 2395-96, 2408-10, 2416-20; GX

479, 501, 502).

Vitesse's public filings contained false statements concerning its stock options.  For

example, in its SEC Forms 10-K for the 2001 through 2005 fiscal years, Vitesse represented that

compensation expense was recorded for options granted to employees on the date of grant only if

the current market price of the underlying stock on that date exceeded the exercise price.  (Tr.

1973-74; GX 68).  Vitesse further represented in its 2002, 2003 and 2004 Forms 10-K that, other

than options granted in connection with certain acquisitions, "all of the option grants made by

Vitesse to employees and directors are granted at fair market value at the time of grant."  (GX

56, 60, 64).  In its 2004 and 2005 Forms 10-K, Vitesse represented that it "had no options

granted to employees in which the market price of the underlying stock exceeded the exercise

price on the date of grant."  (GX 64, 68).  Between 2001 and 2005, Vitesse did not record any

compensation expense for employee stock options.  (Tr. 1974).

---

[5] The meeting minutes for meetings of the Board and its committees were drafted by Hovanec,
typed up by Karen Keever ("Keever"), an administrative assistant, and sent to the Board for
review and approval before the next Board meeting.  (Tr. 2386-88).

These representations were false in at least two respects.  First, as Tomasetta and

Hovanec well knew, when Vitesse issued stock options that were "in the money," Vitesse did not

record a compensation expense for those options.  Second, contrary to its public representations,

Vitesse had in fact issued options to employees where the market price of the underlying stock

exceeded the exercise price on the date of grant.

The evidence at trial established the Vitesse issued backdated options on at least April 12,

2001, October 25, 2001, and January 26, 2004.  In each of these instances, it was clear from the

face of the Compensation Committee meeting minutes that the exercise price of the options was

the price "as of" a prior date, which was significantly lower than the price on the date of the

meeting.  (Tr. 1976-80, 1999, 2093; GX 473, 490, 513).  It was obvious from the evidence at

trial that these option prices had been selected because they were low and that no Compensation

Committee meetings had been held on the earlier dates.

The most compelling proof that Tomasetta and Hovanec knew that the meetings had not

occurred and that the representations in Vitesse's public filings about the options were false

came from the evidence about their response to inquiries concerning Vitesse's stock options.  In

the fall of 2005, a Wall Street Journal reporter asked Mody about Vitesse's stock options.  (Tr.

1976).  Mody consulted with Vitesse's then-outside counsel from Davis Polk & Wardwell

("DPW"), who reviewed the Compensation Committee meeting minutes.  The lawyers were

concerned because certain of the option grants, most notably the April and October 2001 option

grants, had exercise prices that were as of an earlier date and were lower than the fair market

value on the date the options were granted.  (Tr. 419-21, 1981, 2618; GX 600).  The DPW

lawyers advised Tomasetta and Mody that this circumstance might require that Vitesse record

and disclose a large compensation expense relating to the options.  (Tr. 419-21, 1981, 2622,

-17-

2659-61; *see* Tr. 1984-1987). The DPW lawyers recommended to Tomasetta and Mody that Vitesse investigate the option grants and delay filing its Form 10-K for the 2005 fiscal year, which was due to be filed in mid-December. (Tr. 421-25, 511-12, 1981).

Tomasetta and Hovanec told Mody that DPW was overreacting and rejected the advice. (Tr. 1987-89). They told Mody that meetings had actually occurred on April 6 and October 2, 2001.[6] (Tr. 1987-89; *see* Tr. 2621-22). Mody testified that after he was unable to locate either the original minutes or electronic versions of the minutes, he caused meeting minutes for purported April 6 and October 2, 2001 Compensation Committee meetings to be created. (Tr. 1991-93). Tomasetta took the minutes and asked Pierre Lamond ("Lamond"), the former chairman of Vitesse's Board, to sign them. (Tr. 1992-96; GX 470, 486, 1500).[7] Mody also created minutes in November 2005 for a meeting that purportedly happened on December 17, 2003 (which was the date referenced in the January 26, 2004 meeting minutes). (Tr. 1999-2000). Hovanec took these minutes and had another board member sign them. (Tr. 2000-01; GX 513-A).

Mody and Hovanec falsely told Board members and auditors that the options had actually been granted at meetings held on the earlier dates and that the questions raised by the lawyers related only to documentation issues. (Tr. 434-37, 549-58, 2002-06, 2032; GX 611, 1125). Tomasetta, Mody, and Hovanec never disclosed to the Board or the auditors that minutes for

---

[6] Tomasetta claimed that he had entries on his Palm Pilot calendar for the April 6 and October 2, 2001 meetings. (Tr. 1988, 2071-72). The evidence showed that these statements were lies, as entries in Tomasetta's Palm Pilot were actually placed there in late 2005, after questions had been raised about the meetings. (Tr. 2800-03; GX 1190).
[7] Keever testified that she recalled Hovanec asking her to create meeting minutes for two meetings that had occurred quite a while ago, and that Tomasetta had gotten them signed by Lamond. (Tr. 2444-47).

certain of the meetings at issue had been created years after the fact.[8]  (Tr. 553-55, 557-58, 2003-04, 2084).  Moreover, Mody and Hovanec each created documents to present to the Board and others which misleadingly disguised the when the April and October 2001 minutes had been created.  (*See* GX 611 (Mody's December 2005 presentation to the Audit Committee); GX 1125 (Hovanec's February 2006 memo to the Audit Committee)).  Vitesse thereafter filed its Form 10-K for the 2005 fiscal year on December 12, 2005.[9]  (Tr. 2008-09).

   After the Wall Street Journal published an article in March 2006 that raised questions about stock options at various companies, including Vitesse, the DPW lawyers again voiced concerns about Vitesse's option grants and the fact that documentation concerning the options had been created years after the fact.  (Tr. 442-45, 2012-14, 2026-28; GX 619).  Counsel articulated these concerns at a meeting with Vitesse's directors and management (including Tomasetta, Hovanec, and Mody).  (Tr. 446-47, 562-64, 567, 2032-34).  At the meeting, counsel advised the Chairman of Vitesse's Board that the recent creation of these minutes raised questions about whether the meetings at issue had actually occurred.  (Tr. 448-49, 565-68, 2034).  In response to these concerns, Hovanec falsely claimed that he had found the original minutes for the compensation committee meetings at issue.  (Tr. 449-50, 2034-35, 2332-33).

   The Vitesse directors at the meeting had not known about the recent creation of the minutes and decided to commission an independent investigation into Vitesse's stock options

---

[8] On December 13, 2005, one of the DPW lawyers spoke to Jack Lewis, Chairman of Vitesse's Board.  Although the lawyer advised Lewis of DPW's concerns, Lewis, based upon assurances from Hovanec, concluded that the issue was a documentation issue.  (Tr. 549-51, 2006-07, 2630-33, 2649).

[9] The defense argue that Tomasetta and Hovanec relied in good faith upon the fact that neither Vitesse's lawyers nor its auditors had raised any questions about the April and October 2001 option grants prior to the fall of 2005.  No matter how hard they try, however, the defendants cannot escape the fact that prior to the filing of the 2005 10-K, counsel had specifically warned them that the options appeared to have been backdated and that an investigation was necessary to determine whether a compensation expense needed to be recorded.

grants to conduct it.  (Tr. 450, 568, 2035-36).  The Munger, Tolles & Olson ("MTO") lawyers

hired to conduct the investigation interviewed Tomasetta, Hovanec and Mody, all of whom

continued to maintain that Hovanec had found the original contemporaneous minutes.  (Tr. 2700-

02).

      In addition, the MTO lawyers requested access to Keever's computer so they could

review electronic copies of the relevant Compensation Committee meeting minutes.  (Tr. 2037-

40, 2448-49).  Knowing that Keever's computer would not have contemporaneous electronic

copies of the meeting minutes for the April 6 and October 2, 2001 meetings, Tomasetta, Hovanec

and Mody typed up new electronic versions of these minutes, placed them on Keever's

computer, and then backdated the computer clock so that it would appear that the minutes had

been there all along.[10]  (Tr. 2040-43; *see* Tr. 2450).  Forensic analysis of Keever's and

Tomasetta's computers found evidence that suggested that the phony minutes were created on

Tomasetta's computer, transferred to Keever's computer, and that Keever's computer clock was

changed.  (Tr. 2790-93).

## ARGUMENT

### I.    The Standard For A Rule 29 Motion

      "A defendant challenging the sufficiency of trial evidence bears a heavy burden, and the

reviewing court must view the evidence presented in the light most favorable to the government

and draw all reasonable inferences in the government's favor."  *United States* v. *Gagliardi*, 506

F.3d 140, 149 (2d Cir. 2007) (internal quotation marks omitted).  A reviewing court must

---

[10] On May 17, 2006, Tomasetta confessed to MTO lawyers that he, Mody, and Hovanec had
manufactured documents on Keever's computer and backdated the computer clock.  (Tr. 2727-
34).  Tomasetta was hardly forthcoming during his confessions and minimized his involvement.
(Tr. 2729, 2734).  Moreover, the confession came only after MTO had successfully imaged the
computers assigned to Keever, Tomasetta, and Hovanec (Tr. 2045-48, 2718-22), which meant
that it was obvious that their obstructive conduct would be discovered.  In fact, both Tomasetta
and Hovanec had strongly objected to having their computers imaged.  (Tr. 2449-50).

"credit[] every inference that the jury might have drawn in favor of the government," *United States* v. *Morrison*, 153 F.3d 34, 49 (2d Cir. 1998) (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, a reviewing court must analyze the pieces of evidence "not in isolation but in conjunction," *United States* v. *Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). Further, a reviewing court must "resolv[e] all inferences from the evidence and issues of credibility in favor of the verdict" and thereby refrain from "substitut[ing] [its] own determinations of credibility or relative weight of the evidence for that of the jury." *United States* v. *Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008) (internal quotation marks omitted).

## II.   The Evidence Was Sufficient For A Jury To Find Venue Was Proper In The Southern District Of New York

The defendants assert that the Government failed to present evidence that would enable a reasonable jury to find by a preponderance of the evidence that venue was proper in the SDNY. (Def. Mem. 3-17). There was sufficient evidence for the jury to find venue for Counts One and Two.[11]

### A.   Applicable Law

The Constitution and Federal Rules of Criminal Procedure require that a federal defendant be tried in the district where the crime was committed. U.S. Constitution, Amendment VI; Fed. R. Cr. P. 18. Whether venue is proper in a particular district requires a determination of the nature of the crime alleged and the location of the acts constituting it. *United States* v.

---

[11] The Government concedes that venue was not established for Counts Three through Seven of the Indictment.

*Rodriguez-Moreno*, 526 U.S. 275, 279 (2000).  When a defendant is charged in more than one count, venue must be proper with respect to each count.  *United States* v. *Smith*, 198 F.3d 377, 382 (2d Cir. 1999).  Venue is not an element of the crime; the Government therefore bears the burden of proving venue only by a preponderance of the evidence.  *See id.* at 384.

Venue may be proper in more than one district for a single crime.  "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue."  *United States* v. *Reed*, 773 F.2d 477, 480 (2d Cir. 1985);   When the acts constituting a criminal offense take place in several districts, prosecution is proper in any district in which some part of the offense conduct occurred.  *United States* v. *Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984).  Section 3237(a) of Title 18 expressly provides that "any offense against the United States . . . committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  Accordingly, a defendant accused of a crime may be prosecuted in any district where any part of such a "continuing offense" occurred.  *United States* v. *Chalarca*, 95 F.3d 239, 245 (2d Cir. 1996); *United States* v. *Gonzalez*, 922 F.2d 1044, 1054 (2d Cir. 1991); *United States* v. *Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994).

**B.     Discussion**

   **1.     Conspiracy To Commit Securities Fraud**

The evidence was sufficient for a jury to find by a preponderance of the evidence that venue was proper in the SDNY for the conspiracy charge.  The crime of conspiracy is a continuing offense, the prosecution of which is proper "in any district in which such offense was begun, continued or completed."  18 U.S.C. § 3237(a); *United States* v. *Tannenbaum*, 934 F.2d 8, 12 (2d Cir. 1991).  Venue is appropriate in a district where any act in furtherance of the

conspiracy was committed by any of the co-conspirators.  *See United States* v. *Royer*, 549 F.3d
886, 896 (2d Cir. 2008); *Tannenbaum*, 934 F.2d at 12.  An overt act is any act performed by any
conspirator for the purpose of accomplishing the objectives of the conspiracy.  The act need not
be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object
or purpose of the conspiracy.  *See United States* v. *Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011);
*United States* v. *Rommy*, 506 F.3d 108, 119 (2d Cir. 2007).  In *Tzolov*, for example, the Second
Circuit found that the defendant's travel through Kennedy airport to attend meetings with
investors constituted acts in furtherance of the conspiracy and established venue in the EDNY.[12]
642 F.3d at 320-21.

Here, the evidence showed two categories of conduct in the SDNY during the life of the
conspiracy that furthered the securities fraud conspiracy.  First, Hovanec and Tomasetta
regularly attended meetings in the SDNY with Nadata and Bowers, the two most senior
executives at Nu Horizons.  The evidence at trial showed that there were at least 14 such
meetings during the time of the conspiracy.  (GX 1325-A, 1325-B).  The discussions at the
meetings were business and social, and included discussions about the quarterly stocking
packages.  (Tr. 1390-91, 1409, 1435-36, 1484-85, 1500, 1515-17, 1530, 1610).  These meetings
furthered the scheme because they made it more likely that Nu Horizons would continue to enter
into the quarterly stocking packages.  As set forth above, the fraudulent scheme depended to a
large degree upon Nu Horizons' willingness to place orders for the quarterly packages, which
Tomasetta and Hovanec used to fill the gap between Vitesse's actual revenue and its revenue
targets – by as much as 40 percent in certain quarters.

---

[12] Although the defendants discuss *Tzolov* extensively (Def. Mem. 13-14), they fail to mention
that the *Tzolov* court found venue sufficient on the conspiracy count.

Second, as Mody testified, Tomasetta, Hovanec, and Mody frequently attended conferences in the SDNY where they would meet with institutional investors and analysts.  At these conferences, the defendants and Mody would make presentations about the company. Tomasetta's calendar (GX 1175) indicates that he attended investor conferences in Manhattan on the following dates:  May 2-3, 2001 (Lehman/Merrill Lynch); October 29, 2002 (Prudential); November 18, 2002 (Lehman); June 16, 2003 (Lehman); September 2, 2003 (Salomon); May 6, 2004 (Magma briefing for Wall Street analysts); and May 2-4, 2005 (Merrill Lynch)).  These meetings furthered the conspiracy because the defendants and Mody communicated information – which necessarily included Vitesse's false publicly reported results – at these meetings.[13] Indeed, as Mody made clear, none of the top executives at the company ever disclosed the company's fraudulent transactions to anyone outside Vitesse.

The jury could have found that these two different types of meetings constituted acts in furtherance of the conspiracy, and were therefore more than sufficient to establish venue for Count One.  *See Tzolov*, 624 F.3d at 320 (defendant's travels through the EDNY in order to attend investor meetings was sufficient to establish venue for a conspiracy charge); *Smith*, 198 F.3d at 382 (telephone calls made by a co-conspirator from the SDNY were sufficient to establish venue over conspiracy).

---

[13] Mody explained that he, Tomasetta and Hovanec frequently discussed what they would say in their presentations.  For example, Mody testified that, in September 2005, before a conference he was scheduled to attend in San Francisco with Hovanec, he advocated for publicly lowering guidance when he realized that their revenue numbers were unachievable for the quarter. Because Tomasetta would not authorize them to do it, Mody and Hovanec made a presentation to investors that they knew contained misleading information.  (Tr. 1939-43).

-24-

### 2.      Substantive Securities Fraud

The defendants also argue that venue was improper for Count Two, which charged the

defendants with violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F. R. § 240.10b-5.  Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,
>
> a.      To employ any device, scheme, or artifice to defraud,
>
> b.      To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light
> of the circumstances under which they were made, not misleading, or
>
> c.      To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

The Exchange Act provides that: "[a]ny criminal proceeding may be brought in the

district wherein any act or transaction constituting the violation occurred."  15 U.S.C. § 78aa;

*Royer*, 549 F.3d at 894.  The language of this provision is "manifestly broad" and simply

requires that "*any*" act constituting the violation have taken place in the district.  *United States* v.

*Johnson*, 510 F.3d 521, 525 (4th Cir. 2007).

Rule 10b-5 criminalizes the "*employ[ment]* of any device, scheme, or artifice to defraud"

and "*engage[ing] in any act, practice, or course of business* which operates or would operate as

a fraud or deceit on any person."  Rule 10b-5(a)-(c).  The "essential conduct elements" of the

crime are the acts performed pursuant to the fraudulent scheme.  *Cf. United States* v. *Ramirez*,

420 F.3d 134, 145-46 (2d Cir. 2005) (explaining that the essential conduct element in mail fraud

case is the use of the mails).  In a securities fraud case, the essential conduct elements include

false representations to investors, but also include acts that the defendant performs that further

-25-

the fraudulent scheme. For that reason, the Second Circuit has held in securities cases that "'venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does].'" *Royer*, 549 F.3d at 894 (quoting *United States* v. *Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)).

Applying this test, Tomasetta's and Hovanec's meetings with Nu Horizons executives, analysts, and investors in the SDNY easily establish venue over the securities fraud scheme charged in Count Two of the Indictment. *See, e.g.*, *Royer*, 549 F.3d at 894-95 (the transmission of information to traders in the judicial district was sufficient to establish venue); *Johnson*, 510 F.3d at 525 (the transmission of fraudulent information into the judicial district is sufficient to establish venue even where, unlike here, the defendant is never physically present in the district). The meetings with Nu Horizons resulted in the transactions that were fraudulently reported to investors and therefore furthered the defendants' "device, scheme or artifice" to defraud. Similarly, the presentations about the company that Mody, Tomasetta, and Hovanec made to prospective investors at the conferences in New York furthered the scheme by communicating false reported results and inflated guidance to the public. (Tr. 1825-27, 1939-43). These meetings were part of the defendants "course of business that would operate as a fraud or deceit on any person." Furthermore, since the defendants themselves traveled to New York for these meetings, the substantial contacts test described in *Royer* also was satisfied. 549 F.3d at 895 (citing *United States* v. *Reed*, 773 F.2d 477, 481 (2d Cir. 1985)).

The defense argument that the Nu Horizons meetings were merely preparatory to the securities fraud charged in Count Two and were therefore insufficient to establish venue (Def. Mem. 11-15), fails because it ignores the fact that the Nu Horizons meetings were an essential

part of the defendants' fraudulent "course of business."  In fact, as the evidence showed, the

fraud scheme depended upon Nu Horizons to place quarter-end stocking packages so that Vitesse

could report to the public that it had hit its revenue targets.  The meetings in Manhattan between

Tomasetta and Hovanec and senior Nu Horizons executives were critical towards cementing the

relationship between the two companies and ensuring that Nu Horizons would place the stocking

package orders.[14]  Given the fact that these meetings constituted "activity in [this district] that

was intended to, and did, effectuate their scheme," venue was proper.  *Royer*, 549 F.3d at 895.

Moreover, the defendants do not address the analyst and investor meetings that occurred in this

district.

The defendants also argue that because the Government did not offer evidence of

meetings with Nu Horizons or investors in the SDNY that occurred after December 7, 2005 (*i.e.*,

during the statute of limitations period), the Government has failed to establish venue.  While we

recognize that the Court instructed the jury consistent with this argument (Tr. 3348-49, 3410),

we respectfully submit that the instruction was incorrect because the securities fraud scheme

charged in Count Two was a continuing offense.

The evidence at trial showed that the defendants engaged in a scheme to defraud

investors that lasted from 2001 to 2006.  The evidence also showed that acts constituting that

---

[14] By comparison, the cases relied upon by the defendants involved conduct that was far more anterior and remote to the criminal conduct at issue. *Tzolov*, 642 F.3d at 318-319 (travel through and airport en route to investor meetings insufficient to confer venue); *Ramirez*, 420 F.3d at 141 (venue not proper in New York for immigration fraud charge where immigration forms were assembled in New York, but were actually filed with the INS in Vermont); *United States* v. *Geibel*, 369 F.3d 682 (2d Cir. 2004) (tipper's misappropriation in New York of information that defendants illegally traded on was insufficient to confer venue); *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) (defendants' orders for adulterated apple juice concentrate in the SDNY were "merely prior and preparatory to th[e] offense" of introducing adulterated juice into commerce).

scheme took place throughout that time period in a number of different locations, including the Southern District of New York.

The language of Rule 10b-5 strongly suggests that it is a continuing offense.  By framing the criminal activity in terms of a "scheme or artifice to defraud" or a "course of business which operates or would operate as a fraud," the Rule plainly criminalizes ongoing fraud schemes. Thus, not surprisingly, in almost every securities fraud case charged in this district, it is alleged that a defendant engaged in numerous fraudulent acts in connection with the purchase or sale of securities, all of which are charged as part of one overarching fraud scheme.

The conclusion that the securities fraud is a continuing offense is supported by the Court's charge concerning the definition of the scheme to defraud.  At the defendants' request, and over the Government's objection, the Court specifically defined the scheme to defraud charged in Count Two using the exact same "single overarching scheme" language that it used in connection with the conspiracy charge.  *Compare* Tr. 3308 (defining scope of the conspiracy) *with* Tr. 3322 (defining scope of scheme to defraud).  This instruction recognized that the fraud scheme charged in Count Two was coextensive with the conspiracy.  It follows that, like the conspiracy, the scheme was a continuing offense.

Moreover, although we have been unable to locate any Second Circuit cases holding that securities fraud is a continuing offense for venue purposes, the Second Circuit has held that other fraud crimes that extend over a period of time are continuing offenses.[15]  *See, e.g., United States v. Magassouba*, 619 F.3d 202, 207 (2d Cir. 2010 (bank fraud)); *United States v. Kim*, 246 F.3d

---

[15] One court, in the Eastern District of New York, held that securities fraud under 18 U.S.C. § 1348 is not a continuing offense for statute of limitations purposes. *See United States v. Motz*, 652 F. Supp. 2d 284, 292-93 (E.D.N.Y. 2009).  That case relied, in turn, on *United States v. Rivlin*, 2007 WL 4276712 (S.D.N.Y. Dec. 5, 2007), which considered whether embezzlement of funds from an employee benefit fund was a continuing offense.  *Motz* is not controlling, and should not be followed for two reasons.  First, it did not consider Rule 10b-5.  Second, it relied upon an embezzlement case that has no bearing upon an ongoing securities fraud scheme.

186, 191-92 (2d Cir. 2001) (wire fraud)).  Indeed, it is logical that an ongoing scheme should be viewed as a continuing offense.  Otherwise, the Government would be unable to prosecute in one case acts occurring in different locales that are part of the same scheme, or one securities fraud scheme involving multiple purchases and sales of stock.

Because securities fraud is a continuing offense, venue was proper in any district where the offense was "begun, continued, or completed."  18 U.S.C. § 3237(a).  The Second Circuit has held that where an offense is a continuing offense there is no requirement that the acts that establish venue occur within the statute of limitations.  *United States* v. *Tannenbaum*, 934 F.2d at 13.  Recognizing the distinction between venue and statute of limitations, the Second Circuit found that "imposition of a limitations requirement for the overt acts establishing just venue would bifurcate a conspiracy into two sets of events – those within the limitations period and those without – and thereby conflict with the fundamental nature of a continuing crime."  *Id.* (quotations and citations omitted).  Accordingly, the court held that certain acts were sufficient to confer venue, even though they were committed outside the statute of limitations.  Although *Tannenbaum* was a conspiracy case, that is not the basis for its holding.  The holding is premised upon the recognition that venue for a continuing offense is proper in "the whole area through which force propelled by an offender operates."  *Id.* at 12 (citations omitted).  Because the scheme to defraud charged in Court Two was likewise a continuing offense, venue was proper in the SDNY because the evidence showed that the scheme was, at a minimum, continued in this district.

### III.   The Evidence Was Sufficient For A Jury To Find A Single Conspiracy

The defendants argue that the Court should grant a judgment of acquittal with respect to the conspiracy charged in Count One on the ground that the evidence was not sufficient for the jury to find a single conspiracy.  (Def. Mem. 18-19).  This argument fails.

The Second Circuit repeatedly has held that whether the Government's proof shows a single conspiracy or multiple independent conspiracies "is a question of fact for a properly instructed jury." *United States* v. *Berger*, 224 F.3d 107, 114 (2d Cir. 2000); *United States* v. *Rosa*, 11 F.3d 315, 340 (2d Cir. 1993).  To prove a single conspiracy, the Government need show only that the defendant "agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States* v. *Geibel*, 369 F.3d at 688.  The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan. *Berger*, 224 F.3d at 114 (quoting *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir.1990)).  A "single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." *United States* v. *Williams*, 205 F.3d 23, 33 (2d Cir. 2000); *United States* v. *Aracri*, 968 F.2d 1512, 1522-23 (2d Cir. 1992).  Nor is a single conspiracy transformed into multiple conspiracies "merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'" *United States* v. *Geibel*, 369 F.3d at 688 (quotations omitted).

The evidence at trial was sufficient for a reasonable jury to conclude that the conspiracy encompassed a scheme to lie to investors and auditors about Vitesse's true financial condition and results of operations, and that each defendant was conscious of the conspiracy's general nature and extent.  Specifically, Tomasetta and Hovanec were responsible for communicating

-30-

Vitesse's financial results to the public and willfully communicated false information to investors about Vitesse's financial performance and results of operations, including its revenues, credits, and options.  The lies about Vitesse's revenues and the lies about Vitesse's options were simply two different components of the same scheme.  Each category of lies had the same general purpose: making the company's performance look better than it actually was.

The defendants argue, and the Court instructed the jury, that the "single unlawful design or purpose alleged here included both: (1) recognizing revenue on product shipments in a manner that was inconsistent with Vitesse's disclosures; and (2) falsely representing that Vitesse had no options granted to employees in which the market price of the underlying stock exceeded the exercise price on the date of grant." (Tr. 3308, 3322, 3380).  The Government objected to this language on the grounds that it mischaracterized the Indictment, was contrary to the Court's September 22, 2011 Order, and that the language was incorrect and likely confuse the jury.[16] However, even under this jury instruction, the evidence was more than sufficient to demonstrate a single conspiracy.

When viewed in the light most favorable to the Government, the evidence overwhelmingly showed that Tomasetta and Hovanec participated in a single conspiracy to making Vitesse's reported financial results appear better than they really were.  The evidence showed that the lies about revenues and the lies about options:  (1) served the same overriding goal of falsely bolstering Vitesse's financial performance; (2) were orchestrated by the same senior executives at Vitesse, namely Tomasetta, Hovanec, and Mody; (3) were communicated to

---

[16] The confusion that resulted from the instruction is evidenced by the fact that the jury twice asked for clarification of this precise language. (Tr. 3365, 3402).  Nonetheless, as the defendants are well aware, 11 jurors voted to convict on the conspiracy count.  Although the defense claims that the vote was based on certain improper considerations by members of the jury (Def. Mem. 1 n.1), we disagree.  Based on our discussions with the jurors, the claim that the jurors acted in bad faith and in violation of their oaths is unfounded.

the same audience (analysts, investors, and auditors); and (4) were communicated in the same written documents and oral presentations. The jury could reasonably have inferred that the defendants – who were the leaders of the conspiracy and were directly involved in all facets of the conspiracy – were aware of the general nature and extent of the criminal agreement. *See Berger*, 224 F.3d at 115 (finding evidence sufficient to establish a single conspiracy where the defendants participated in a massive conspiracy to obtain by fraud millions of dollars in student financial aid, rental subsidies, social security benefits, and small business loans from different government agencies). It follows that the motion for a judgment of acquittal must be denied.

## IV.    The Evidence Was Sufficient For A Jury To Find Material Misrepresentations

The defendants argue that the evidence was not sufficient to establish that the defendants made material misrepresentations about Vitesse's financial performance. (Def. Mem. 20-24). This argument should also be rejected.

In order to establish materiality, the Government was required to prove that there must have been a "substantial likelihood" that the misstatements would be important to a reasonable investor. *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988); *United States* v. *Ferguson*, 653 F.3d 51, 75 (2d Cir. 2011). The Second Circuit has consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation. *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Rather, the court must consider the charged misstatements in context. Although quantitative indicators of a misstatement's significance to investors could be determinative of materiality, "[w]ith respect to financial statements, ... '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Id.* at 163 (quoting SEC Staff Accounting Bulletin No. 99 ("SAB No. 99"), 64 Fed. Reg. 45150, 45152 (1999)). The Second Circuit has noted that SAB No. 99 identifies a non-exhaustive list of qualitative factors

-32-

relevant to assessing materiality, including: (1) whether the misstatement conceals a change in earnings or other trends; (2) "whether the misstatement hides a failure to meet analysts' consensus expectations;" and (3) "whether the misstatement changes a loss into income or vice versa." SAB No. 99, 64 Fed. Reg. at 45152; *see Ganino*, 228 F.3d at 163 ("SAB No. 99 is thoroughly reasoned and consistent with existing law – its non-exhaustive list of factors is simply an application of the well-established *Basic* analysis to misrepresentations of financial results – we find it persuasive  guidance for evaluating the materiality of an alleged misrepresentation."). Additionally, SAB No. 99 observes that "[w]hile the intent of management does not render a misstatement material, it may provide significant evidence of materiality." 64 Fed. Reg. at 45152; *see Gebhardt* v. *ConAgra Foods, Inc.*, 335 F.3d 824, 829-30 (8th Cir. 2003) (recognizing management's role in misstatements as part of the total mix of information that "would probably be important to investors").

Measured by these standards, there was sufficient evidence from which the jury could have found that the defendants made and caused to be made material misrepresentations about Vitesse's revenues.  First, the evidence plainly showed that revenue was a subject of intense scrutiny by the defendants, the Board, analysts, and investors.  (Tr. 541-42, 1862, 1941-42, 1950-51, 2486-87, 2498-2505, 2509-10).  Second, Srini Pajjuri's testimony clearly indicated that it was important for analysts to know how Vitesse recognized revenue on its sales to its distributor in order to evaluate revenue trends.  (Tr. 2494-97).  *Cf. Ferguson*, 653 F.3d at 76 n. 10 (describing testimony by stock analysts about the importance of loss reserve information to investors and analysts as "substantial").  Third, the Government offered powerful summary charts that showed that the revenue from the transactions at issue (all of which were recorded inconsistently with the company's public disclosures) constituted a substantial percentage of

Vitesse's quarterly revenues, ranging, in the critical time period, from over 20 percent to up to 40 percent of reported revenues in a given quarter – numbers that are material on their face. (Tr. 2815, 2817-18, 2826; GX 10-A through 10-E).

Similarly, a reasonable investor would have found important the misrepresentations about Vitesse's handling of credits for product returns. The evidence overwhelmingly showed that Tomasetta and Hovanec reviewed the level of pending credits at the end of each quarter and determined the dollar amount of the credits that would be should be recorded based upon Vitesse's ability to hit its revenue targets. Both Tomasetta and Hovanec were well aware that the practice of bleeding out credits was improper because, when the internal investigation was ordered in 2006, they told Mody to clean up the credits. (Tr. 1957). The fact that management was directly involved in a manipulative practice that altered the revenue figures to meet analyst estimates is exactly the type of information that a reasonable investor would have found important. Moreover, as noted above, the amount of credits pending at the end of the quarter was often significant when viewed in the context of quarterly revenue.

The false representations about stock options in the 2005 10-K were also material. By December 2005, the defendants were aware that the company's outside counsel had identified option grants that were backdated and which would have required a compensation expense of over $100 million. (Tr. 549-51, 1987; 2629-33). The evidence established that, rather than adopting counsel's recommendation that the matter be investigated and the true facts reported, the defendants took steps to make it look like meetings had actually occurred on the putative grant dates. Mody explained that this was to avoid a restatement. (Tr. 2004). In light of these

facts, there was evidence sufficient for the jury to find that the false representations about stock

options were material.[17]

## V.    The Evidence Was Sufficient For A Jury To Find That Tomasetta and Hovanec Knowingly And Willfully Participated In The Fraudulent Scheme

Defendants Tomasetta and Hovanec each raise independent arguments suggesting that the

evidence was insufficient to show that they knowingly and willfully made false statements to

investors.  (Def. Mem. 24-26, 27-30).  These arguments ignore the facts that were proved at trial.

As explained above, the evidence overwhelmingly proved that Tomasetta and Hovanec directed

weekly meetings tracking the company's revenues (Tr. 843, 1857, 1862-1863, 1887-88);

participated in end-of-quarter "close the gap" meetings at which a small number of participants,

most of whom were involved in committing the fraud, discussed booking last-minute stocking

packages in order to meet the revenue targets; knew and understood that the stocking packages

were quarter-end shipments to a warehouse based on optimistic hopes of future sales, rather than

actual orders for products, and that Nu Horizons had 100-percent return rights; and directed that

the company's credits for product returns be manipulated.  (Tr. 827-28, 844, 870-72, 1916-19).

The purpose of engaging in these fraudulent revenue transactions was to make Vitesse's

revenues appear to be greater than they actually were and to hit the revenue guidance that

Tomasetta had provided to Wall Street.  (Tr. 829-31, 839, 1906-12).  As the evidence at trial

---

[17] The defendants' reliance upon the Ninth Circuit's decision in *United States* v. *Goyal*, 629 F.3d 912 (9th Cir. 2010), is misplaced.  In that case, the Court found evidence of materiality to be insufficient because the only evidence concerning the revenue misrepresentations were stipulations that applying sell-through accounting to the company's entire business would have resulted in "a revenue figure that is materially less than the reported figure" for the periods charged in the false filing counts.  *Id*. at 915-16.  The Ninth Circuit found these stipulations to be "fatally overbroad" because the Government did not argue that the company was required to use sell-through accounting for all of its transactions.  *Id*.  Here, by contrast, the Government argued that the defendants misrepresented Vitesse's revenues by recording revenue on specific stocking package transactions with Nu Horizons inconsistently with Vitesse's public disclosures, and offered evidence to show the amount of the specific transactions at issue and the material effect that they had on Vitesse's reported revenues for the relevant quarter.

made clear, no one (outside of the co-conspirators), including the auditors, the Board of Directors or investors, ever knew the truth about how the defendants manipulated Vitesse's revenues.

Tomasetta now claims that the evidence was insufficient to prove that he knowingly misrepresented his company's financial condition when he signed and certified his company's financial statements – which were replete with false statements – because there was no evidence that he read these important documents, or that anyone explained their contents to him. (Def. Mem. 25-26). Hovanec makes a similar claim, stating that he "never prepared or oversaw preparation of the books, records, or financial statements for Vitesse during 2001 to 2006" and that, after April 2005, he relinquished his CFO position and left the Finance Department entirely. (Def. Mem. 27).

Not surprisingly, there was no proof offered at trial that the defendants authored the company's public filings, or that someone sat and read the company's filings to the defendants before they were signed – but the Government did not need to prove that the defendants performed every function in the accounting department in order to have proved them guilty of securities fraud and conspiracy to commit securities fraud. The proof, described above, that the defendants gave direction to book certain large sales to Nu Horizons and not to book credits in order to meet specific revenue targets is powerful evidence that they knew the company's public filings contained false and misleading information throughout the pendency of the scheme to defraud.[18] Moreover, there was ample evidence from which a reasonable jury could have

---

[18] Moreover, the evidence showed that Hovanec's special relationship of trust with Tomasetta was in no way diminished by Mody's promotion to CFO in April 2005 – indeed, the evidence showed that when Mody was offered more stock options than Hovanec in late 2005, Hovanec became so angry at the perceived slight that he stopped showing up for work and threatened to quit, until Tomasetta personally apologized and ensured that Hovanec received the equivalent amount of options as Mody. (Tr. 2346-48).

concluded that that the defendants, who routinely addressed the Board, investors and analysts –
often expertly answering questions about the details of the business – had complete command of
the company's reported results and its public filings.  Finally, if the defendants did not know, for
example, that the public filings contained representations that Nu Horizons sales with return
rights were treated as deferred revenue, Hovanec would have had no reason to agree to an *oral*
right of return on all stocking packages but refuse to put such an agreement in writing – as the
evidence at trial proved he did.  (Tr. 1420-21).

     In sum, the evidence overwhelmingly proved that the defendants knowingly and willfully
made and caused to be made false and misleading statements to the investing public about
Vitesse's true financial condition sufficient to find them guilty of both Counts One and Two.

## **CONCLUSION**

     For the foregoing reasons, the defendants' motions for judgment of acquittal with respect
to Counts One and Two should be denied.

Dated: New York, New York
       May 22, 2012

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney

By:                         
                          JOHN J. O'DONNELL
                          KATHERINE R. GOLDSTEIN
                          Assistant United States Attorneys
                          Telephone: (212) 637-2490/2262

# EXHIBIT A

# Vitesse Revenue on Quarterly Stocking Package to Nu Horizons and Titan

| Quarter | 2003 | | | | | |
|---|---|---|---|---|---|---|
| | 2 Q | Exhibit Ref. | 3 Q | Exhibit Ref. | 4 Q | Exhibit Ref. |
| Quarterly Stocking Package – NH & Titan | $ 2,469,626 | [1202-A/C] | 6,232,278 | [1203-A/C] | 3,578,832 | [1204-A/C] |
| Vitesse Sales Journal Revenue | $ 1,506,528 | [220] | 4,719,232 | [220] | 3,498,802 | [220] |
| Revenue Reported by Vitesse | $40,172,000 | [58] | 39,738,000 | [59] | 42,791,000 | [60] |
| Percentage | 4% | | 12% | | 8% | |



GOVERNMENT
EXHIBIT
10-B
10 Cr. 1205 (PAC)

# Vitesse Revenue on Quarterly Stocking Package to Nu Horizons and Titan

| Quarter | 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 Q | Exhibit Ref. | 2 Q | Exhibit Ref. | 3 Q | Exhibit Ref. | 4 Q | Exhibit Ref. |
| Quarterly Stocking Package – NH & Titan | $ 7,472,454 | [1205-A/C] | 8,900,329 | [1206-A/C] | 22,441,402 | [1207-A/C] | 21,509,965 | [1208-A/C] |
| Vitesse Sales Journal Revenue | $ 6,012,504 | [220] | 6,585,319 | [220] | 21,263,531 | [220] | 20,935,641 | [220] |
| Revenue Reported by Vitesse | $50,312,000 | [61] | 56,034,000 | [62] | 60,417,000 | [63] | 52,012,000 | [64] |
| Percentage | 12% | | 12% | | 35% | | 40% | |



GOVERNMENT
EXHIBIT
10-C
10 Cr. 1205 (PAC)

# Vitesse Revenue on Quarterly Stocking Package to Nu Horizons and Titan

| Quarter | 2005 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 Q | Exhibit Ref. | 2 Q | Exhibit Ref. | 3 Q | Exhibit Ref. | 4 Q | Exhibit Ref. |
| Quarterly Stocking Package – NH & Titan | $ 16,828,114 | [1209-A/C] | 17,080,859 | [1210-A/C] | 16,038,693 | [1211-A/C] | 17,021,809 | [1212-A/C] |
| Vitesse Sales Journal Revenue | $ 17,141,550 | [220] | 13,075,508 | [220] | 15,645,191 | [220] | 16,039,901 | [220] |
| Revenue Reported by Vitesse | $44,459,000 | [65] | 47,158,000 | [66] | 50,971,000 | [67] | 48,190,000 | [68] |
| Percentage | 39% | | 28% | | 31% | | 33% | |



GOVERNMENT EXHIBIT
10-D
10 Cr. 1205 (PAC)

# Vitesse Revenue on Quarterly Stocking Package to Nu Horizons and Titan

| Quarter | 2006 1 Q | Exhibit Ref. |
|---|---|---|
| Quarterly Stocking Package – NH & Titan | $ 13,331,357 | [1213-A/C] |
| Vitesse Sales Journal Revenue | $ 13,005,224 | [221] |
| Revenue Reported by Vitesse | $ 53,011,000 | [69] |
| **Percentage** | **25%** | |



GOVERNMENT
EXHIBIT
10-E
10 Cr. 1205 (PAC)

AFFIRMATION OF SERVICE

JOHN J. O'DONNELL hereby affirms pursuant to Section 1746 of Title 28, United States Code:

1.      I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York.

2.      On May 22, 2012, I caused a true and correct copy of the foregoing Memorandum Of Law In Opposition To The Defendants' Motions For Judgments Of Acquittal, via the Court's Electronic Case Filing system on:

Dan Marmalefsky, Esq.                    Gary Lincenberg, Esq.
Lawrence Gerschwer, Esq.                 Peter J. Shakow, Esq.
Morrison & Foerster                      Bird, Marella, Boxer, Wolpert, Nessim,
1290 Avenue of the Americas              Drooks & Lincenberg
New York, NY 10104                       1875 Century Park East
                                         Los Angeles, CA 90067-2561

*Counsel for defendant*                  *Counsel for defendant*
*Louis Tomasetta*                        *Eugene Hovanec*

3.      I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Dated:      New York, New York
            May 22, 2012


                                         _____
                                         JOHN J. O'DONNELL