UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

        Plaintiff,

- against -

LOUIS TOMASETTA AND
EUGENE HOVANEC,

        Defendants.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 6, 2012

10 Cr. 1205 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

On December 8, 2010, Defendants Louis Tomasetta and Eugene Hovanec ("Defendants") were charged in a seven count indictment with (1) conspiracy to commit securities fraud, to make false statements to auditors, to make false statements in Securities and Exchange Commission ("SEC") filings, and to falsify the books and records of a public company (Count One); (2) securities fraud (Count Two); (3) making false entries in the books and records of an issuer of securities (Count Three); (4) two counts of making false filings with the SEC (Counts Four and Five); and Tomasetta only was charged with (5) false certification of financial statements (Count Six); and (6) making false statements to auditors (Count Seven). On March 21, 2012, the Defendants proceeded to trial. At the close of the Government's case, the Defendants moved, pursuant to Fed.R.Crim.P. 29, for a judgment of acquittal. The Court reserved ruling on the motion, pursuant to Fed.R.Crim.P. 29(b). On April 24, 2012, the Court declared a mistrial due to the jury's inability to reach a unanimous verdict on any of the Counts.

On May 8, 2012, Defendants renewed their Rule 29 motion for a judgment of acquittal on all Counts, arguing: (1) that all Counts should be dismissed for lack of venue; (2) Count One should be dismissed for lack of proof of a single, overarching conspiracy; (3) Counts Two, Four, and Five should be dismissed for lack of proof that the misstatements in the SEC filings were material; (4) Counts Two, Four, and Seven should be dismissed for lack of proof that Tomasetta acted knowingly and willfully;

1

and (5) all Counts against Mr. Hovanec should be dismissed for insufficient evidence. On May 23, 2012, the Government filed its opposition brief, and conceded that it failed to prove venue with respect to Counts Three through Seven. (Opp. 21 n.11.) The Government opposes the Defendants' motion as to Counts One and Two.

For the following reasons, Defendants' Rule 29 motion for a judgment of acquittal is GRANTED with respect to Counts Two through Seven, and DENIED with respect to Count One.

## FACTS

The facts sufficient to understand the disputed Counts are set forth below.

Dr. Tomasetta was the Chief Executive Officer of Vitesse Semiconductor Corporation ("Vitesse") from 1987 through May 2006; Mr. Hovanec was Vitesse's Chief Financial Officer from December 1993 through April 2005, and Executive Vice President from April 2005 through May 2006. Vitesse is a semiconductor technology company located in California. Defendants were charged with deceiving Vitesse's investors and auditors about Vitesse's true financial condition by making materially misleading disclosures about Vitesse's revenue recognition and backdating stock options practices.

With respect to Vitesse's revenue recognition practices, the Government introduced evidence at trial that from September 2001 through early 2006, Defendants and others arranged to send large quarterly shipments of product—"quarterly stocking packages"—to a major distributor, Nu Horizons Electronics Corp. ("Nu Horizons"). Vitesse's 10-K stated: "Certain of our production revenues are made to a major distributor under an agreement allowing for pricing credits and rights of return on products unsold. Accordingly, we defer recognition of revenue on such products until the products are sold by the customer to the end user." (GX 68 at 33.) The Government introduced evidence that, contrary to this disclosure, Vitesse recorded the quarterly stocking packages as revenue when they were shipped to Nu Horizons, even though Defendants knew that Nu Horizons could and did frequently return large amounts of product. In addition, the Government introduced evidence that showed Vitesse would not record credits, or reductions, to revenue in a timely fashion for the product returned by Nu Horizons,

2

which was also contrary to its public disclosures. Such practices artificially inflated Vitesse's revenue and hid Vitesse's true financial condition from investors.

With respect to Vitesse's stock options grants, the Government introduced evidence that showed on at least two occasions—April 12, 2001 and October 25, 2001—Vitesse's Compensation Committee minutes reflected, on their face, that the stock options were granted at an exercise price as of a prior date; a date when the stock price was lower. If the options were granted on the date of the Compensation Committee meetings—i.e., assuming that these options were not officially granted on prior dates—then the options would be "in-the-money" grants, which was not consistent with Vitesse's public disclosure that it "had no options granted to employees in which the market price of the underlying stock exceeded the exercise price on the date of grant." (GX 68.) According to the Government, if these options were in-the-money, Vitesse should have recorded a non-cash compensation charge of approximately $100 Million, but it did not do so.

## DISCUSSION

Under Fed.R.Crim.P. 29, a court is permitted to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). In considering a Rule 29 motion, the Court "views the evidence presented in the light most favorable to the government, and . . . draw[s] all reasonable inferences in its favor." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir.1984).) "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.' " Id. (quoting United States v. Guadagna, 183 F.3d 122, 129 (2d Cir.1999)).

I.    <u>Venue</u>

Article III, section 2, of the Constitution mandates that criminal trials "be held in the state where the said crimes shall have been committed." The Sixth Amendment is more restrictive: a defendant must be tried in the "State and district wherein the crime shall have been committed." When a defendant is charged in more than one count, as the Defendants are here, venue must be proper with respect to each count. See <u>United States v. Beech-Nut Nutrition Corp.</u>, 871 F.2d 1181, 1188 (2d Cir. 1989). "Because venue is not an element of a crime, the government need establish it only by a preponderance of the evidence." <u>Id.</u>

    *A. Count Two: Securities Fraud*

Count Two charges the Defendants with committing securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. The securities fraud statute has its own venue provision, stating: "Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. A securities fraud violation involves, among other elements, "employ[ing] a device, scheme or artifice to defraud"; or "ma[king] an untrue statement of material fact or omit[ing] to state a material fact"; or "engage[ing] in an act, practice or course of business which operates or would operate as a fraud or deceit." (Rule 10b-5 (a)-(c).) Defendants were charged with making false statements about Vitesse's revenue recognition and stock options practices, which furthered their scheme to defraud investors by hiding Vitesse's true financial condition. (See Indict. ¶ 17.) Regardless of whether Defendants' conduct is viewed under section (a), (b), or (c) of Rule 10b-5, it is Vitesse's false disclosures that are at the heart of the charged securities fraud offense.[1]

At trial, the Court instructed the jury "for the conspiracy charge only, the overt acts in support of venue need not have occurred during the statute of limitations" and that for Count Two, the jury must

---

[1] As the Defendants summarize at length (<u>see</u> <u>e.g.</u>, Def. Reply 13-14 & n.9), the Government repeatedly argued that this case is about Defendants' failure to follow their disclosed practices, and not about the legality of those practices. Thus, to the extent Defendants' conduct is characterized as a "scheme to defraud" the scheme involved failing to accurately disclose Vitesse's revenue recognition and options practices. Similarly, Defendants can be seen as having engaged in a course of conduct that violated Vitesse's disclosed practices.

4

decide "whether the acts or transactions constituting the crime charged occurred in the Southern District of New York." (Tr. 3348-49.)   After days of deliberation, the jury sent a note indicating that they were deadlocked and barring an "additional clarification" of a single overarching conspiracy and the definition of venue, they would not reach a verdict. (Tr. 3402.)  In response to this note, the Court clarified that with respect to Count Two, "the government must prove that the act or transaction constituting the offense occurred in the Southern District of New York on or after December 7, 2005," which was the beginning of the statute of limitations period. (Tr. 3410.)

The Government did not prove that an act or transaction constituting the securities fraud offense occurred in the Southern District of New York on or after December 7, 2005.  The Defendants' dinner meetings with Nu Horizons and the so called New York investor meetings, discussed in more detail below, all occurred before that date.

The Government argues that the Court's venue instructions were incorrect because securities fraud is a continuing offense, and therefore the dinner meetings and investor meetings are sufficient to establish venue, even though they did not occur within the statute of limitations period.  In support of its argument, the Government relies on 18 U.S.C. § 3237(a) which provides:  "*Except as otherwise expressly provided by enactment of Congress*, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." (emphasis supplied).  By its own terms, this statute does not apply where Congress expressly provides otherwise, as it has with the specific venue provision for securities fraud, under 15 U.S.C. § 78aa.  A securities fraud charge is to be brought in "the district wherein any act or transaction constituting the violation *occurred*"—not where the act or transaction begun, continued, or completed.  Indeed, the Government concedes that it has "been unable to locate any Second Circuit cases holding that securities fraud is a continuing offense for

5

venue purposes . . . ."[2] (Opp. 28.)  Given the clear language of 15 U.S.C. § 78aa and the lack of support for the Government's argument, the Court holds that securities fraud is not a continuing offense.  The Government therefore was required to, but failed to, prove that an act or transaction constituting the securities fraud offense occurred in this District within the statute of limitations period.  Accordingly, the Government has not established venue with respect to Count Two.

Furthermore, even if securities fraud was a continuing offense, the Government still failed to establish venue in this District because, as the Second Circuit has long held, "[w]hether the crime be continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense."  Beech-Nut, 871 F.2d at 1190.  Thus, in United States v. Geibel, 369 F.3d 682, 697 (2d Cir. 2004), the location of the initial misappropriation of information was insufficient to establish venue for an insider trading charge, even though the defendants committed the offense by trading on this information in other states, because the initial misappropriation was "anterior and remote" and thus merely preparatory to the charged offense.  Similarly, in United States v. Ramirez, 420 F.3d 134 (2d Cir. 2005), the Second Circuit vacated a conviction for visa fraud, holding that defendant's assembling of the visa petition in Manhattan—which involved obtaining approvals from the Manhattan office of the Department of Labor—was insufficient to establish venue, as such acts were merely preparatory to the charged offense.  Id. at 140-41.  The defendant was charged with committing visa fraud in connection with the submission of false statements to an INS branch in Vermont, and not "charged in connection with assembling the forms prior to their submission."  Id.  Since the defendant's conduct in Manhattan was a "condition precedent" that "preceded" and "was in preparation of the offense, it, consequently, was not part of the offense."  Id.

In United States v. Tzolov, 642 F.3d 314, 318-319 (2d Cir. 2011), the Second Circuit found that defendants' travel through the Eastern District of New York was insufficient to establish venue for the

---

[2]  While the Government cites cases analyzing venue under 18 U.S.C. § 3237(a), those cases are inapposite as they did not involve securities fraud charges; or involve the application of 18 U.S.C. § 3237(a) to another congressionally mandated venue provision.

substantive securities fraud counts.  The court rejected the government's argument that the defendants' flights through John F. Kennedy Airport established venue because they were "an important part of furthering the [fraudulent] scheme."  Id.  The court "ha[d] little difficulty concluding that the government failed to offer competent proof that any 'act or transaction *constituting* the [securities fraud] violation occurred' in the Eastern District," as none of the false or misleading information was transmitted into or out of the Eastern District.  Id. (emphasis in original).  The court held that "[a]t most, catching flights from the Eastern District to meetings where [defendant] made fraudulent statements were preparatory acts," which were insufficient to establish venue.  Id.

There was no evidence at trial that Vitesse's disclosures were drafted in New York, or sent to any investors in New York, or that any false statements regarding Vitesse's revenue recognition and options practices were made or received in this District.  The Government nonetheless argues that the Defendants' dinner meetings with Nu Horizon's executives were "critical towards cementing a relationship between the two companies" and that the stocking packages discussed at these meetings were later fraudulently reported to investors—thereby furthering the Defendants' scheme to defraud, and establishing venue in this District.  (Opp. Br. 26-27.)  As discussed above, however, the scheme to defraud involved making false representations about Vitesse's revenue recognition and stock options practices.  Defendants were not charged with "cementing a relationship," or negotiating stocking packages with return rights.  Indeed, the Government does not claim, and the evidence at trial did not show, that there was anything improper or fraudulent in se about stocking packages, return rights, or even recognizing revenue, via the point-of-purchase method, when a shipment enters the sales channel, so long as those practices are properly disclosed.  Under the Government's theory, it was Vitesse's undisclosed recognition of revenue on such shipments in an apparent violation of its disclosed practices that was fraudulent.  Yet, there was no evidence that Defendants' revenue recognition decisions or Vitesse's disclosures were discussed at these dinners.

7

Even if Nu Horizon agreed to accept large stocking packages which "set in motion a chain of events ultimately leading to" defendants' fraudulent disclosures, venue for a securities fraud charge cannot be based on preparatory acts alone. See Geibel, 369 F.3d at 697; see also Beech-Nut, 871 F.2d at 1190-91 (holding that "[t]he mailings and telephone calls into the Eastern District . . . [ordering] concentrate that would later be used in Beech-Nut's fabrication of apple juice and . . . were merely preparatory to the eventual introduction of the juice into commerce," which was the criminal conduct at issue). Like preparing a visa application, these dinner meetings merely preceded and were preparatory to Vitesse's false disclosures. See Ramirez, 420 F.3d at 141. Since the dinner meetings did not involve an act or transaction constituting the securities fraud offense, they are insufficient to establish venue for Count Two.

After searching the record, the Government argues for the first time that investor meetings, which were listed on Tomasetta's calendar, maintained by his secretary, and referenced in Mody's testimony, are sufficient to establish venue in this District. The Government never referred to GX 1175 during its case; indeed, Defendants introduced GX 1175 during their cross-examination of Karen Keever. (See Tr. 2574.) Nor did the Government argue, until now, that Mody's testimony establishes venue.

Mody testified that he, Tomasetta, and Hovanec would attend (1) "investor conference[s]" hosted by investment banks in New York and other places, where "the company would present for 30 minutes to a roomful of investors" (Tr. 1825:17-22), and (2) private meetings with mutual funds "who were primarily based in New York," where they would "answer these investor questions" (Tr. 1825:23-1826:10).[3] There was no testimony—general or specific—regarding what information was presented or what questions were asked at these New York meetings.

---

[3] The Government also cites Mody's testimony, at Tr. 1939-43, regarding an investor meeting in Silicon Valley. Such testimony, however, clearly does not concern any act or transaction that occurred in this District.

The Government also argues that Tomasetta's calendar, GX 1175, reflects that investor conferences were scheduled in Manhattan on May 2-3, 2001, October 29, 2002, November 18, 2002, June 16, 2003, September 2, 2003, May 6, 2004, and May 2-4, 2005. (Opp. 24.) The May 2-3, 2001 entry, however, pre-dates any SEC filing at issue; the November 18, 2002 meeting appears to have taken place in northern California, and not New York; and the May 6, 2004 entry suggests that Vitesse's customer, Magma, was briefing Wall Street analysts, not Vitesse. What happened at these meetings is sheer speculation, if the meetings occurred at all. Scheduling a meeting is not the same as attending a meeting. Attending a meeting is not the same as speaking at a meeting, and speaking does not mean that the Defendants "communicat[ed] false . . . results and inflated guidance to the public," as the Government asserts. (Opp. 26.)

There was no evidence at trial whatsoever that showed that the Defendants presented any false information at these meetings. What the Government might have proved, but failed to, cannot establish venue for the securities fraud count. Defendants are not charged with holding investor meetings, but rather are charged with deceiving investors about Vitesse's revenue recognition and options practices and, therefore, Vitesse's true financial condition. On the face of this record, a reasonable juror could not conclude that the Defendants presented such fraudulent information at the investor meetings held in New York. Accordingly, the existence of investor meetings is insufficient to establish venue in this District for Count Two.[4]

---

[4] The Government relies on United States v. Royer to argue that these meetings constituted "activity in [this District] that was intended to, and did, effectuate their scheme." 549 F.3d 886, 895 (2d Cir. 2008). Royer, however, is distinguishable as the defendants in that case sent hundreds of emails containing the misappropriated information to investors in the Eastern District of New York, who then traded in the relevant securities based on that information. Id. at 894. Here, there is no evidence that any information (must less false information) was ever communicated in the Southern District of New York or that any investor in this District traded on such information—and, thus, no evidence that Defendants' attendance at investor meetings *did*, in fact, effectuate their scheme to defraud.

Since the Government failed to prove by a preponderance of the evidence that an act or transaction constituting the securities fraud offense occurred in the Southern District of New York, venue is not proper here, and Count Two is dismissed.[5]

Having dismissed Count Two for failure to establish venue, the Court need not address Defendants' materiality and intent arguments.

### B. Count One: Conspiracy

Unlike the securities fraud claim, venue for a conspiracy claim is proper "in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a); see also United States v. Tannenbaum, 934 F.2d 8, 12 (2d Cir.1991). In other words, "venue is proper in any district in which 'an overt act in furtherance of the conspiracy was committed.'" Royer, 549 F.3d at 896 (quoting United States v. Naranjo, 14 F.3d 145, 147 (2d Cir.1994)). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." Tzolov, 642 F.3d at 319-20.

"[I]n this Circuit, venue must . . . also satisfy the 'substantial contacts' test" enunciated in United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985), which requires consideration of four factors: "(1) the site of the crime; (2) its elements and nature; (3) the place where the effect of the criminal conduct occurs; and (4) the suitability of venue chosen for accurate factfinding." Royer, 549 F.3d at 895.

The Government claims that Defendants' dinner meetings with Nu Horizons and the investor meetings in New York establish venue in this District for Count One. The evidence at trial showed that Defendants attended dinner meetings with Arthur Nadata and David Bowers, two executives at Nu Horizons, in the Southern District of New York; typically at San Pietro's restaurant in Manhattan.

---

[5] The Government failed to prove venue for Counts Three through Seven for the same reason—it introduce no evidence to show that the acts constituting the offenses occurred in this District. Since the Government concedes that it failed to prove venue with respect to Counts Three through Seven, the Court dismisses these Counts without further discussion.

While the parties' discussions at these dinners were primarily social, on occasion the quarterly stocking packages, Nu Horizon's need to return product, and certain cash payments were discussed. (See e.g., Tr. 1409:2-22, 1435:7-17, 1500:15-23.)[6]

Defendants argue that the dinner meetings are insufficient to establish venue because there is no evidence that the dinner meetings involved discussions of Vitesse's accounting disclosures, and Bowers' vague testimony did not show that these dinners were, as the Government claimed, "critical" to ensuring that Nu Horizons would place a large order on a quarterly basis. While the Defendants' attack on the "criticality" of the dinner meetings to the ordering patterns is not without merit; the Government's use of the word—"critical"—does not create a higher burden of proof. To establish venue for Count One, the Government need not show that every dinner meeting was essential to the conspiracy, or that agreements concerning stocking packages and return rights were illegal, or that any misrepresentation was made in this District. Rather, the Government need only show one act, which itself may be innocent, occurred in this District that was "done in furtherance of the object or purpose of the conspiracy." Tzolov, 642 F.3d at 319-320. Indeed, in Tzolov, the Second Circuit held that defendants' travel through John F. Kennedy Airport in the Eastern District of New York was sufficient to establish venue for a conspiracy claim, because a reasonable jury could have concluded that without such travel, "the face-to-face meetings with potential investors [in other locations], which was a regular part of their fraudulent scheme, would not have occurred." Id. at 320.

In addition, a communication in a district that furthers the conspiracy is sufficient to establish venue there. See United States v. Smith, 198 F.3d 377, 381-382 (2d Cir. 1999) ("Overt acts in furtherance of a conspiracy can include phone calls.") Accordingly, a reasonable jury could conclude that Defendants' dinner meetings—which furthered Vitesse's business relationship with Nu Horizons

---

[6] Defendants argue that the $3 for $2 deal discussed at a dinner meeting never came to fruition—Bowers could not recall one way or the other whether the deal was implemented. (Def. Br. 6 & n.2.) Bowers also testified, however, that the amount of product that was moving and not moving was "typically" discussed at these dinner meetings. (Tr. 1435:12-17.) Accordingly, even if one particular deal had not come to fruition there is still a basis for a reasonable jury to conclude that at least some of the dinner meetings involved a productive discussion of stocking packages, cash payments, or return rights.

and involved discussions of, <u>inter alia</u>, quarterly stocking packages—furthered the conspiracy because without Nu Horizon's acceptance of quarterly stocking packages, Vitesse could not have recognized revenue on these shipments, which was a regular part of Defendants' fraudulent scheme.  <u>See</u> <u>Tzolov</u>, 642 F.3d at 320.[7]

Since the Defendants committed the overt act in furtherance of the conspiracy in the Southern District of New York, finding venue exists here for Count One is not unfair or prejudicial and satisfies the substantial contacts test.  <u>See</u> <u>id.</u> at 321.

II.     Count One: A Single Overarching Conspiracy

Whether a single or multiple conspiracies existed is generally acknowledged to be an issue of fact for the jury.  <u>See</u> <u>United States v. Berger</u>, 224 F.3d 107, 114 (2d Cir. 2000).  "A single conspiracy, rather than multiple conspiracies, may be found where the coconspirators had a 'common purpose.'" <u>Beech-Nut</u>, 871 F.2d at 1191 (quoting <u>United States v. Heinemann</u>, 801 F.2d 86, 91-92 (2d Cir.1986)). "[T]he participants' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at 'cross purposes.'"  <u>Id.</u> (quoting <u>Heinemann</u>, 801 F.2d at 92 & n. 1)).  "The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan."  <u>United States v. McDermott,</u> 245 F.3d 133, 137 (2d Cir.2001) (internal quotation marks omitted).  "Moreover, 'a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'"  <u>Berger</u>, 224 F.3d at 114-15 ((quoting <u>United States v. Maldonado-Rivera</u>, 922 F.2d 934, 963 (2d Cir.1990)).

---

[7]  In making this determination, the Court does not rely on the Government's new argument that the Defendants' attendance at investor meetings in New York establishes venue for the conspiracy count.  Neither Mody's testimony, nor GX 1175 show what information, if any, was conveyed by Defendants or Mody about Vitesse's true financial condition at these meetings.  Based on this record, a reasonable jury could not conclude that these meetings were in furtherance of a fraudulent scheme relating to Vitesse's revenue recognition and backdating options practices.

The Government argues that the evidence established a single scheme whereby Defendants "lied to investors and auditors about Vitesse's true financial condition and the results of operations." (Opp. 30.) The Indictment charges that the scheme's unlawful design or purpose involved both revenue inflation and backdating stock options. (See Dkt. No. 2.) The Government argues that both of these categories of lies were made to make "the company's performance look better than it actually was." (Gov. Opp. 30-31.) The Defendants argue that the trial record is "devoid of any evidence that there existed an illicit agreement contemplating both revenue inflation and options backdating" and, therefore, no reasonable jury could find a single, overarching conspiracy existed. (Defs. Br. 19.)

A reasonable jury could find that the scheme of revenue inflation was part of a single overarching plan to hide Vitesse's true financial performance. Defendants' revenue recognition practices led to inflated financial figures because (1) contrary to Vitesse's disclosures, the quarterly stocking packages were recorded as revenue upon shipment, and (2) credits to revenue were not timely recorded for product returned from customers. (See e.g., Tr. 919:5-923:20, 1417: 18-24, 1889:11 - 1894:8, 1911:24-1913:15.)

With respect to backdated options, there is no question that the April 12, 2001 and October 25, 2001 Compensation Committee minutes, on their face, reflect that options were granted at exercise prices as of prior dates. Moreover, Keever testified that Hovanec "look[ed] at fair market values within a month time frame or within a three-month period time frame looking for the lowest price," and then would pick the "date and price the options were to be granted." (Tr. 2395:11-15, 2394:3-9.) Accordingly, a reasonable jury could find that Vitesse had an undisclosed practice of issuing backdated stock options that were in-the-money. Moreover, a reasonable jury could find that by not disclosing this practice, Vitesse could hide that it should have recorded a charge to earnings or non-cash compensation expense for its backdated, in-the-money options. Testimony at trial demonstrated that if the April and October 2001 options were backdated, then Vitesse would have to record a charge to earnings of approximately $100 Million over the life of these options. (Tr. 419:6-420:5.) Taken together, a

reasonable jury could conclude that Defendants' failure to disclose their practice of backdating stock options was part of a single scheme, along with the revenue inflation, to hide Vitesse's true financial performance.[8]

In further support of a single scheme, the evidence showed that the revenue and options disclosures involved common participants, and were led by the same group—namely, the Defendants and Mody.  The evidence also showed that the false disclosures about Vitesse's revenue recognition and stock options practices were made in the same SEC filings, over the same period of time, and therefore, presumably delivered to the same audience.  Viewed in the light most favorable to the Government, there is sufficient evidence for a reasonable jury to find that the conspiracy involved a single, overarching scheme to hide Vitesse's true financial condition.  See Berger, 224 F.3d at 115.

III.    Evidence of Hovanec's Participation In The Conspiracy

The Government has produced sufficient evidence for a reasonable jury to conclude that Hovanec was guilty of joining and participating in the conspiracy charged in Count One.

"To be guilty of conspiracy, 'there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.'"  United States v. Morgan, 385 F.3d 196, 206 (2d Cir. 2004) (quoting United States v. Gaviria, 740 F.2d 174, 183 (2d Cir.1984)).

The Government introduced evidence that Hovanec participated in negotiating the terms of the quarterly stocking packages with Nu Horizons, and negotiating Nu Horizon's return rights—often personally authorizing large or blanket returns.  (Tr. 340:11-19; 699:5-700:4, 844:1-5, 870:4-871:22.) Hovanec knew that Vitesse was recognizing revenue upon shipment of these quarterly stocking packages, and that it needed to do so to inflate its revenue figures.  (See Tr. 1887:3-1889:17.)  The

---

[8]  The actual act of backdating stock options to issue in-the-money grants would not have "bolstered the company's financial performance," because Vitesse would be required to take a charge to earnings. Nonetheless, since it is the failure to disclose this practice—and not the act of backdating—that is at issue here, Defendants' conduct can be seen as part of a scheme to defraud Vitesse's investors and auditors about Vitesse's true financial condition, as discussed above.

evidence also showed that Hovanec was involved in the decision to "bleed" off credits over time, rather than record credits in a timely manner as product was returned. (Tr. 828:3-7; 1845:18-1847:11.) With respect to backdating stock options, Hovanec would personally "look at fair market values within a month time frame or within a three-month period time frame looking for the lowest price, the best price to give the employees, rather than . . . using the price on the board meeting day," and then would pick "what date and price the options were to be granted." (Tr. 2395:11-15, 2394:3-9.)

The evidence detailed above—which is not an exhaustive summary of the record of Hovanec's involvement in the conspiracy—is sufficient for a reasonable jury to conclude that Hovanec knowingly joined and participated in a conspiracy to hide Vitesse's true financial performance from investors. Accordingly, Defendants' motion to dismiss Count One against Hovanec is denied.

## CONCLUSION

Defendants' Rule 29 motion is GRANTED with respect to Count Two, for failure to prove venue. The Government concedes that it failed to prove venue with respect to Counts Three through Seven, and Defendants' Rule 29 motion is GRANTED as to these Counts as well. Defendants' motion to dismiss Count One is DENIED in all respects.

The Clerk of the Court is directed to terminate this motion.

Dated: New York, New York
June 6, 2012

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge

15