UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA      :

   -v.-                         :     10 Cr. 1205 (PAC)

LOUIS TOMASETTA and      :
EUGENE HOVANEC,

                                :

              Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW IN OPPOSITION TO THE
## DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL

PREET BHARARA
United States Attorney
for the Southern District of New York
Attorney for the United States of America

JOHN J. O'DONNELL
KATHERINE R. GOLDSTEIN
DAVID I. MILLER
Assistant U.S. Attorneys
   - Of Counsel -

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENTS...................................................................1

STATEMENT OF FACTS.........................................................................2

    A.    Vitesse's Disclosures Concerning Its Financial Position
            And Results of Operations.............................................................3

    B.    The Fraudulent Scheme...............................................................4

            1.    False Representation Concerning Vitesse's Revenue................. 4

                     a.    Misrepresentations Concerning Recognition
                            of Revenue On Transactions With Nu Horizons............. 5

                            (i.)    The Initial Stocking Package...........................5

                            (ii.)    Quarterly Stocking Packages..........................8

                     b.    Fraudulent Manipulation of Credits
                            For Returned Product.............................................11

                     c.    Misrepresentations Concerning
                            Accounts Receivables............................................ 14

             2.    Misrepresentations Concerning Vitesse's Options.................... 15

ARGUMENT........................................................................... 19

    A.    The Standard For A Rule 29 Motion.......................................... 19

    B.    The Evidence Was Sufficient For A Jury To Find
            A Single Conspiracy............................................................ 20

CONCLUSION..........................................................................27

## TABLE OF AUTHORITIES

**Page**

**Cases**

*United States* v. *Berger*, 224 F.3d 107 (2d Cir. 2000)……………………………………...21, 23

*United States* v. *Gagliardi*, 506 F.3d 140 (2d Cir. 2007)………………………………….. 19

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999)……………………………… 20

*United States* v. *Hardwick*, 523 F.3d 94 (2d Cir. 2008)……………………………… 20

*United States* v. *Johansen*, 56 F.3d 347 (2d Cir. 1995)…………………………………23, 24

*United States* v. *Matthews*, 20 F.3d 538 (2d Cir. 1994)……………………………… 20

*United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001)………………………………20, 26

*United States* v. *Morrison*, 153 F.3d 34 (2d Cir. 1998)……………………………………20

*United States* v. *Rigas*, 281 F. Supp. 2d 660 (S.D.N.Y. 2003)……………………………. 24, 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| -v.- | : |
| LOUIS TOMASETTA and EUGENE HOVANEC, | : |
| | : |
| Defendants. | : |

10 Cr. 1205 (PAC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendants Louis Tomasetta's ("Tomasetta") and Eugene Hovanec's ("Hovanec") motion for a judgment of acquittal on the single count of the Indictment.  Following a three-and-a- half week trial before this Court and a jury, the jury deadlocked.  For the reasons set forth below, the motion should be denied.

Indictment S1 10 Cr. 1205 (PAC), filed on December 6, 2012, charged Tomasetta and Hovanec in one count with conspiracy to commit securities fraud and make false statements in annual and quarterly reports filed with the SEC.  Tomasetta and Hovanec proceeded to trial on this Indictment on January 16, 2013.  The trial ended on February 19, 2013, when the Court declared a mistrial due to the jury's inability to reach a unanimous verdict on the single count in the Indictment.

Tomasetta and Hovanec move for a judgment of acquittal arguing that the Government failed to present evidence that would enable a reasonable jury to find beyond a reasonable doubt that the conspiracy charged in Count One constituted a single conspiracy.  This argument lacks merit.  As this Court is well aware, this is the second trial in this matter.  The first trial also ended in a mistrial due to a jury deadlock.  Following that trial, the defendants moved pursuant to Rule 29 for a judgment of acquittal on the ground that the evidence was insufficient for the jury to find that the Government had proven beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.  On June 6, 2012, the Court issued an Opinion and Order finding that the evidence presented by the Government at the first trial was sufficient and denying the motion ("June 6 Opinion").  The evidence at the January 2013 trial was substantially similar to the evidence at the first trial and was likewise sufficient to sustain a jury verdict.  It follows that, for the same reasons the Court found in June 2012, the present motion should be denied.

## **STATEMENT OF FACTS**

The evidence at trial overwhelmingly demonstrated that Tomasetta, the former Chief Executive Officer of Vitesse Semiconductor Corporation ("Vitesse"), and Hovanec, the former Chief Financial Officer and Executive Vice President of Vitesse, orchestrated a scheme from 2001 to 2006 to deceive Vitesse's investors about Vitesse's financial condition and results of operations.  The fraudulent scheme primarily involved false statements to investors about Vitesse's revenues, sales returns, accounts receivable, and stock options.  Vitesse publicly disclosed certain methods of accounting for its revenue, sales returns, and stock options, but its actual practices were materially different from its disclosures.  Tomasetta and Hovanec lied directly to investors and auditors about transactions that they negotiated and directed.  In

addition, the defendants intentionally caused their subordinates, including co-conspirators Yatin

Mody ("Mody") and Nicole Kaplan ("Kaplan"), to effect transactions and entries into Vitesse's

accounting records that they knew would result in false and misleading disclosures to investors.

**A.    Vitesse's Disclosures Concerning Its Financial Position
        And Results of Operations**

During the relevant time, Vitesse was a publicly-traded corporation, and was required to

publicly report information concerning its business and results of operations.  Vitesse

communicated this information by (1) filing with the Securities and Exchange Commission

("SEC") annual and quarterly reports of SEC Forms 10-K and 10-Q, which were signed and

certified by Tomasetta and Hovanec (until he became Executive Vice President in April 2005)

(Tr. 546-547; GX 50-69);[1] (2) issuing press releases that were reviewed and approved by

Tomasetta and Hovanec (Tr. 526-528; GX 100-120, 124-27, 129, 131); (3) holding regular

conference calls with securities analysts on which Tomasetta and Hovanec (until he became

Executive Vice President in April 2005) participated (Tr. 136-138, 528-529; GX 143-159); and

(4) attending meetings with securities analysts and institutional investors in, among other

locations, New York, Boston, and San Francisco.  (Tr. 464-465, 476-79).

The evidence showed that securities analysts and investors focused on Vitesse's reported

revenue and associated revenue trends, and earnings or loss per share.  (Tr. 113, 560-561).

Because Vitesse was losing money during 2001 to 2006, the analysts specifically concentrated

on when Vitesse would return to profitability.  (Tr. 562-563).  Vitesse's revenue trends were an

important metric that aided analysts in predicting when Vitesse would become profitable.  (Tr.

---

[1] "Tr." refers to the transcript of the testimony at the January 2013 trial; "GX" refers to
Government exhibits; and "DX" refers to defense exhibits.  "Def. Mem." refers to the
defendants' April 29, 2013 memorandum in support of the motion.

139).  In late 2005, Vitesse came close to achieving profitability and at least one analyst upgraded his recommendation regarding Vitesse's stock.  (Tr. 169-170, 680-681; GX 422).

In addition to providing information concerning past results of operations, Tomasetta and Hovanec also provided "guidance" to the investing public, which was a prediction of the company's future performance.  (Tr. 136-137).  Vitesse's guidance for revenue figures was based upon revenue targets that were set by Tomasetta.[2]  (Tr. 516-517, 541-543)  This guidance was important to investors and securities analysts who made recommendations concerning whether investors should buy or sell the stock.  (Tr. 137, 669-671, 676).  It was well known that failure to meet these expectations would "disappoint[] the Street" and reflect poorly on management  (Tr. 598-599, 627).  In fact, over 17 quarters from 2002 to 2006, Vitesse failed to meet its revenue guidance only two times.  (*See* GX 260).

B.     **The Fraudulent Scheme**

1.     **False Representations Concerning Vitesse's Revenue**

The evidence overwhelmingly proved that Vitesse's public disclosures contained improperly inflated revenue figures because, among other things:  (1) Vitesse had recorded as revenue shipments to Nu Horizons Electronics Corp. ("Nu Horizons"), a distributor which had an undisclosed right to return the product; and (2) Vitesse had failed to record credits, or reductions, to revenue for product returned from customers, all contrary to its public disclosures.

---

[2] The revenue targets were initially developed by Vitesse's sales department, and were revised by Tomasetta to make them higher.  (Tr. 541-542, 602-03, 2356-2358).  Tomasetta regularly communicated the revenue targets to Vitesse employees.  Tomasetta and Hovanec also attended regular "revenue meetings" with Vitesse sales and finance executives, at which they discussed ways in which they could assure that Vitesse's revenue would meet the target.  The witnesses described an atmosphere at Vitesse of pressure to meet the revenue targets, which pressure was attributed to Tomasetta.  (Tr. 599, 2351-2352).

    a.       **Misrepresentations Concerning Recognition of Revenue On Transactions With Nu Horizons**

    (i.)       **The Initial Stocking Package**

The Nu Horizons relationship commenced in 2001 in the midst of a severe downturn in the technology industry.  Beginning in late 2000 and continuing through the summer of 2001, Vitesse experienced a sharp decline in its revenues, and saw an unprecedented level of product returns from customers.  (Tr. 498-99).  Vitesse's revenues dropped from $165 million for the quarter ended December 31, 2000 to $60 million for the quarter ended June 30, 2001.  (*Id.*).  Vitesse's stock price experienced a similar precipitous decline during the same period.  (*Id.*)  As of April 2001, Vitesse had received at least $52 million in product returns.  (Tr. 522-523; GX 375).  These pending product returns, once they were recorded on Vitesse's books, would have resulted in significant reductions in Vitesse's revenues, on top of the significant decline in revenues the company had already experienced.  (Tr. 500-01).

Throughout 2001, Mody routinely apprised the defendants of the company's increasing number of product returns and, in April 2001, specifically discussed with Tomasetta and Hovanec the $52 million in pending returns, a number which the defendants found disturbing. (Tr. 509-512).  In a meeting with Mody, Tomasetta and Hovanec made the decision to embark on a fraudulent course, deciding that, rather than record all of the credits at once and miss their revenue targets by a wide margin, they would "bleed" the credits out over time by recording portions of the credits over subsequent periods.  (*Id.*)  Tomasetta and Hovanec made this decision hoping that the markets would improve, and they would be able to clean up the credits as it did.  (*Id.*)  The decision to defer the recording of credits was based in part upon the fact that in March 2001 Vitesse had taken the unprecedented step of revising its guidance down twice in the same month.  (Tr. 517).

Accordingly, Vitesse did not record the $52 million in pending credits during the quarter ended June 30, 2001, and fraudulently reported revenue of $60 million that quarter.  (GX 51).  If Vitesse had recorded the $52 million in credits, the revenue for that quarter would have been close to zero.  (Tr. 563-564, 1569-1570).  The decision not to record credits was not disclosed to Vitesse's Board or its auditors.  (Tr. 592, 1569).

In the summer of 2001, Vitesse began discussing a distribution agreement with Nu Horizons.  (Tr. 564-565, 1305).  Although there were business reasons for Vitesse to engage a distributor at that time, the evidence plainly showed that the defendants planned, from the outset, to use a multi-million dollar initial stocking package ("ISP") transaction with Nu Horizons as a means to disguise the large number of pending credits.  (Tr. 566-567, 596, 1568).  The evidence showed that Hovanec was a key participant in negotiating the ISP.  The testimony established that the initial package was for approximately $10 million, but that Hovanec suggested that the order include the purchase of an additional $30 million in product, a request that Richard Riker ("Riker") (then Vitesse's Vice President of Sales and Marketing) thought was "sizeable."  (Tr. 2322-2324).  Nu Horizons agreed to the entire $40 million ISP, but only on the condition that it would be allowed to return any product it could not sell.  (Tr. 2324-2325, 2339, 2362).  Charles David Bowers ("Bowers"), a senior executive at Nu Horizons involved with the Vitesse relationship, explained that, because Nu Horizons had no prior experience in selling Vitesse products, it was necessary for Nu Horizons to have the ability to return any product it purchased in the ISP that it was unable to sell. (Tr. 1311).  Vitesse agreed to Nu Horizons's request, and Riker provided a written side letter making clear that Nu Horizons had the right to return any product that it purchased in the ISP.  (Tr. 1312-1314, 2328-2329; GX 700).  Drafts of the side letter were reviewed and approved by Hovanec.  (Tr. 2326-30; GX 691, 692).  Indeed, the

-6-

evidence showed that it was Hovanec's idea to put the return provisions for the ISP in a document separate from the distributorship agreement – where it could be kept secret from auditors.[3] (Tr. 1564, 2331; GX 691, 692).

In late September 2001, Vitesse shipped approximately $42 million worth of product to Nu Horizons. (GX 1200A). Mody and Kaplan both knew that the package included large quantities of products that had previously been returned or were otherwise not likely to sell through to an end customer. (Tr. 573, 575, 593, 1567-1568). Mody believed that it was widely known in the company that there was no demand for the products. (Tr. 574).

Vitesse recorded approximately $37 million in revenue for the quarter ended September 30, 2001 in connection with the ISP. (Tr. 587-588; GX 10A; *see* Tr. 2277-2278). At the same time, Vitesse booked credits in roughly the same amount, using the revenue from the ISP to offset the reduction in revenue that would result from booking the credits. (Tr. 566-567, 583, 1560). Had Vitesse not recorded revenue on the ISP, its reported revenue for that quarter would have been negative. (Tr. 580; GX 1248A). Tomasetta and Hovanec directed that revenue from the ISP be used to allow Vitesse to secretly record the outstanding credits. (Tr. 565-566 (Tomasetta explained the plan to Mody in a meeting where Hovanec was present)).

Nu Horizons eventually returned approximately $24.4 million worth of product from the ISP, an astonishing 58 percent of product that had already been counted as revenue. (Tr. 2014-2015; GX 1200-A). Tomasetta and Hovanec were well aware of these returns because they

_____

[3] Vitesse and Nu Horizons entered into a written distribution agreement in September 2001, which provided, among other things, that Nu Horizons had the right to rotate its stock by returning up to 10 percent of its prior six months purchases twice a year. (Tr. 1307-1308, 1565; GX 701). Kaplan and Mody both testified that Hovanec took measures to make sure that the distributorship agreement contained provisions that would facially support recognizing revenue on sales to Nu Horizons. (Tr. 571-572, 1564, 1575-1576). The fact that Hovanec instructed that the return rights be set forth in a separate letter strongly suggested that he intended to conceal them.

discussed them with Bowers (Tr. 1320-1323; GX 708), were advised of the returns by Vitesse employees (Tr. 1577-1578, 2347-2348; GX 695), and approved large returns.  (Tr. 594-595, 1580-1582; GX 711-A, 714).

Vitesse's Form 10-K for the fiscal year ended September 30, 2001 ("FY 2001"), signed by Tomasetta and Hovanec, omitted any disclosure about the $40 million ISP or about the fact that Vitesse had recorded large numbers of credits for product returns.  (Tr. 590).  Hovanec directed Kaplan not to tell Vitesse's auditors about the ISP during the 2001 audit (Tr. 1569; *see* Tr. 591-592).  The concealment of details of the ISP – such as the fact that product shipped had previously been returned and that Nu Horizons had return rights – was fraudulent.  Since Vitesse recorded $40 million in revenue on the transaction – revenue that converted its reported revenue from negative to positive – information about the ISP transaction was plainly material.

### (ii.)    Quarterly Stocking Packages

From late 2002 to March 2006, Vitesse used quarter-end transactions (called "quarterly stocking packages") with Nu Horizons to fill the persistent gaps between Vitesse's revenue targets and its actual revenue.  (Tr. 598, 620-622, 1589-1593, 2349-2355, 2361, 2375-2376). These quarterly stocking packages had a material effect on Vitesse's reported quarterly revenue. (Tr. 2279-2282; GX 10B to 10-E).  Indeed, in some quarters, the quarterly stocking packages accounted for nearly 40 percent of Vitesse's reported revenue.  Bowers testified that the Vitesse quarterly stocking packages grew to be a large percentage of the business between the two companies (Tr. 1323-1324), and led to higher margins than packages that Nu Horizons had with other suppliers.  (Tr. 1329).

The evidence overwhelmingly showed that Nu Horizons had an unlimited right to return all of the product purchased in these stocking packages that it could not re-sell to end customers.

(Tr. 595, 1314, 1331-1333, 1347-1352, 1380-1381, 1618-1619, 1662-1663).  Tomasetta and
Hovanec were aware of and authorized these return rights.  (Tr. 1350-1352, 1662).  In addition,
Vitesse granted Nu Horizons significant financial concessions as a further inducement for Nu
Horizons to enter into the transactions.  (Tr. 1358).  Nu Horizons also frequently made large cash
payments – referred to as "prepayments" – to Vitesse that were negotiated in conjunction with
the quarterly stocking packages.  (Tr. 639, 1332-1334; GX 727).  These cash payments were not
related to the size of the stocking package or Nu Horizons's outstanding payables to Vitesse, but
rather were based upon Vitesse's desire to show the investing public a stronger cash position on
its balance sheet.  (Tr. 640-642, 1333).

Tomasetta and Hovanec were well aware that Vitesse's reported revenue included the
quarterly stocking packages.  The quarterly stocking packages were regularly discussed at
Vitesse's revenue meetings and at smaller "close the gap" meetings, held with only key
executives, including those directly involved in the fraud, that sometimes followed the revenue
meetings.  (Tr. 619-624, 1556-1557, 1612, 1671, 2348-2354, 2435-2437).  It was openly
discussed at these meetings that the quarterly stocking package would be a mechanism to close
the gap between the revenue target and the projected quarterly revenue.  (Tr. 620-624, 2348-
2354, 2435-2437; *see also* GX 1220-B).

Both Tomasetta and Hovanec were directly involved in the Nu Horizons relationship.
Hovanec was the "executive sponsor" at Vitesse for Nu Horizons, and he regularly traveled to
New York to meet with representatives of Nu Horizons concerning the stocking packages.  (Tr.
624, 637-639, 841, 1321-1322, 1407-1408, 1490, 1555-1556).  Hovanec and Tomasetta had
quarterly meetings with Nu Horizons senior executives Bowers and Arthur Nadata ("Nadata"),
Nu Horizons' CEO, usually at a restaurant in Manhattan.  (Tr. 1321-1322, 1355, 1390, 1410).

-9-

The regular meetings that Tomasetta and Hovanec had with Bowers and Nadata – especially the dinner meetings in Manhattan – involved high-level business discussions between the senior executives, but also usually involved discussions concerning the scope of the stocking package and cash payment that Vitesse was requesting for the quarter.  (Tr. 1321-1322, 1355-1356).

Some specific examples of Tomasetta's and Hovanec's direct involvement in the quarterly stocking packages include the following:

- From late 2002 to late 2003, the return rights were set forth in side letters signed by Riker.  (Tr. 2360-2364; GX 717, 726, 742, 744, 751).  In late 2003, Vitesse sales employees told Bowers that Vitesse would not continue to provide written side letters.  (Tr. 1347).  In response, Bowers told Vitesse that he would not agree to any more of the quarterly stocking packages without written assurances that Nu Horizons would be allowed to return any unsold product.  (Tr. 1347-1351, 1353).  At a meeting in December 2003, Hovanec told Bowers that he could not put anything in writing, but that Nu Horizons could treat the quarterly stocking packages as standard purchases with a full right of return, thereby convincing Nu Horizons to continue placing quarterly stocking package orders.  (Tr. 1347-1351, 1353).

- In September 2004, Vitesse was having difficulty meeting its revenue target for the September 2004 quarter and proposed a $20 million stocking package to Nu Horizons – the largest to date.  At this time, Nu Horizons had a large volume of materials from prior stocking packages that it wanted to return and was resistant to the large stocking package.  (Tr. 1388-1393).  The issue was discussed at a meeting Kaplan attended with Mody, Tomasetta and Hovanec, where Tomasetta told Hovanec to make a deal with Nu Horizons.  (Tr. 1612-1614).  In a conference call with Nu Horizons representatives, Hovanec agreed that Nu Horizons could return $10 million worth of inventory by November 2004.  (Tr. 650-654, 1386-1388).  Hovanec subsequently directed Kaplan and Barbara Gzyl ("Gzyl") to create blank return forms (called "return material authorizations" or "RMAs") that would enable Nu Horizons to return $10 million worth of unspecified product to Vitesse during the time period requested by Nu Horizons.  (Tr. 1611-1618).  Kaplan and Gzyl created documents denominated as RMA 10001 and 10002 and sent them to Nu Horizons, which used the RMAs to return $12 million worth of product.  (Tr. 1616-1618; GX 805, 809).  The creation of these return authorization documents was highly unusual.  Kaplan complained to Hovanec about the request.  (Tr. 1629-1630).  The documents bore Hovanec's initials to evidence the fact that he had authorized the returns.  (Tr. 1618).

- In December 2004, Hovanec authorized Vitesse to provide Nu Horizons with another blank RMA form that allowed Nu Horizons to return an unlimited amount of product.  (Tr. 1630-1633; GX 348, 822).  Nu Horizons used this document – denominated RMA 10003 – to return approximately $12 million worth of product.  (Tr. 1634-1635).

-10-

Hovanec was aware of the return (GX 826, 827, 828), and told Kaplan not to record approximately $4.7 million worth of product into Vitesse's inventory. Hovanec told Kaplan to ship that product back to Nu Horizons that same quarter using manual invoices. (Tr. 1635-1639). Kaplan complained to Hovanec about the issuance of the blank RMA to secure the order and the instruction to ship product back to Nu Horizons without recording it into inventory. (Tr. 1629-1630, 1634-1637). Hovanec told her that they had to do the transaction to meet the revenue target. (Tr. 1629).

- In September 2005, senior sales executives at Vitesse proposed a new distributorship contract to Nu Horizons that contained less favorable terms. (Tr. 1410-1414; GX 878, 879). Bowers, recognizing that he had leverage from the quarter-end activities between Vitesse and Nu Horizons (GX 879), complained to Hovanec about the proposed new contract. Hovanec rescinded it on the spot. (Tr. 1416-1418; GX 883).

Although the quarterly stocking packages were a significant percentage of Vitesse's recorded revenue quarter after quarter, Vitesse represented in its financial statements that it *deferred* counting the revenue from the sale of such products until the products were sold by Nu Horizons to the end-user. (Tr. 696-698, 1661-1662; GX 64, 68). Hovanec and Tomasetta knew that these disclosures were false. (Tr. 1662).

### b.    Fraudulent Manipulation of Credits For Returned Product

The evidence also overwhelmingly demonstrated that the defendants directed Mody and Kaplan to manipulate the timing of the recognition of credits for product returns to conceal the fact that revenue had been improperly recognized and to avoid reducing revenue to reflect product returns.

As Mody explained, in early 2001, upon learning that there were approximately $52 million worth of credits for product returns pending, Tomasetta and Hovanec decided not to record the credits, but to bleed them out over time. (Tr. 510-512, 523). Then, they decided to use the revenue from the ISP as a disguise so they could record the credits without any obvious impact to Vitesse's 2001 revenue. (Tr. 565-567, 1560).

Over the following years, Vitesse developed a practice, at the direction of the defendants, in which it did not immediately record credits for product returns on its books and records. Rather, members of the finance department kept track of the pending credits on an off-line spreadsheet.  (Tr. 631-637, 810, 1625-1626, 1663, 1711; GX 324, 331, 336, 338, 341).  Each quarter, Tomasetta and Hovanec would review the pending credits with Mody (and sometimes Kaplan) and they would determine the amount of credits that would be recorded for that quarter.  (Tr. 630-637, 1646-1647, 1686-1687, 1692).  This determination was based upon their assessment of how the amount of credits recorded would negatively impact Vitesse's revenue number for the quarter.  (Tr. 630, 1678-1679).

The amount of credits on the spreadsheet fluctuated during the relevant time.  As the quarterly stocking packages with Nu Horizons grew in size in 2004 and 2005, the product returns by Nu Horizons and corresponding credits also grew larger.  (*See* Tr. 1670).  These returns were not fully recorded until months after the product was actually returned.  For example, as noted above, in early 2005, Nu Horizons returned $11.4 million worth of product purchased in prior stocking packages.  Of that return, approximately $5.6 million was not recorded until June 2006, more than a year later.  (Tr. 2263-2264; GX 1100).

From late 2004 through early 2006, the amount of credits on the pending list ranged from $5 million to $17 million.  (*Compare* GX 324 ($5.5 million as of August 26, 2004) *with* GX 333 ($17.5 million as of April 12, 2005)).  When compared to the reported revenue figures during that same time period, which ranged from $44.4 million to $60 million (GX 10-B to 10-E), the significance of the pending credits to Vitesse's quarterly revenues is obvious.[4]

---

[4] Any argument that Vitesse's revenues were actually understated cumulatively from August 2001 through December 2005 is misleading.  First, because the evidence showed that they were used to close the gap on a quarterly basis, the real issue is how the stocking packages and the pending credits for the various quarters compared to that quarter's revenue.  Second, as Mody

Because Vitesse did not record credits during the quarters that the product was returned, its revenues were overstated during the relevant time.  In addition, its representations concerning product returns and the calculation of its sales return reserve were false and misleading.  (Tr. 523-524, 1627, 1689-1690, 1703).

Tomasetta and Hovanec were well aware that the manipulation of the credits made Vitesse's publicly reported results false and misleading because they had discussed the credits with Mody and Kaplan for years.  (Tr. 688, 691-692, 1671-1672).  For example, in January 2006 Vitesse reported $53 million in revenue for the quarter ended December 31, 2005, and told analysts that Vitesse was making progress towards a return to profitability.  (Tr. 674-675; GX 159).  At the time of this report, however, Vitesse had $15 million worth of pending credits, which would have had a significant negative impact upon revenue for that quarter.  (Tr. 675-676).  Indeed, prior to an analyst call, Mody told Tomasetta that an employee of the finance department had overbooked approximately $850,000 worth of credits more than was budgeted, and that Mody had reversed these credits in order to avoid missing the revenue target for that quarter.  (Tr. 677-680).

In April 2006, at around the time Vitesse's Board directed that an internal investigation be conducted into its stock options, Tomasetta and Hovanec each separately instructed Mody to record all of the then-outstanding credits notwithstanding the effect that would have on Vitesse's ability to meet its revenue targets.  (Tr. 781-783).  This direction demonstrated that Tomasetta and Hovanec were each aware that the outstanding credits had previously been concealed.  In addition, after Tomasetta, Hovanec and Mody were suspended, they discussed the fact that the internal investigators had questioned Kaplan about Vitesse's practices with respect to credits.

---

explained, the two mechanisms were used in conjunction with one another, and thus looking at them individually does not present the whole picture.  (Tr. 1215-1217, 1239-1240).

(Tr. 810-811).  At that meeting, Tomasetta observed that the inquiry into credits would "open up a new can of worms."  (Tr. 811).

### c.     Misrepresentations Concerning Accounts Receivables

Vitesse also misrepresented its accounts receivable by failing to reflect the fact that Nu Horizons had returned product and therefore was not obligated to pay the invoices for that product.  (Tr. 689-690, 1700-1702).  When Vitesse did record credits for Nu Horizons product returns, the finance department generally applied the credits to the oldest invoices, rather than the invoice that related to the product that was returned.  In addition, Vitesse improperly manipulated its accounts receivable balances by applying cash payments from Nu Horizons to older, unrelated invoices.  (Tr. 640-641, 1605-1606, 1693).  These practices made Vitesse's receivables look less aged than they actually were.

Mody discussed the fact that Vitesse's receivables balance included aged and uncollectible receivables with Tomasetta and Hovanec.  In those discussions, Mody explained that Kaplan's group would apply cash to the oldest receivables in order to conceal the true age of the receivables from Vitesse's auditors.  (Tr. 634-635).  Kaplan testified to having discussions with Hovanec and Mody to coordinate their stories on what information to share with the auditors concerning receivables.  (Tr. 1700-1701).  In fact, Kaplan, at the direction of Hovanec and Mody, told Nu Horizons representatives not to return an audit confirmation letter to KPMG because she and the others knew that Nu Horizons could not truthfully confirm the statements in the letter.  (Tr. 690-691, 1697-1698).

### 2.    Misrepresentations Concerning Vitesse's Options

During the relevant period, Vitesse regularly granted stock options to its employees and senior executives, which enabled the employees to purchase Vitesse stock in the future at a specified price called the "exercise price." Tomasetta and Hovanec generally initiated and oversaw the options grant process. (Tr. 2097-2098). Options were granted by Vitesse's Compensation Committee, a committee comprised of members of the Board of Directors, and their action was memorialized by minutes of Compensation Committee meetings.[5] (Tr. 2074-2075)

The grant date for options was usually the date of the board meeting at which the options were approved. (Tr. 1140). However, during periods where the stock became more volatile, Hovanec would fix the grant price by looking for the lowest price within a month or so of the Board meeting, rather than using the price on the date of the meeting. (Tr. 2101-2102). Keever assisted Hovanec (and sometimes Tomasetta) in making these determinations by printing lists of stock prices within a date range and circling the low prices. (Tr. 2140-2143, 2159-2163; *see, e.g.* GX 479, 501, 502).

Vitesse's public filings contained false statements concerning its stock options. For example, in its SEC Forms 10-K for the 2001 through 2005 fiscal years, Vitesse represented that compensation expense was recorded for options granted to employees on the date of grant only if the current market price of the underlying stock on that date exceeded the exercise price. (Tr. 135-136; *see, e.g.*, GX 68). Vitesse further represented in its 2002, 2003 and 2004 Forms 10-K that, other than options granted in connection with certain acquisitions, "all of the option grants made by Vitesse to employees and directors are granted at fair market value at the time of grant."

---

[5] The meeting minutes for meetings of the Board and its committees were drafted by Hovanec, typed up by Karen Keever ("Keever"), an administrative assistant, and sent to the Board members for review and approval before the next Board meeting. (Tr. 2074-2075).

(GX 56, 60, 64).  In its 2004 and 2005 Forms 10-K, Vitesse represented that it "had no options granted to employees in which the market price of the underlying stock exceeded the exercise price on the date of grant."  (GX 64, 68).  Between 2001 and 2005, Vitesse did not record any compensation expense for employee stock options.  (Tr. 713).

These representations were false in at least two respects.  First, as Tomasetta and Hovanec well knew, when Vitesse issued stock options that were "in the money," Vitesse did not record a compensation expense for those options.  Second, contrary to its public representations, Vitesse had in fact issued options to employees where the market price of the underlying stock exceeded the exercise price on the date of grant.

The evidence at trial established the Vitesse issued backdated options on at least April 12, 2001, October 25, 2001, and January 26, 2004.  In each of these instances, it was clear from the face of the Compensation Committee meeting minutes that the exercise price of the options was the price "as of" a prior date, which was significantly lower than the price on the date of the meeting.  (Tr. 299-301, 304, 721; GX 473, 490, 513).  It was obvious from the evidence at trial that these option prices had been selected because they were low and that no Compensation Committee meetings had been held on the earlier dates.  Thus, Vitesse should have recorded a compensation expense, but it did not.

The most compelling proof that Tomasetta and Hovanec knew that the meetings had not occurred and that the representations in Vitesse's public filings about the options were false came from the evidence about their response to inquiries concerning Vitesse's stock options.  In the fall of 2005, a Wall Street Journal reporter asked Mody about Vitesse's stock options.  (Tr. 716).  Mody consulted with Vitesse's then-outside counsel from Davis Polk & Wardwell ("DPW"), who reviewed the Compensation Committee meeting minutes.  The lawyers were

-16-

concerned because certain of the option grants, most notably the April and October 2001 option grants, had exercise prices that were as of an earlier date and were lower than the fair market value on the date the options were granted. (Tr. 299-304, 721-723; GX 600). DPW lawyers advised Tomasetta and Mody that this circumstance might require that Vitesse record and disclose a large compensation expense relating to the options. (Tr. 313, 725-727). Frank Currie – a DPW partner – testified that the compensation expense relating to the April and October 2001 options could be as high as $120 million. (Tr. 299-304, 307). DPW recommended to Tomasetta and Mody that Vitesse investigate the option grants and delay filing its Form 10-K for the 2005 fiscal year, which was due to be filed in mid-December. (Tr. 334, 724).

Tomasetta and Hovanec told Mody that DPW was overreacting and rejected the advice. (Tr. 726-728). They also told Mody that meetings had actually occurred on April 6 and October 2, 2001.[6] (Tr. 310, 334, 728-731). Mody testified that after he was unable to locate either the original minutes or electronic versions of the minutes, he caused meeting minutes for purported April 6 and October 2, 2001 Compensation Committee meetings to be created. (Tr. 730-731). Tomasetta took the minutes and asked Pierre Lamond ("Lamond"), the former chairman of Vitesse's Board, to sign them. (Tr. 733-736; GX 470, 486).[7] Mody also created minutes in November 2005 for a meeting that purportedly happened on December 17, 2003 (which was the date referenced in the January 26, 2004 meeting minutes). (Tr. 751-752). Hovanec took these minutes and had another board member sign them. (Tr. 752-754; GX 513-A).

---

[6] Tomasetta claimed that he had entries on his Palm Pilot calendar for the April 6 and October 2, 2001 meetings. (Tr. 314-315, 728-729, 786). The evidence showed that these statements were lies, as the entries in Tomasetta's Palm Pilot for those dates were actually placed there in late 2005, after questions had been raised about the meetings. (Tr. 1257-1259; GX 1190).

[7] Keever testified that she recalled Hovanec asking her to create meeting minutes for two meetings that had occurred quite a while ago, and that they were signed by Lamond after Tomasetta met with him. (Tr. 2171-2174).

Mody and Hovanec falsely told Board members and auditors that the options had actually been granted at meetings held on the earlier dates and that the questions raised by the lawyers related only to documentation issues. (Tr. 324-328, 754; GX 600, 611). Tomasetta, Mody, and Hovanec never disclosed to the Board or the auditors that minutes for certain of the meetings at issue had been created years after the fact. (Tr. 756-757, 775). Moreover, Mody and Hovanec each created documents to present to the Board and others that misleadingly disguised when the April and October 2001 minutes had been created. (*See* GX 611 (Mody's December 2005 presentation to the Audit Committee); GX 536 (Hovanec's March 28, 2006 e-mail to Jack Lewis)). Vitesse thereafter filed its Form 10-K for the 2005 fiscal year on December 12, 2005.[8] (Tr. 761-762).

After the Wall Street Journal published an article in March 2006 that raised questions about stock options at various companies, including Vitesse, the DPW lawyers again voiced concerns about Vitesse's option grants and the fact that documentation concerning the options had been created years after the fact. (Tr. 339-341, 767-770; GX 619). Counsel articulated these concerns at a meeting with Vitesse's directors and management (including Tomasetta, Hovanec, and Mody). (Tr. 342-346, 784-786). At the meeting, counsel advised the Chairman of Vitesse's Board that the recent creation of these minutes raised questions about whether the meetings at issue had actually occurred. (Tr. 340-341, 784-785). In response to these concerns, Hovanec falsely claimed that he had found the original minutes for the compensation committee meetings at issue. (Tr. 344, 784-785).

---

[8] The defense argued that Tomasetta and Hovanec relied in good faith upon the fact that neither Vitesse's lawyers nor its auditors had raised any questions about the April and October 2001 option grants prior to the fall of 2005. No matter how hard they try, however, the defendants cannot escape the fact that prior to the filing of the 2005 10-K, counsel had specifically warned them that the options appeared to have been backdated and that an investigation was necessary to determine whether a compensation expense needed to be recorded.

The Vitesse directors at the meeting had not known about the recent creation of the minutes and decided to commission an independent investigation into Vitesse's stock options grants to conduct it.  (Tr. 345-346, 785-786).  The Munger, Tolles & Olson ("MTO") lawyers hired to conduct the investigation interviewed Tomasetta, Hovanec and Mody, all of whom continued to maintain that Hovanec had found the original contemporaneous minutes.  (Tr. 796-799, 2479-2484, 2523-2524).

In addition, the MTO lawyers requested access to Keever's computer so they could review electronic copies of the relevant Compensation Committee meeting minutes.  (Tr. 787-789, 2177-2179).  Knowing that Keever's computer would not have contemporaneous electronic copies of the meeting minutes for the April 6 and October 2, 2001 meetings, Tomasetta, Hovanec and Mody typed up new electronic versions of these minutes, placed them on Keever's computer, and then backdated the computer clock so that it would appear that the minutes had been there all along.[9]  (Tr. 789-793, 797-798).  Forensic analysis of Keever's and Tomasetta's computers found evidence that suggested that the phony minutes were created on Tomasetta's computer, transferred to Keever's computer, and that Keever's computer clock was changed.  (Tr. 1256-1259).

## ARGUMENT

A.    **The Standard For A Rule 29 Motion**

"A defendant challenging the sufficiency of trial evidence bears a heavy burden, and the reviewing court must view the evidence presented in the light most favorable to the government

---

[9] On April 17, 2006, Tomasetta confessed to MTO lawyers that he, Mody, and Hovanec had manufactured documents on Keever's computer and backdated the computer clock.  (Tr.2502-2504).  Tomasetta was evasive and hardly forthcoming during his confessions.  (Tr.2505).  Moreover, the confession came only after MTO had successfully imaged the computers assigned to Keever, Tomasetta, and Hovanec (Tr.2177-2178, 2522), which meant that it was obvious that their obstructive conduct would be discovered.

-19-

and draw all reasonable inferences in the government's favor." *United States* v. *Gagliardi*, 506 F.3d 140, 149 (2d Cir. 2007) (internal quotation marks omitted). A reviewing court must "credit[] every inference that the jury might have drawn in favor of the government," *United States* v. *Morrison*, 153 F.3d 34, 49 (2d Cir. 1998) (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, a reviewing court must analyze the pieces of evidence "not in isolation but in conjunction," *United States* v. *Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). Further, a reviewing court must "resolv[e] all inferences from the evidence and issues of credibility in favor of the verdict" and thereby refrain from "substitut[ing] [its] own determinations of credibility or relative weight of the evidence for that of the jury." *United States* v. *Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008) (internal quotation marks omitted).

**B.    The Evidence Was Sufficient For A Jury To Find A Single Conspiracy**

The sole argument raised by the defendants is that the Court should grant a judgment of acquittal with respect to the conspiracy charged in Count One on the ground that the evidence was not sufficient for the jury to find a single conspiracy. This argument should be rejected.

As the Court recognized in the June 6 Opinion after the first trial – which denied the defendant's Rule 29 motion on Count One on the ground that the evidence failed to show proof of a single overarching conspiracy – whether a single or multiple conspiracies existed is generally acknowledged to be an issue of fact for the jury. (June 6 Opinion (citing *United States*

v. *Berger*, 224 F .3d 107, 114 (2d Cir. 2000)).  Outlining the well-settled law in this Circuit

concerning multiple conspiracies, the Court stated:

> A single conspiracy, rather than multiple conspiracies, may be found where the
> coconspirators had a common purpose.  The participants' goals need not be
> congruent for a single conspiracy to exist, so long as their goals are not at cross
> purposes.  The co-conspirators need not have agreed on the details of the
> conspiracy, so long as they agreed on the essential nature of the plan.  Moreover,
> a single conspiracy is not transformed into multiple conspiracies merely by virtue
> of the fact that it may involve two or more phases or spheres of operation, so long
> as there is sufficient proof of mutual dependence and assistance.

(*Id.* at 12 (quotations and citations omitted)).  The Court found that the Indictment alleged a

"single overarching plan to hide Vitesse's true financial performance" and that the plan involved

both revenue inflation and false statements about backdated stock options.  (*Id.* at 13).  The

Court then found that the evidence at trial established that a reasonable jury could find that the

scheme of revenue inflation was part of a single overarching plan to hide Vitesse's true financial

performance.  (*Id.*)  In addition, the Court found that "a reasonable jury could conclude that

defendants' failure to disclose their practice of backdating stock options was part of a single

scheme, along with the revenue inflation, to hide Vitesse's true financial performance."  (*Id.*)

    There is no basis for the Court's conclusion to be any different with respect to the

evidence presented at the January 2013 trial.  For starters, the S1 Indictment defined the scope of

the conspiracy the same as the original indictment.  *Compare* S1 10 Cr. 1205 at ¶¶ 17-21 with

Indictment 10 Cr. 1205 at ¶¶ 17-20.  Both charging instruments alleged that the defendants

engaged in a conspiracy to hide Vitesse's true financial condition by making materially false

statements about Vitesse's revenues and options.

    In addition, not surprisingly, the evidence at both trials was substantially similar. When

viewed in the light most favorable to the Government, the evidence at the January 2013 trial – as

in the prior trial – overwhelmingly showed that Tomasetta and Hovanec participated in a single

conspiracy to make Vitesse's reported financial results appear better than they really were.   As was the case in the first trial, the evidence established that the defendants' revenue recognition practices led to inflated financial figures because (1) contrary to Vitesse's disclosures, the quarterly stocking packages were recorded as revenue upon shipment, and (2) credits to revenue were not timely recorded for product returned from customers. (*See, e.g.*, Tr. 588-598, 646-647, 1330-1331, 1585, 1585, 1606, 1625-1628, 1636, 1639, 1646, 1661-1664).

Likewise, the evidence at the January 2013 trial was sufficient for a jury to find that Vitesse had failed to disclose the fact that it had backdated its option grants and had not recorded a compensation expense for the backdated options.  The compensation committee meeting minutes for April 12 and October 25, 2001 plainly showed that the options were granted at exercise options as of prior dates.  Moreover, the testimony established that Vitesse had an undisclosed practice of issuing backdated stock options that were in the money. (*See, e.g.*, Tr. 2101-02).  There was sufficient evidence for a reasonable jury to find that, by not disclosing the practice of issuing backdated stock options, Vitesse could hide the fact that it should have recorded a charge to earnings for its backdated, in-the-money options.  In fact, Frank Currie testified that when he reviewed the compensation committee meeting minutes for April 12 and October 25, 2001, he was concerned that the potential charge to earnings could be approximately $120 million.  (Tr. 299-307).  The revenue misrepresentations and the option misrepresentations both had the effect of misrepresenting Vitesse's true financial condition and results of operations.

Moreover, as the Court previously found in connection with the first trial, the evidence showed that the lies about revenues and the lies about options:  (1) served the same overriding goal of falsely bolstering Vitesse's financial performance; (2) were orchestrated by the same senior executives at Vitesse, namely Tomasetta, Hovanec, and Mody; (3) were communicated to

the same audience (analysts, investors, and auditors); and (4) were communicated in the same written documents and oral presentations.  Thus, the jury could reasonably have inferred that the defendants – who were the leaders of the conspiracy and were directly involved in all facets of the conspiracy – were aware of the general nature and extent of the criminal agreement.  *See Berger*, 224 F .3d at 115 (finding evidence sufficient to establish a single conspiracy where the defendants participated in a massive conspiracy to obtain by fraud millions of dollars in student financial aid, rental subsidies, social security benefits, and small business loans from different government agencies).  *Accord* June 6 Order at 13-14.

The defendants argue that the Government failed to prove the existence of the requisite conspiratorial agreement because both Mody and Kaplan testified that they were not involved in the improper options accounting at Vitesse.  (Def. Mem. 3-5).  This argument is contradicted by the cases cited by the defendants, which make clear that it is the *defendant's* intent and conduct that is at issue in determining whether the Government has proven the existence of the conspiracy alleged in the Indictment.  In *United States* v. *Johansen*, 56 F.3d 347, 351 (2d Cir. 1995), a case relied upon by the defense, the Second Circuit stated that, in determining whether single conspiracies or multiple conspiracies have been proven, the court focuses on "what agreement, if any, the jury could reasonably have found to exist vis-à-vis each defendant."  The court must review the scope of the criminal enterprise(s) proven at trial to evaluate whether they fit the pattern alleged in the indictment and then "weigh[] [the defendant's] conduct and statements to determine whether a jury could reasonably infer that he participated in the alleged enterprise with a consciousness of its general nature and extent."  *Id.*

Applying this test, it is manifest that the evidence was sufficient to establish that defendants Tomasetta and Hovanec participated in the charged conspiracy "to hide Vitesse's true

-23-

financial performance" and that the plan involved both revenue inflation and false statements about backdated stock options. The evidence showed that Tomasetta and Hovanec were aware of and involved with *both* the revenue inflation and with the backdating of stock options. The evidence also showed that Tomasetta and Hovanec each knowingly made false statements about Vitesse's financial results (including the inflated revenue and the understated expenses) to investors at meetings, conference calls, and in Vitesse's SEC filings. Finally, the evidence showed that both Tomasetta and Hovanec had a motive to hide Vitesse's true financial condition because a significant portion of their compensation was stock based. It follows that the jury had ample evidence from which it "could reasonably infer that [Tomasetta and Hovanec] participated in the alleged enterprise with a consciousness of its general nature and extent." 56 F.3d at 351. Since the test properly focuses on the defendant's intent, the fact that Mody and Kaplan were involved in Tomasetta's and Hovanec's revenue fraud, but not their backdating of options, proves nothing.

Judge Sand's analysis in *United States* v. *Rigas*, 281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003), illustrates the fundamentally incorrect nature of the multiple conspiracies/duplicity arguments that have been raised by the defendants throughout this litigation. In that case, Judge Sand found that the defendants – the former senior executives of Adelphia Communications Corp. ("Adelphia") – were charged with engaging in a single conspiracy to conceal Adelphia's financial condition and its alleged improper business relationships with the defendants, even though the conspiracy (like the conspiracy charged in this case) involved misrepresentations about different subject matters:

> Here, on its face Count One charges the central players in Adelphia's corporate affairs with a single conspiracy to defraud Adelphia creditors and investors by concealing Adelphia's perilous financial condition and its alleged improper business relationships with the Rigas family and separate businesses controlled by the Rigas family. The Indictment describes, for example, Defendants' attempt to misrepresent the actual state of

-24-

> Adelphia's liabilities on its financial statements (Indictment ¶¶ 64-73) while at the same time concealing the true extent of Adelphia's growing debt burden through false press releases and false entries in Adelphia's books and records (Indictment ¶¶ 73-81), and misrepresentations to Moody's Investors Service. (Indictment ¶¶ 82-91.)  The Indictment alleges a similar strategy of misrepresentations and concealment regarding Adelphia's earnings (Indictment ¶¶ 92-126) and operating results, including the number of basic cable (Indictment ¶¶ 127-38) and high-speed Internet subscribers.  (Indictment ¶¶ 139-42.)

281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003).  Judge Sand analyzed the issue by considering whether the specific misrepresentations were connected to the overall scheme – not whether they were connected to each other – and found that they were:  "Despite the effects on various persons and entities, and the uses of various media, Count One adequately connects these activities to a single scheme designed to ensure that Adelphia's declining financial health – and the Rigas family's involvement in such decline – would remain concealed."  *Id.*  Then, applying well-settled multiple conspiracies law, Judge Sand concluded that "[a]lthough not all Defendants are individually implicated in every fraudulent act, the identification of various overt acts and different substantive crimes involving only some Defendants does not automatically transform a single overarching scheme into a series of separate conspiracies."  *Id.*

Judge Sand's reasoning makes plain that the defendants' argument that the false statements must be linked to each other (Def. Mem. 3), is illogical and incorrect.  The various false statements must be linked, as they were here, to the overall scheme to make the company's financial results look better than they actually were.  It is hard to fathom how a scheme by two corporate executives to lie about their company's financial performance can encompass multiple conspiracies simply because they lie about different financial metrics in the same financial statement (in this case, revenues and compensation expenses).   The argument is especially ludicrous when one considers that the defendants' lies were made for the singular purpose of

making the company's performance look better than it was and were conveyed to the same audience of investors and analysts.

The defendants also argue that the Government is improperly seeking to redefine the conspiracy by its purpose, rather than by the agreement of its members to that purpose.  (Def. Mem. 6-7).  Contrary to the defendants' argument, the indictment alleged, and the evidence showed, that Tomasetta and Hovanec conspired to conceal Vitesse's true financial condition and results of operations from investors.  The evidence showed that they did so by misrepresenting the true facts concerning Vitesse's revenues and options.  This was the essence of the agreement proved at trial, and was not merely its purpose.[10]  In sum, the trial evidence was more than sufficient to prove the defendants' guilt and clearly withstands the deferential review applied on a Rule 29 motion.

---

[10]     The defense's reliance upon *United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001), is misplaced.  In that case, the defendant passed along material non-public information to his paramour, who in turn shared it with another person with whom she was involved.  Because there was no evidence that the defendant knew that his paramour was involved with another person and that she would pass the information to the third person, the court found that the evidence was insufficient to establish that the defendant's agreement with his girlfriend encompassed a broader scope than the two of them.  *Id.* at 137-38 ("We decline to hold as a matter of law that a cheating heart must always foresee a cheating heart").  The *McDermott* case has nothing to do with this case where the defendants were directly involved in making false statements to investors about Vitesse's revenues and its options.

## CONCLUSION

For the foregoing reasons, the defendants' motion for judgment of acquittal with respect

to Count One should be denied.

Dated: New York, New York
       May 24, 2013

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney

                            By: _____
                                    JOHN J. O'DONNELL
                                    KATHERINE R. GOLDSTEIN
                                    DAVID I. MILLER
                                    Assistant United States Attorneys
                                    Telephone: (212) 637-2490/2262/2484

-27-

<u>AFFIRMATION OF SERVICE</u>

JOHN J. O'DONNELL hereby affirms pursuant to Section 1746 of Title 28, United States Code:

1.      I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York.

2.      On May 24, 2012, I caused a true and correct copy of the foregoing Memorandum Of Law In Opposition To The Defendants' Motions For Judgments Of Acquittal, via the Court's Electronic Case Filing system on:

Dan Marmalefsky, Esq.                    Gary Lincenberg, Esq.
Lawrence Gerschwer, Esq.                 Peter J. Shakow, Esq.
Morrison & Foerster                      Bird, Marella, Boxer, Wolpert, Nessim,
1290 Avenue of the Americas              Drooks & Lincenberg
New York, NY 10104                       1875 Century Park East
                                         Los Angeles, CA 90067-2561

*Counsel for defendant*                  *Counsel for defendant*
*Louis Tomasetta*                        *Eugene Hovanec*

3.      I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Dated:      New York, New York
            May 24, 2013


                                         _____
                                         JOHN J. O'DONNELL