UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                      :

UNITED STATES OF AMERICA,          :

                      Plaintiff,     :       No. 10 Crim. 1205 (PAC)

                        :

         v.               :

LOUIS TOMASETTA and EUGENE HOVANEC,  :

                  Defendants.   :

------------------------------------------------------------- x

## **DEFENDANT LOUIS TOMASETTA'S SENTENCING MEMORANDUM**

**MORRISON & FOERSTER** LLP
Dan Marmalefsky (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013-1024
213.892.5200

Lawrence Gerschwer
Katie L. Viggiani
1290 Avenue of the Americas
New York, New York 10104-0050
212.468.8000

*Attorneys for Defendant Louis Tomasetta*

More than seven years ago, defendant Louis Tomasetta accepted full responsibility for the conduct for which the Court will impose sentence on November 7, 2013.  Not once did Tomasetta deny his involvement in the wrongful re-creation of meeting minutes—neither during his dealings with Vitesse Semiconductor Corporation's outside counsel nor when he settled shareholder litigation nor in the two criminal trials before the Honorable Paul A. Crotty.  As a result of his misconduct, Tomasetta lost his employment and became unemployable in a field for which he was renowned; paid millions of dollars from his personal funds and assets to settle civil litigation; and has been the subject of criminal and civil enforcement investigations and later-filed actions. For the reasons discussed herein, and as both the Probation Office and the Government agree, Tomasetta submits that the relevant factors governing sentencing under 18 U.S.C. § 3553(a) do not warrant incarceration.  Tomasetta respectfully requests that the Court adopt and impose the Probation Office's recommended sentence.

I.      **PROCEDURAL BACKGROUND**

On December 7, 2010, the United States Attorney's Office for the Southern District of New York sought and obtained an Indictment against Louis Tomasetta and Eugene Hovanec.  The Indictment charged Tomasetta—the former CEO of Vitesse Semiconductor Corporation ("Vitesse")—with seven counts of federal securities law violations.

The first trial in this matter commenced on March 22, 2012.  In its case-in-chief, the Government elicited testimony from 19 witnesses.  After several days of deliberations and an *Allen* charge, on April 24, 2012, the Court declared a mistrial because the jury was unable to reach a unanimous verdict on any count.  On June 6, 2012, the Court granted

1

Defendants' motion for judgment of acquittal with respect to all substantive counts, leaving for retrial a one-count charge of conspiracy to violate the federal securities laws.

On December 6, 2012, the Government filed a Superseding Indictment charging a single count "conspiracy to commit securities fraud and to make false statements in annual and quarterly SEC reports." The retrial began on January 22, 2013. Once again, after several days of deliberations and an *Allen* charge, the jurors reported that they were "'hopelessly' dead locked [sic] at 6 vs. 6 over the issue of whether the Government [had] proved or not [its] case." (Dkt. No. 231 at 6.) On February 20, 2013, the Court declared a mistrial. The Court denied Defendants' renewed motion for judgment of acquittal on June 11, 2013.

The Government and defense counsel then began an earnest dialogue about an alternative to a third lengthy trial about conduct dating back to 2001. Pursuant to a written plea agreement, on August 15, 2013, the Government filed a Superseding Information charging defendants with a theretofore-uncharged crime—"conspiracy to destroy, alter, or falsify records in contemplation of a federal investigation," in violation of 18 U.S.C. § 1519. Defendants consented to the filing despite the expiration of the statute of limitations and the absence of venue in the Southern District of New York, and pled guilty to the count. The Government has recommended a sentence of probation and will dismiss the securities-fraud conspiracy count at the time of sentencing.

On October 31, 2013, the Probation Office for the Southern District of New York issued its Presentence Investigation report for Tomasetta. Based on its investigation and analysis, the Probation Office has recommended that the Court "impose a sentence of a $30,000 fine, only, to be paid immediately." (PSI at 19.)

la-1223221

## II.      THE OFFENSE

In early 2006, Vitesse and Intel were negotiating Vitesse's purchase of Intel's Optical Networking Components division.  To maintain the negotiation's confidentiality, the division was code-named "Aptos," and the potential acquisition "Project Monaco." The Aptos product line perfectly complemented Vitesse's existing product lines. Vitesse's Board and management unanimously agreed that the acquisition would add immediately to profits with minimal additional overhead, improve overall market share, and provide exposure to new customers.  Over the next four years, the acquisition was estimated to contribute more than $100 million in operating income.  Not surprisingly, everyone at Vitesse agreed that the transaction presented a game-changing opportunity.

Vitesse proposed to raise capital for the Aptos acquisition through a public equity offering.  Davis, Polk & Wardwell ("DPW"), Vitesse's outside corporate counsel, was helping with the acquisition's due diligence and the equity offering's required documentation.  The DPW partners in charge of the Vitesse relationship—Frank Currie and Martin Wellington—had represented Vitesse since 1986, both at DPW and earlier at the Wilson Sonsini law firm, and had assisted Vitesse with due diligence and required documentation on multiple transactions over the course of that representation.

As the parties to the acquisition were completing the due diligence and negotiating the final documentation, the Wall Street Journal published an article concerning possible stock-options backdating at eight companies, including Vitesse and another DPW (Currie) client, Mercury Interactive.  DPW thereafter informed the company that DPW would neither issue a standard opinion letter nor sign off on the offering memorandum unless its concerns about specific historical stock option grants documented in 2001 were addressed through an independent investigation.  DPW also

3

advised that, in light of the Wall Street Journal article, an SEC investigation of Vitesse's option grants was likely.  At DPW's recommendation, on April 11, 2006, Vitesse's Audit Committee (with Tomasetta's agreement) decided to retain independent outside counsel to investigate the 2001 grants.

Jack Lewis (then the chairman of Vitesse's Board and its audit committee) later that day sent an email to Pierre Lamond (the prior chairman of the Board and its compensation committee) regarding "documentation holes" for two option grants that may result in "charges to earnings."  (Ex. 5359.)  The two sets of option grants in question had grant dates of April 6, 2001 and October 2, 2001.  Because Vitesse's stock price was falling rapidly both before and after these grants, no employee had exercised any options awarded on those dates.  Both Tomasetta and Hovanec were certain that meetings had occurred on those dates.[1]  Lewis wrote that DPW needed the issue to be resolved "before they will give the underwriters their blessing on the upcoming offering." (*Id.*)  He also wrote that the audit committee, at the recommendation of DPW, had retained an independent law firm to investigate and wanted the issue resolved within a week's time.  (*Id.*)  The audit committee wanted the investigation concluded and the issues resolved quickly so as not to scuttle the game-changing Aptos transaction.

On Wednesday, April 12, 2006, the law firm of Munger, Tolles & Olson ("MTO") began its investigation into the April 6, 2001 and October 2, 2001 option

---

[1] Contemporaneously prepared minutes of in-person compensation committee meetings on April 12, 2001 and October 25, 2001—which the committee's chair signed and Vitesse's outside auditor, KPMG, reviewed as part of its quarterly reviews and annual audits—memorialized the option grants on April 6, 2001 and October 2, 2001, respectively.  The accuracy of the earlier grant dates was further corroborated at trial by both testimonial and documentary evidence.

grants.  MTO requested from Yatin Mody electronic copies of compensation committee minutes, which were kept on Vitesse-employee Karen Keever's computer.  While there were hard, executed copies of minutes of telephonic meetings on those dates, which Mody had prepared in November 2005 after discussion with and then provided to DPW, Mody realized that there were no electronic copies of the April 6, 2001 and October 2, 2001 meeting minutes on Keever's computer.  He so informed Tomasetta and Hovanec. Tomasetta and Hovanec remained unequivocal that the telephonic meetings had taken place.  Neither Mody nor Defendants wanted to jeopardize the Aptos transaction over what they considered a mere documentation issue.

At Mody's suggestion, Hovanec retyped the minutes and transferred the files onto a portable storage device (e.g., flash drive).  Before saving the files onto Keever's computer into a folder that Mody had newly created, Mody noted that the computer clock would reflect the April 2006 creation date; Tomasetta then changed the computer's clock so that it would appear that the documents had been created earlier.  The next day, Tomasetta and Hovanec traveled to Colorado for meetings at Vitesse's Colorado Springs facility.

That Saturday, April 15, 2006, Tomasetta and Mody met at a local coffee shop and agreed that MTO should be told the truth.  Tomasetta also called chairman Lewis to explain the situation.  On Monday, April 17, 2006, Tomasetta asked to meet with the MTO attorneys as soon as they arrived at the office; he told them about the retyping of the minutes the previous week and the transfer of the retyped minutes onto Keever's computer after changing the system clock.  That night, Tomasetta, Hovanec, and Mody

were suspended from their positions at Vitesse.  Shortly thereafter, Vitesse terminated their employment.

Thus, within days of his wrongdoing, and at all times since April 2006, Tomasetta acknowledged and accepted responsibility for his misconduct.

## III.    PERSONAL BACKGROUND

Louis Tomasetta was born in the Bronx in 1948.  In 1951, he and his family moved to New Jersey, where he remained through high school.  He attended elementary and middle school in Nutley and high school in Newark.  Tomasetta's father supported his family working as an industrial engineer at Curtis Wright and later at General Foods; he simultaneously attended college at nights, earning his bachelor's and master's degrees in industrial engineering.  Tomasetta's mother worked inside the home, raising Tomasetta and his two younger siblings.

After graduating near the top of his class from Essex Catholic High School, Tomasetta attended the Massachusetts Institute of Technology ("MIT") on a partial National Merit Scholarship and a matching scholarship from General Foods.

In his junior year at MIT, Tomasetta accepted a co-op assignment at RCA Laboratories.  At RCA, Tomasetta built advanced circuitry to help computers run more quickly.  In 1970, Tomasetta was drafted into the National Guard and took a six-month leave to complete his basic and infantry training in Fort Polk, Louisiana.  He then returned to New England, where he completed his military service over six years, receiving an honorable discharge.  In 1971, Tomasetta concluded his co-op assignment at RCA Laboratories and earned bachelor's and master's degrees in electrical engineering. The subject of his master's thesis was auger nonradiative recombination in gallium arsenide.

6

la-1223221

Tomasetta received early admission into MIT's doctoral program and devoted the next three years to cutting-edge research and theory. His doctoral thesis established the fundamental infeasibility of room-temperature infrared lasers using III-V compounds (e.g., lead-tin-tellurium). While earning his doctorate degree, Tomasetta worked part-time as a teaching assistant and at MIT Lincoln Laboratory. At MIT Lincoln Laboratory, Tomasetta helped develop an early radar detection system. Tomasetta held a "top secret" security clearance. In 1974, Tomasetta earned his doctorate in electrical engineering. He then worked full-time at MIT Lincoln Laboratories, developing imaging radar.

Tomasetta met his future wife, Maureen, while he was a doctoral student. She was then working as a secretary for one of Tomasetta's professors. They married in 1973. Maureen continued working outside the home until the birth of their son, James, in 1978. Their daughters, Kathleen and Susan, were born in 1983 and 1985, respectively.

In 1977, Tomasetta accepted a position at Rockwell Science Center in Southern California to work on gallium arsenide semiconductors. At the time, Rockwell employed about 500-600 people and served as a research laboratory for both commercial and governmental projects. Tomasetta joined Rockwell to lead a group building prototype lasers for the U.S. government. He maintained his "top secret" security clearance at Rockwell.

In 1984, a Rockwell colleague recruited Tomasetta to join Vitesse Electronics, a high-tech startup funded by Norton (a sandpaper company), as president of a division created to manufacture gallium arsenide circuitry for high-speed computers. In 1986, Norton was in financial straits and could no longer fund the continued operations of Vitesse Electronics. A consortium of venture capital funds led by Sequoia Capital

incorporated a new company, Vitesse Semiconductor, which then purchased the gallium arsenide business of Vitesse Electronics.  The newly formed Board (comprising the funds' representatives and Tomasetta) elected Tomasetta CEO and President.  The owners of Vitesse took the company public on NASDAQ in 1991.

Tomasetta served as Vitesse's CEO and President for two decades.  During his tenure, Vitesse earned and maintained a well-deserved reputation for innovation and quality.  For example, it was Vitesse products that enabled AT&T to bring high-speed optic communications to the general public.  Whether during the high-speed communications boom in the 1990s or the collapse of the telecommunications market in the early 2000s, Tomasetta steadfastly put the interests of the company, its shareholders, and its employees foremost.

Tomasetta devoted his time to fostering relationships with major clients (e.g., Fujitsu, AT&T, and EMC), analyzing industry trends, and addressing technical/manufacturing issues.  As the witnesses at both trials agreed, Tomasetta had no involvement in making accounting determinations or preparing financial statements.  For such functions, he relied on Vitesse's outside and in-house experts, including attorneys from DPW, auditors from KPMG, and Vitesse's internal team of certified public accountants and trained accounting staff.

Tomasetta was fully committed to the company that he helped found and grow.  Vitesse was his life, both professionally and socially.  He worked 12-hour days, seven days a week, seldom taking vacations.  He was constantly on the road, meeting with clients and visiting manufacturing facilities around the world.  Year after year, he purchased shares of Vitesse stock, even when stock prices were scraping the bottom.

Even at the height of Vitesse's success, with its stock peaking at a non-split-adjusted price of $2,086.25 a share, Tomasetta remained humble and down-to-earth.  He drove a Datsun B210 and changed his own motor oil.  While Tomasetta earned substantial profits from selling founder's shares and exercising stock options, he retained more than 800,000 shares of stock and left unexercised stock options worth many millions of dollars.  In 2000, Tomasetta donated $2.3 million to establish an endowed chair at MIT; while his personal donation (along with a smaller contribution by a close friend) funded the chair, Tomasetta asked that the chair be in Vitesse's name.  The Vitesse Professorship in Electrical Engineering and Computer Science still exists today.

Tomasetta lost his life's centerpiece because of a thoughtless decision to participate in the surreptitious and misleading re-creation of two pages of telephonic compensation committee minutes.  Though he quickly regretted his mistake and came clean days later, the damage proved irreparable.  Vitesse's Board suspended and then terminated Tomasetta.

With his professional and personal reputation in ruins, he moved to the seclusion of Ojai, California.  Tomasetta has since been a defendant in numerous shareholder lawsuits, an SEC civil action, and a DOJ criminal prosecution.  In addition to the millions of dollars expended defending himself through two criminal trials, Tomasetta personally paid more than $2 million in cash and Vitesse stock to settle the shareholder lawsuits.  He also voluntarily gave up the right to be reimbursed for defense costs in SEC and DOJ proceedings, even though such rights cannot be waived under governing California law. Other than limited consulting for personal friends in the first couple years, Tomasetta has

9

not worked since Vitesse fired him.  He is an outcast in an industry that at one time

regarded him as a technological innovator and a businessman of integrity.

## IV.    LETTERS OF SUPPORT FROM FAMILY, FRIENDS, AND COLLEAGUES

Attached to this memorandum are letters from Tomasetta's family, friends, and

colleagues, submitted for the Court's consideration to help provide a more rounded

portrait of Tomasetta.  The following are excerpts from some of the letters:

### A.    Letters from Family

#### 1.    James Tomasetta, son

My dad has been and continues to be a major influence in
my life.  Even from an early age he would always find the
time to participate in my school and extracurricular
activities.  On numerous occasions he would return from a
business trip on Friday and immediately meet me and my
scouting troop at a remote camp site….  He always made
sure that I was focused on my school particularly as I
struggled with dyslexia in grammar school.  He spent
numerous hours every week with me helping me overcome
my challenge.  Today I am a successful electrical engineer
living in Colorado Springs, CO.  I can only conclude that
without the time he spent helping me and the
encouragement he gave me I do not believe I would have
been as successful as I have been….  He has taught me the
value of being consistent with the decisions I make in life
and to stand up for what I believe is right even when it is
inconvenient.  I think the most important thing that I
learned from my dad is to always listen to people, but to be
my own man and come to my own conclusions and to
always continue forward.  He was always there for me
when I needed help in school or guidance on life.  Because
of him I was able to complete my college degree which
enabled me to support myself and my family.  I could not
have asked for a better father and hope that I will be as
good.

#### 2.    Kathleen Tomasetta, older Daughter

Throughout my life, my father instilled in me and my
siblings the importance of honesty and love.  These charges

are extremely out of character for the man that raised me into a strong and honest woman and I believe he sincerely regrets his actions and has grown from this experience…. He is a constant support system for me.  He always taught me to be honest and sincere in my actions towards others. My father personally tutored me through high schools and business school when I was simply not receiving the help I need from my professors.  I remember one time when I was having a math test he drove 40 miles to help me through something I didn't understand and then returned to his meeting.  To this day, he teaches and supports my choices with my current position with a small start up fashion line in Los Angeles.  His teaching and support have helped me develop the foundation to become a respected woman…. He is a sensitive and quiet man and I beg that he receive a punishment comparable to the crime, such as probation. He is not a threat to society and just wants to be home with his loving wife and children. I love him with all my being.

### 3.      Robert Tomasetta, younger brother

Lou is my older brother and though we are seven years apart, I ended up following in his footsteps.  He has always been a role model for our immediate family as well as those of our extended family and has been held as an example of a dedicated hard working person who strives to be the best in all aspects of his life….  Once Lou decided to become an engineer, he dedicated his studies and career to the development of new technology and eventually started his business.  I followed suit by becoming an engineer as well and early in my career I also started my business....  Our companies had a culture of doing the right thing for the customer, the community and our employees.  We prided ourselves in valuing each person for their work ethic, no one person was more important than the other, they would be valued for their contributions….  Lou has been a loving husband and father and his family is the most important aspect of his life.  He worked endless hours not to become a CEO but to be the best provider for his family, to be able to give his children opportunities he did not have while growing up and to be a mentor to many young engineers and entrepreneurs.

### 4.      Susan Tomasetta, younger daughter

My dad has always been a reliable person often going out of his way for others.  Growing up, he spent countless

11

hours helping me with my homework. Although the life of an executive can be demanding, he always found the time to work through problems with me whether it was at our dining room table or over the phone because he was out of town on business. It didn't matter if he was in California, New York or Tokyo, my father acted as a constant in my life providing me logical and sound advice and instilling in me an uncompromising work ethic…. My dad is a quiet man, but nothing makes him more proud than his family. He displays great excitement for his children's accomplishments and never stops encouraging us to succeed no matter the path we have chosen. As a graduate student in economics I wrote a paper that was chosen to be printed in a University publication. Although I preferred to remain reserved about the honor, my father surprised me by having the article framed. He told me that one day I will want to hang it in my office as a reminder of my accomplishment and that my paper read better than most written in national publications, a comment that I will always remember and appreciate…. This trial has been a deep source of regret for my father and a time of confusion for myself as the charges are completely out of character for the man I love. He only wishes to move on from these events and to focus once again on making a positive contribution to society and being there for his family.

**B.   Letters from Friends**

**1.   Thomas Garrity, a friend for 45 years**

Lou is a "content guy", an "engineer's engineer" in the mold of what is valued at MIT – that you are as good as what you contribute – your ancestry, ethnicity, wealth, "connections" are irrelevant…it is what you can do – what you can add through hard work and expertise that count. Lou has always been a tireless contributor to every endeavor that I've observed him in – whether building furniture at a table saw or leading an executive team. Lou is not one who grabs for glory nor one whom isn't trustworthy in apportioning credit where it's earned…. Lou is a brilliant engineer who played a central role in creating technologies that made significant contributions to the telecommunications capabilities that we all enjoy today. His early work in gallium-arsenide semiconductors was critical in both military and civilian applications.

### 2.      Eric Keitel, a friend for 33 years

Lou continues to one of the kindest, most considerate, generous, and loyal friends one could ever know.  In spite of the incredible time his businesses demanded of Lou, he consistently found time for the questions and needs of his friends and family.  My family and I always look forward to time with Lou because his consistent good nature, humor, and interest in others guarantee a relaxing and refreshing visit….  As a father I watched Lou invite and encourage his own children to pursue their curiosity, often at the expense of his having to later fix something.  He shares the same openness at his home with his friends.  As a son and son-in-law, I watched Lou return from long overseas business trips only to jump right back on a plane and visit his ailing and elderly family on the East coast….  He treats others with the same respect that he has earned for himself and has consistently demonstrated his ability to confront difficult situations with dignity, empathy, and the requisite resolve.

### 3.      Jim Mikkelson, a friend for 47 years and Vitesse cofounder

[At MIT,] Lou was also a caring friend.  Home was too far away and too expensive for me to get to for most holidays and breaks.  Lou often took me home to his family in New Jersey during these periods, where I was welcomed like I was part of his family.  I found Lou to always be honest and trustworthy.  If he said he would do something, he would keep his word….  In 1984, Lou approached me with the opportunity to help found a new company.  I was concerned about leaving my well established position, but my knowledge of Lou's capabilities and the opportunity to work with him and to create new products was enough to get me to join.  For the next 17 years I worked for and with Lou to make Vitesse a successful company….  I retired form Vitesse in 2001, and Lou and I remain good friends.  I continue to believe in Lou's honesty, abilities and character.  I feel that he has strongly contributed to the success of Vitesse and the wellbeing of hundreds of its employees.

### 4.      Raymond Milano, a friend for 30 years

[Lou] is a private person who lives his life in balance and is not given to ostentatious displays or behavior.  I believe that this is one of his strongest traits.  Lou is highly

13

intelligent, well-read, thoughtful, and unafraid to express his opinions. In addition, he is helpful, "plays by the rules", and is honest in his dealings with others. In short, Lou is a person of high integrity who lives a consistent life and leads by example…. Lou is a great team builder and leader. He is both a mentor and motivator and has guided, directly or indirectly, the professional development of hundreds of engineers. Lou has inspired all of these people to know more, understand more, and do more. Lou set a personal standard at both Rockwell and Vitesse for hard work and accomplishment, leading by example. He is the boss you want to have because he gives you the freedom, responsibility, and support, to do your job. As a result, you are able to grow rapidly and accomplish more…. On a personal level, I know Lou to be a devoted family man, a reliable friend, and a generous person. He will readily lend you his tools, help you change your brake pads, or repair a lawn sprinkler…. Lou's strong sense of family is evidenced in the way he and his wife have raised their children, each of whom has completed advanced education in engineering, finance, or merchandising and is an independent, contributing member of society…. In closing, Lou Tomasetta is a "regular guy" who does everything to the best of his ability. He conducts himself on a daily basis with honesty and integrity. He is industrious and hard-working, considerate of others, and always trying to make positive contributions to business, family, friends, and his community.

**5.      Michael Salour, a friend for 36 years**

I consider the breadth of Dr. Tomasetta's contributions, both as scientist and citizen, to be truly amazing. I can attest to the fact that in my years of knowing Lou, he has always been very transparent and trustworthy with very high integrity and has lived an honorable life. His conduct, character, and demeanor are those of an exceptionally creative and productive scientist who has made highly significant contributions in several important areas of science and to society. At a time when our nation is producing very few engineers and scientists, Dr. Tomasetta's singular accomplishments and talents constitute a real asset to our nation and its security, and his dedication and mentoring remain integral to developing the next generation of scientists and engineers who dream of ideas and want to transition them from concept to real

products and services that can someday be successfully deployed worldwide.

## C.   Letters from Colleagues

### 1.   Sabra Bennett, Vitesse's former director of human resources

[Lou] is and was a caring individual.  Lou would not just spend time in his office.  He is an Engineer and would take the time to visit the employees in all of the various areas.... The employees had a fond appreciation of his interest.  The employees liked Lou and had a genuine respect for the kind of person they knew....  Vitesse Semiconductor was a great place to work and you would hear that from the employees. He wanted to be fair and treat the employees with respect. Lou is a very down to earth individual and could relate to employees at all levels....  Lou Tomasetta is a kind and respectful man and I would work for him again in a heartbeat.

### 2.   Jim Cole, Vitesse investor and director

Lou Tomasetta, along with the help of the board built an outstanding management team that was uniquely position and very competitive in the market they served.  Lou, as the company's CEO displayed the leadership, moral character and shared values of its employees and shareholders....  On the personal side of our relationship, I experienced a man of high integrity, ethical life style and a serious interest in social development for his family, children, friends and community.  Lou's wife, Maureen and Lou have three terrific grown children with outstanding educations and became productive citizens.

### 3.   Ira Deyhimy, a friend for 36 years and Vitesse cofounder

At Vitesse, we built a world-class company that ultimately created jobs for over 1400 people.  From inception of the company in 1984 through over 20 years, Lou exhibited leadership with extraordinary strength of character through numerous and various challenges and set a stellar example for everyone in the company.  He always showed compassion for the employees, and always the engineer, approached his leadership role with great humility.  There are numerous examples of Lou helping colleagues in personal matters and promoting their careers....  Should the

15

opportunity arise, I would have no hesitation in working
with him again.

### 4.   Paul Matranga, Vitesse's former vice president of quality

To me there is a significant difference between someone
accorded respect as a person as opposed to their position.
In Lou's case it was apparent that the workforce at all
levels respected him as a person.  He not only started the
company, but also set an example as a hardworking and fair
individual.  People responded to that on a basic level.
During the seven year period I observed as Lou continued
to consistently build a sense of community at Vitesse.  He
treated all employees the same, with respect for each as an
individual.  On a regular basis he brought employees
together as a group (meetings, barbeques, Christmas
parties, dinners on site etc.) to build esprit de corps and a
sense of teamwork.  He worked alongside them during
heavy workload periods on the test floor.  Despite the
growth in the number of employees during this period Lou
seemed to know each by name.  He went out of his way to
interact with them at a personal level.

### D.   Witness Testimony of Colleagues

#### 1.   Chis Gardner, Vitesse's former general manager and its current CEO (Dep. 134:15-135-5)

Q.  Did you have an opinion as to whether he [Lou
Tomasetta] was a hard-working CEO?

A.  Yeah, I think Lou was a hard-working individual.  I
think that's generally true.  I think that's how he built
the company.

Q.  Did you have an opinion as to whether he was
motivated to make as much money as he possibly
could, versus being motivated to do whatever he
thought was in the best interests of the company?

A.  I never got the view that Gene -- or Lou was
particularly motivated by money.  For the first years of
Vitesse he drove around in a Datsun, you know, 210, so
. . .

Q.  Did he spend a lot of time socializing and chitchatting
with people?

A.  He was -- yeah, I think he was pretty accessible to
employees.  And I think there was certainly a group of

16

folks that, you know, consistently went to lunch every
week and that sort of thing.

**2.      Karen Keever, Vitesse's stock option administrator and
Tomasetta's assistant (2/8/13 Tr. 2228:4-15)**

Q.  You worked at Vitesse for 17 years.

     Did you like working there?

A.  Yes, I did.

Q.  OK.  Did you enjoy working with Dr. Tomasetta?

A.  Yes.

Q.  Did he treat you well and with respect?

A.  Yes.

Q.  He let you do your job?

A.  Yes.

Q.  He never asked you to do anything that you remotely
considered improper?

A.  No.

**3.      John Lewis, Vitesse board chairman (3/28/12 Tr. 654:8-24)**

Q.  You had a chance to observe and work with Dr.
Tomasetta for 14 years, from 1992 through 2006?

A.  Yes.

Q.  You felt he was a good businessman, a good technical
leader?

A.  Yes.

Q.  From your observations, you could tell Vitesse was his
life?

A.  Yes.

Q.  He built that company; he was its founder?

A.  Absolutely.

Q.  He worked 24/7 to do whatever he could for the
company?

A.  Yes.

Q.  He was someone who cared very deeply about the
company and at all times tried to do what was best for
the company and its shareholders?

17

A.  Yes.

## V.    ADVISORY GUIDELINES AND SENTENCING RECOMMENDATIONS

### A.       Principles of Sentencing Under 18 U.S.C. § 3553(a)

Section 3553(a) sets out the principles that guide the determination of the

sentence to be imposed.  The overarching principle is that the sentence imposed must be

"sufficient, but not greater than necessary," to fulfill the following four purposes of

sentencing:  (A) "to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense"; (B) "to afford adequate deterrence to

criminal conduct"; (C) "to protect the public from further crimes of the defendant"; and

(D) "to provide the defendant with needed educational or vocational training, medical

care, or other correctional treatment in the most effective manner."  18 U.S.C.

§ 3553(a)(2).

Any sentencing determination must also take into account "the nature and

circumstances of the offense and the history and characteristics of the defendant."

18 U.S.C. § 3553(a)(1).  Other guiding principles of sentencing include "the need to

avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct," and "the need to provide restitution to any victims

of the offense."  18 U.S.C. § 3553(a)(6) & (7).  Finally, Section 3553(a) instructs courts

to consider "the kinds of sentences available" and the advisory sentence range under the

Sentencing Guidelines.  18 U.S.C. § 3553(a)(3) & (4).

### B.       Calculations Under the Advisory Guidelines

As part of the plea negotiations, the Government and Tomasetta stipulated to an

overall Guidelines offense level of 13.  Because Tomasetta has no prior criminal history,

the Guideline range for the stipulated offense level is 12–18 months.  But in light of the

18

circumstances of the case here (discussed herein), both the Probation Office and the Government have recommended that the Court not impose a sentence of incarceration here.

### C.   Avoiding Sentencing Disparity

As noted above, a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Tomasetta has pled guilty to conspiring to destroy, alter, or falsify records in contemplation of a federal investigation. A sentence of a $30,000 fine here would be in line with probationary sentences imposed in more serious obstruction of justice convictions around the country, several of which also involved attempts to mislead lawyers conducting an internal investigation. Though the cases are from other districts, the primary purpose of Section 3553(a)(6) is to "minimize nationwide disparities." *United States v. Wills*, 467 F.3d 103, 110 (2d Cir. 2007). The following are examples of a few other such cases.

### 1.   *United States v. O'Brien*, D. Ariz., Case No. 09-CR-365

Edward O'Brien III was the controller of CSK Auto, Inc., a publicly traded retailer of automobile parts based in Phoenix, Arizona. As the company's controller, O'Brien became embroiled in and perpetuated multiple accounting improprieties that predated O'Brien's arrival at CSK Auto. O'Brien pled guilty to obstructing the SEC's pending investigation into CSK Auto's accounting practices in violation of 18 U.S.C. § 1505. O'Brien admitted to lying to the law firm conducting an independent investigation into the accounting practices, even though he knew that the company would be reporting the investigation's results to the SEC. After applying the sentencing guidelines

19

applicable to obstruction of justice, the court in November 2011 sentenced O'Brien to probation.

### 2. *United States v. O'Brien*, S.D. Cal., Case No. 04-CR-2584

Peter O'Brien was the director of alliances for Peregrine Systems, Inc., a publicly traded software manufacturer based in San Diego, California. According to its restated financial statements, Peregrine Systems had improperly recognized more than $500 million in revenue and understated its expenses by more than $880 million. O'Brien was involved in facilitating the false recognition of more than $10 million of revenue. In 2004, O'Brien pled guilty to obstructing a proceeding pending before the SEC in violation of 18 U.S.C. § 1505. O'Brien admitted to providing false information to government agents who were investigating the financial improprieties at Peregrine Systems. Although admitting in his plea agreement that he was a knowing participant in a conspiracy to deceive the investing public, the court applied the sentencing guideline applicable to obstruction of justice and sentenced O'Brien in 2008 to probation.

### 3. *United States v. Silverstein*, E.D.N.Y., Case No. 04-CR-24; *United States v. Rivard*, E.D.N.Y., Case No. 04-CR-329; and *United States v. Kaplan*, E.D.N.Y., Case No. 04-CR-330

Lloyd Silverstein, David Rivard, and David Kaplan were former officers of Computer Associates, Inc., a publicly traded software company based in Brooklyn, New York. Silverstein was senior vice president of global sales, Rivard vice president of finance, and Kaplan a senior vice president. Each of the three defendants pled guilty to conspiracy to obstruct justice, and Rivard and Kaplan also pled guilty to conspiracy to commit securities fraud. The obstruction count in each case was based on lies that the defendants had told the law firm that Computer Associates had hired to conduct an internal investigation and that was expected to report the investigation's results to

government officials.  Silverstein, Rivard, and Kaplan were sentenced to a period of home detention, as well as three years of probation.

### 4. *United States v. Cracchiolo*, C.D. Cal., Case No. 07-CR-60

John Cracchiolo was the chief financial officer of Endocare, Inc., a publicly traded medical-device manufacturer based in Irvine, California.  Cracchiolo was charged in a 27-count indictment with wire fraud, securities fraud, and lying to auditors.  On the eve of trial in August 2008, Cracchiolo pled guilty to a one-count information charging him with obstructing a pending SEC proceeding in violation of 18 U.S.C. § 1505.  Cracchiolo admitted to giving false testimony in the SEC investigation.  After applying the sentencing guideline applicable to obstruction of justice, the court in 2009 sentenced Cracchiolo to a period of home detention and probation.

### 5. *United States v. Bonds*, N.D. Cal., Case No. 07-CR-732

Barry Bonds, the baseball player, was charged with obstruction of justice in violation of 18 U.S.C. § 1503 (and other counts) for providing intentionally evasive and misleading testimony to a grand jury investigating performance-enhancing drugs.  In April 2011, a jury convicted Bonds of the obstruction count.  After applying the sentencing guidelines applicable to obstruction of justice, the court sentenced Bonds to 30 days of home confinement and probation.

### D. The Probation Office's Recommended Sentence of a $30,000 Fine Is Appropriate Here

As discussed above, Section 3553(a)(2) sets forth four purposes of sentencing: (1) <u>retribution</u> ("to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"); (2) <u>deterrence</u> ("to afford adequate deterrence to criminal conduct"); (3) <u>incapacitation</u> ("to protect the public from further

21

crimes of the defendant"); and (4) <u>rehabilitation</u> ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

Tomasetta has no prior criminal history.  He led an exemplary life before the events of April 12, 2006, and has been a model citizen since then.  At age 65, retired and living with his wife in the seclusion of Ojai, California, Tomasetta will never again come in contact with the criminal justice system.  Therefore, the recommended maximum guideline fine of $30,000 is more than sufficient to fulfill the sentencing purposes of specific deterrence, incapacitation, and rehabilitation.

As for the sentencing purpose of general deterrence and retribution, Tomasetta has already suffered substantially over the past seven-and-a-half years.  For participating in the re-creation of two documents and concealing that fact for three business days, Tomasetta lost most everything to which he had devoted his life.  His educational achievements at MIT, his technical innovations for national defense programs, and his commercial successes at Vitesse all vanished in a moment.  The fact that he quickly confessed his wrongdoing and accepted full responsibility just days later salvaged nothing.

Tomasetta, along with his family, has suffered endless sleepless nights for the last seven-and-a-half years.  In addition to his public disgrace, Tomasetta has been the target of multiple investigations, civil lawsuits, and criminal prosecutions.  He has defended himself—at his own expense despite Vitesse's statutory indemnification obligation—in two lengthy criminal trials 2500 miles from his home.  He also personally contributed more than $2 million in cash and Vitesse stock in a global settlement of the private

shareholder actions.  And subject to the Court's approval, Tomasetta has agreed to a settlement of the SEC's parallel civil action, which includes the imposition of a 10-year officer and director bar.  Every development in these litigation proceedings garnered media attention, causing him further shame.

With the exception of his family's love, Tomasetta's actions on the night of April 12, 2006, cost him everything—his academic and professional esteem, all employment prospects, and his self-respect.  He has suffered enormously for conduct that he promptly disclosed and for which he took full responsibility mere days later.  Tomasetta's closing in his letter to this Court (attached hereto) aptly sums up the immense price that he has already paid and his deep regret:

> Because of an inexcusable lapse of judgment, I lost most everything that I had dedicated my life to developing and fostering.  My professional reputation was and remains in ruins.  The company that I founded and to which I devoted 22 years, during which I worked endless seven-day work weeks and missed countless family events, was forever taken from me.  I humiliated not only myself, but also my family.  It was painful and mortifying to explain what I had done to my wife, three adult children, mother, brother, and sister.  My children are often asked to explain my actions to their business associates and friends.  This is not the legacy that I wanted or intended to leave to my family.  With a few strokes on a keyboard and clicks of a mouse, I washed away all that I had worked so hard to achieve personally and professionally from 1975 to 2006.  My name will never again be associated with any technical or business achievement.  Rather, I will be remembered only for committing a crime.

> Your Honor, I made a terrible mistake that I deeply regret and for which there is no excuse.  I truly am sorry.  It was a mistake for which I took responsibility soon afterward and that I have never, not even through two criminal trials, denied.

We submit that seven-and-half years of uncertainty and shame, the substantial civil settlement and personally paid defense costs, and the emotional toll of sitting through two lengthy criminal trials collectively represent sufficient punishment for his criminal conduct.  Tomasetta respectfully joins in and requests that the Court adopt and follow the Probation Office's recommendation.

## VI.    CONCLUSION

For the foregoing reasons, Tomasetta respectfully requests that the Court impose the Probation Office's recommended sentence of a $30,000 fine.

Dated: Los Angeles, CA          MORRISON & FOERSTER LLP
       November 1, 2013
                                Dan Marmalefsky
                                555 West Fifth Street
                                Los Angeles, California 90013-1024
                                213.892.5200

                                Lawrence Gerschwer
                                Katie L. Viggiani
                                1290 Avenue of the Americas
                                New York, New York 10104-0050
                                212.468.8000

                                By:    /s/ Dan Marmalefsky
                                       Dan Marmalefsky
                                       *Attorneys for Defendant*
                                       *Louis Tomasetta*